## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COLEMAN DUPONT HOMSEY and )
ELLEN HOMSEY, )
           )
           Plaintiffs, )
           )    C.A. No. 07-338JJF
v. )
           )
VIGILANT INSURANCE COMPANY, )
           )
           Defendant. )


## HOMSEY PLAINTIFFS' ANSWERING BRIEF IN
## OPPOSITION TO VIGILANT'S PARTIAL MOTION TO DISMISS


JOHN SHEEHAN SPADARO, LLC

John S. Spadaro, No. 3155
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

Attorney for plaintiffs Coleman DuPont
Homsey and Ellen Homsey


June 28, 2007


1438

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS .................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................... 2

STATEMENT OF FACTS ...................................................................................................... 5

    A. The Parties ............................................................................................................... 5

    B. The Disputed Insurance Contract ........................................................................... 5

    C. The Underlying Forgeries and Thefts .................................................................... 7

    i. Losses Caused by Forgery of Checks ..................................................................... 7

    ii. Losses Caused By Theft of the Wilmington Trust Visa Card ................................. 7

    iii. Losses Caused By Theft of the AT&T Card ........................................................... 7

    D. The Basic Coverage Analysis ................................................................................. 8

    E. Vigilant's Claims Handling ..................................................................................... 8

ARGUMENT ....................................................................................................................... 12

I. THE APPLICABLE LEGAL STANDARDS ....................................................................... 12

II. THE PLEADING STANDARDS ..................................................................................... 13

III. THE HOMSEYS HAVE SUCCESSFULLY PLED A CLAIM
    FOR BAD FAITH BREACH OF CONTRACT ............................................................... 15

    A. Bad Faith is Easily Pled, and the Homseys Have Pled it In Spades ..................... 15

    B. The Homseys Need Not Plead Compliance With Conditions Precedent ............. 18

    C. Pleading Declaratory Judgment Is Not a Concession On the Merits .................... 19

IV. STATUTORY CONSUMER FRAUD NEED NOT BE PLED
    WITH PARTICULARITY ............................................................................................. 21

V. THE HOMSEYS HAVE PLED CONSUMER FRAUD WITH PLENTY
    PARTICULARITY ....................................................................................................... 25

CONCLUSION ...................................................................................................................28

## TABLE OF AUTHORITIES

*Alston v. Parker*, 363 F.3d 229 (3d Cir. 2004) ...................................................................12, 14, 17

*Casson v. Nationwide Ins. Co.*, 455 A.2d 361 (Del. Super. Ct. 1982) ...............................3, 18, 19

*Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96 (3d Cir. 1983) .............................25

*Colburn v. Upper Darby Township*, 838 F.2d 663 (3d Cir. 1988), *cert. denied*,
489 U.S. 1065 (1989) ................................................................................................................12

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................................12, 14

*Crowhorn v. Nationwide Mut. Ins. Co.*, C.A. No. 00C-06-010WLW,
2001 WL 695542 (Del. Super. Ct. Apr. 26, 2001) ....................................................................27

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,
624 A.2d 1199 (Del. 1993) .......................................................................................................2, 14

*Enzo Life Sciences, Inc v. Digene Corp.*, 295 F. Supp.2d 424 (D. Del. 2003)...........................12

*Fuller v. State Farm Fire & Cas. Co.*, 721 F. Supp. 1219 (M.D. Ala. 1989) ...............................17

*Mentis v. Delaware Amer. Life Ins. Co.*, C.A. No. 98C-12-023WTQ,
1999 WL 744430 (Del. Super. Ct. July 28, 1999).....................................................................27

*Pierce v. Int'l Ins. Co. of Ill.*, 671 A.2d 1361 (Del. 1996) ..........................................................16

*Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786
(3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985)...........................................................3, 4, 25, 27

*Sotelo v. DirectRevenue, LLC*, 384 F. Supp.2d 1219 (N.D. Ill. 2005)........................................24

*State v. Publishers Clearing House*, 787 A.2d 111 (Del. Ch. 2001).............................3, 14, 22, 24

*Stephenson v. Capano Development, Inc.*, 462 A.2d 1069 (Del. 1983) ........................................21

*Strohmaier v. Yemm Chevrolet*, 211 F. Supp.2d 1036 (N.D. Ill. 2001) .......................................24

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ....................................................................14

*Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254 (Del. 1995)......................................16

*Thomas v. Harford Mut. Inc. Co.*, C.A. No. 01C-01-046HDR, 2003 WL 220511
(Del. Super. Ct. Jan. 31, 2003), *as modified*, C. A. No. 01C-01-046HDR,
2003 WL 21742143 (Del. Super. Ct. July 25, 2003).................................................................27

*VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606 (Del. 2003) ............................... 16

*Zinser v. Rose,* 614 N.E.2d 1259 (Ill. App. Ct. 1993) .................................................. 24

## **Other Authorities**

6 *Del. C.* §2535 ...................................................................................... 24

Fed. R. Civ. P. 8 ................................................................................... 15

Fed. R. Civ. P. 9 ..................................................................................... 3

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) ........................................ 8

## NATURE AND STAGE OF THE PROCEEDINGS

This consumer coverage case was filed in Delaware's Superior Court on April 20, 2007.[1] The plaintiffs Coleman DuPont Homsey and Ellen Homsey proceed under a policy of insurance denominated as a "Chubb Masterpiece Policy," and sold to them by the defendant Vigilant Insurance Company (a Chubb affiliate). The Homseys seek, among other relief, a declaration that Vigilant must pay their legal obligations for losses caused by 1) thefts of certain credit cards and/or credit card numbers, up to a total of $10,000 for each such theft, and 2) the forging of certain checks, up to a total of $10,000 for each such check.

On May 29, 2007 Vigilant removed the case from Superior Court to this Court. Thereafter, on June 5, 2007, Vigilant sought to dismiss portions (but not all) of the complaint, including Counts III and IV (for bad faith breach of contract and statutory consumer fraud) and the Homseys' corresponding claims for punitive damages.

Through its motion, Vigilant makes three contentions. First, Vigilant contends that modern standards of notice pleading should be abandoned in bad faith cases. Second, Vigilant contends that claims for statutory consumer fraud are subject to the heightened pleading standard under Federal Rule of Civil Procedure 9(b). Finally, Vigilant contends that by seeking declaratory relief, the Homseys have compromised their bad faith claim on the merits.

This is the Homseys' answering brief.

---

[1] Vigilant's opening brief incorrectly identifies the date of filing as May 15, 2007.

1

## SUMMARY OF ARGUMENT

1. Vigilant repeatedly charges the Homseys with a failure to plead facts. But under time-honored standards of notice pleading, a plaintiff need never plead facts. This is because the pleadings merely serve the function of general notice-giving, while the facts are left to discovery. Nonetheless, the Homseys have pled abundant facts; and Vigilant's claim to the contrary borders on the frivolous.

2. Pleading breach of contract is a simple matter. It requires only that the plaintiffs plead the existence of a contract, its breach, and resulting damages.

3. Pleading bad faith breach of an insurance contract is likewise easily done. It requires only that the basic elements of breach of contract be pled, along with an allegation of unreasonable delay or denial of coverage. Indeed, the Delaware Supreme Court has expressly held that bad faith need not be pled with particularity. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1208 (Del. 1993) ("[W]e hold that [plaintiff] is not required to plead bad faith with particularity.")

4. The Homseys have easily (if not overwhelmingly) succeeded in pleading bad faith breach of contract. They have pled that Vigilant ignored the claim for many months, and offered no payment whatever for a full year -- and this on a claim that, according to Vigilant, has just a $10,000 value. This, they contend, is *unreasonable delay*. The Homseys have further pled that Vigilant willfully ignored the plain meaning of its own insurance contract, treating the term "any" -- a term understood even by toddlers -- as though it meant "all," simply to cheat the Homseys of the "masterpiece" coverage for which they paid. This constitutes *unreasonable denial*. Since the unreasonable delay or denial of coverage is the very definition of bad faith, the Homseys have clearly pled viable bad faith claims. To dismiss such claims at the pleading stage

would not only set pleading standards on their head, but would constitute a new low in consumer protection.

5. Vigilant's reliance on *Casson v. Nationwide Ins. Co.*, 455 A.2d 361 (Del. Super. Ct. 1982) is misplaced. *Casson* was decided on summary judgment, not at the pleading stage. *Casson* does not remotely require that the Homseys plead compliance with conditions precedent; rather, it requires that proof of such compliance be established on the merits -- that is, at summary judgment or trial. Proving such compliance, meanwhile, should be a simple matter: Vigilant would not have offered $10,000 on the claim if, for example, the Homseys had never paid their premiums.

6. Vigilant's assertion that the Homseys have conceded the bad faith issue makes no sense. When the Homseys plead that an "actual controversy of a justiciable nature" exists, they are merely saying that the parties are in dispute. They are not saying, and cannot reasonably be understood to say, that Vigilant's part in the dispute is a reasonable one.

7. No heightened pleading standard applies to claims under Delaware's Consumer Fraud Act. *State v. Publishers Clearing House*, 787 A.2d 111, 114-17 (Del. Ch. 2001) (rejecting any particularity requirement in the pleading of statutory consumer fraud). Though the Homseys pled consumer fraud in abundant detail, that pleading is not subject to the particularity requirement under Federal Rule of Civil Procedure 9(b).

8. If a particularity requirement did apply to the Homseys' consumer fraud claim -- though *Publishers Clearing House* holds that it does not -- it would be easily met under the controlling standards in *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985). *Seville Indus. Machinery* warns against a "too narrow" approach to the particularity requirement, urging instead that allegations be read

with an eye toward the "general simplicity and flexibility" contemplated by modern forms of pleading. *Seville Indus. Machinery*, 742 F.2d at 791. The Homseys, meanwhile, have pled a detailed history of the facts underlying Vigilant's misrepresentations; the source of the misrepresentations; the precise misrepresentations themselves, and so on.

8. Vigilant's claim of a lack of detail in the Homseys' pleading of consumer fraud should thus be rejected both procedurally and as a matter of substance. As with their bad faith claim, the Homseys' claim for consumer fraud serves only the purpose of general notice-giving. Here again, the facts must be left to discovery. Yet the Homseys have pled consumer fraud in abundant detail.

## STATEMENT OF FACTS

### A. The Parties

Plaintiffs Coleman DuPont Homsey and Ellen Homsey are natural persons and husband and wife. They reside at 466 Snuff Mill Lane, Hockessin, Delaware 19707. Compl. ¶1. The disputed insurance policy expressly extends coverage to Mr. Homsey as "the person named in the [policy's] Coverage Summary," along with "a spouse who lives with that person" -- meaning, in this instance, plaintiff Ellen Homsey. Mrs. Homsey is thus an insured person under the disputed policy. *Id.* ¶7.

The defendant Vigilant Insurance Company is a New York corporation with a principal place of business in Warren, New Jersey. *Id.* ¶5. It is engaged in the business of insurance and regularly sells insurance in Delaware. *Id.*

### B. The Disputed Insurance Contract

Vigilant issued to Mr. Homsey its "Chubb Masterpiece Policy" no. 12680929-01 (the "Policy"). The Policy has been in effect at all times relevant to this action. *Id.* ¶6. It provides a variety of coverages, including Deluxe House Coverage, Standard Contents Coverage and Personal Liability Coverage. *Id.* ¶7.

Beginning at page "T-1" the Policy sets forth the terms and conditions of its Personal Liability Coverage. *Id.* ¶8. At page T-4 the Policy sets forth certain "Extra Coverages" as part of the Personal Liability Coverage section. Among these "Extra Coverages" is one titled "Credit cards, forgery and counterfeiting," which appears at page T-6 of the Policy. *Id.* ¶10. This coverage -- on which the entire litigation hinges -- provides as follows:

**Credit cards, forgery, and counterfeiting**

We cover a covered person's legal obligation, up to a total of $10,000 for:

· loss or theft of a credit or bank card issued to you or a family member, provided that all the terms for using the card are complied with;

· loss caused by theft of a credit card number or bank card number issued to you or a family member when used electronically, including use on the Internet, provided that all the terms for using the card are complied with;

· loss caused by forgery or alteration of *any check* or negotiable instrument; or

· loss caused by accepting in good faith any counterfeit paper currency.

We will defend a claim or suit against you or a family member for loss or theft of a credit card or bank card. We have the option to defend a claim or suit against you or a family member (or against a bank, with respect to this coverage) for forgery or counterfeiting.

We may investigate, negotiate and settle any such claim or suit at our discretion. Our obligation to defend ends when our payment for the loss equals $10,000.

In the event of a claim, the covered person shall comply with the duties described in Policy Terms, Property Conditions, Your duties after a loss and Policy Terms, Liability Conditions, Your Duties after a loss. In addition, the covered person shall notify the credit card service company or the issuing bank.

This coverage does not apply to losses covered under Identity fraud.

*Id.* ¶10 (emphasis added).

Under any fair reading of this language, the policy promises up to $10,000 for "loss caused by forgery . . . of any check," and loss caused by theft of a credit card or credit card number. The central issue, then, is whether Vigilant may properly rewrite this language to limit

its liability to $10,000 for a) *all* losses caused by forgery of *all* checks (as opposed to "any check"); and b) *all* losses caused by theft of *all* credit cards (as opposed to "a credit card").

## C. The Underlying Forgeries and Thefts

During 2000 Mr. and Mrs. Homsey opened a "Capital Advantage Checking Account" with Wilmington Trust Company. In addition, Mr. and Mrs. Homsey were issued a Wilmington Trust Visa credit card. Compl. ¶11. At times relevant to this lawsuit, Mr. and Mrs. Homsey have also been holders of an AT&T Universal credit card. *Id.* ¶12.

### i. Losses Caused By Forgery of Checks

Mr. and Mrs. Homsey have suffered multiple losses as the result of the forging of checks from the Wilmington Trust checking account. Specifically, the complaint alleges that their adult son's ex-wife forged multiple checks from that account, and presented them for payment during 2003 and 2004. *Id.* ¶13. These forged checks include individual checks written for as little as $300, or as much as $35,000. *Id.* ¶14. The total amount of forged checks exceeds $218,000. *Id.* ¶15.

### ii. Losses Caused By Theft of the Wilmington Trust Visa Card

Mr. and Mrs. Homsey have suffered multiple losses due to multiple thefts of their Wilmington Trust Visa card and/or thefts of the corresponding credit card number. The complaint alleges that their son's ex-wife misappropriated the card (and/or the card number) on several occasions from 2003 through 2005. *Id.* ¶17. These losses exceed $26,000. *Id.* ¶18.

### iii. Losses Caused By Theft of the AT&T Card

Mr. and Mrs. Homsey have also suffered multiple losses from multiple thefts of their AT&T card and/or card number. The complaint avers that their son's ex-wife misappropriated

the AT&T card (and/or card number) on multiple occasions during 2004 and 2005, with losses in excess of $13,000. *Id.* ¶¶20-21.

### D. The Basic Coverage Analysis

As noted above, a reasonable reading of the Policy's "Credit cards, forgery and counterfeiting" coverage requires Vigilant to pay up to $10,000 for each of the multiple checks forged on their checking account, and each of the multiple thefts of credit cards and/or credit card numbers. For example, the promise to pay up to $10,000 for "loss caused by forgery . . . of *any check*" cannot reasonably justify the payment of just $10,000 for *all* forgeries of *all* checks. This is a natural function of the meaning of "any," which (as even small children understand) connotes *one* and not *all*:

> Any . . . *adj* [ME, fr. OE *aenig*; akin to OHG *einag* any, OE *an* one
> — more at ONE] (bef. 12c) **1** : one or some indiscriminately of
> whatever kind: **a. :** one or another taken at random {ask ~ man
> you meet} . . . .

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 53 (10th ed. 1993).

When a first grader is asked by a magician to *Pick a card, any card*, he or she thus understands immediately that just a single card, and not the entire deck, should be selected. By the same token, a contractual promise to pay up to $10,000 for forgery of *any check* is not a $10,000 ceiling for all checks, but only for one check at a time.

### E. Vigilant's Claims Handling

By letter dated December 29, 2005 and sent by hand delivery and FedEx from the Homseys' attorney to Weymouth & Smith Insurance, Inc. (Vigilant's agent for receipt of notice of claims under the Policy), the Homseys tendered to Vigilant their claim for coverage under the "Credit cards, forgery, and counterfeiting" coverage section. Compl. ¶31. By that same letter, the Homseys provided to Vigilant's agent a detailed set of documents on the forgeries and thefts.

*Id.* A comparison of the pleadings shows that for a full year thereafter, Vigilant essentially

ignored the claim -- barely even communicating with the Homseys' attorney, and never offering

a dime in payment of the claim:

> Compl. ¶33.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during January 2006.

> **Ans.** ¶ 33.  Defendant admits the averment in Paragraph 33.

***

> Compl. ¶35.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during February 2006.

> **Ans.** ¶ 35.  Defendant admits the averment in Paragraph 35.

> Compl. ¶36.  Vigilant did not communicate with the Homseys or their attorney regarding the tendered claim for "Credit card, forgery, and counterfeiting" coverage during March 2006.

> **Ans.** ¶ 36.  Defendant admits the averment in Paragraph 36.

> Compl. ¶37.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during March 2006.

> **Ans.** ¶ 37.  Defendant admits the averment in Paragraph 37.

***

> Compl. ¶39.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during April 2006.

> **Ans.** ¶ 39.  Defendant admits the averment in Paragraph 39.

> Compl. ¶40.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during May 2006.

> **Ans.** ¶ 40.  Defendant admits the averment in Paragraph 40.

Compl ¶41.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during June 2006.

**Ans. ¶ 41.**  Defendant admits the averment in Paragraph 41.

Compl. ¶42.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during July 2006.

**Ans. ¶ 42.**  Defendant admits the averment in Paragraph 42.

Compl. ¶43.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during August 2006.

**Ans. ¶ 43.**  Defendant admits the averment in Paragraph 43.

Compl. ¶44.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during September 2006.

**Ans. ¶ 44.**  Defendant admits the averment in Paragraph 44.

Compl. ¶45.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during October 2006.

**Ans. ¶ 45.**  Defendant admits the averment in Paragraph 45.

Compl. ¶46.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during November 2006.

**Ans. ¶ 46.**  Defendant admits the averment in Paragraph 46.

*Cf.* Compl. ¶¶33, 35-37, 39-46 *with* Answer ¶¶33, 35-37, 39-46 (D.I. 5) (addressing allegations of Vigilant's claims handling).

Having remained virtually silent and almost entirely inactive on the claim for a full year, Vigilant then tendered just $10,000 to the Homseys for their six-figure claim.  Compl. ¶47.  A letter accompanying this payment advised that according to Vigilant, $10,000 represented some

allegedly "maximum payment" under the "Credit cards, forgery and counterfeiting" coverage. *Id.*

Vigilant thus contends that its contractual promise to pay up to $10,000 for forgery of any check allows it to pay just $10,000 for forgery of scores of checks. Similarly, it contends that its promise to pay up to $10,000 for theft of a credit card or credit card number allows it to pay just $10,000 for multiple thefts of two separate credit cards and credit card numbers. Remarkably, it took Vigilant a full year to formulate this position.

# ARGUMENT

## I. THE APPLICABLE LEGAL STANDARDS

The standards for disposing of motions to dismiss are at once firmly established and highly favorable to plaintiffs:

> In examining a complaint, the Court assumes the truth of all well-pled allegations and "construes the complaint in the light most favorable to the plaintiff" determining, "whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief."

*Enzo Life Sciences, Inc v. Digene Corp.*, 295 F. Supp.2d 424, 426-27 (D. Del. 2003) (quoting *Colburn v. Upper Darby Township*, 838 F.2d 663, 665-66 (3d Cir. 1988), *cert. denied*, 489 U.S. 1065 (1989)). *Accord, Alston v. Parker*, 363 F.3d 229, 233 (3d Cir. 2004) (to same effect). In weighing the complaint's sufficiency, the Court must follow "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (citations omitted).

## II. **THE PLEADING STANDARDS**

Litigants sometimes criticize their adversary's pleadings as too spare, and Vigilant levels

that criticism here. It takes this position despite the fact that the complaint is 72 paragraphs long;

recites a detailed history of both the underlying claim and Vigilant's handling thereof; appends

hundreds of pages of documentary evidence detailing the underlying claim; and sets forth four

separate counts in careful detail.[2] For example, Vigilant says that the Homseys "*offer no facts*

regarding their compliance" with conditions precedent. D.I. 4 at 5-6 (emphasis added). It says

that the complaint "*fails to state facts* alleging that Vigilant's refusal to . . . pay Plaintiffs in

excess of $10,000 was clearly without reasonable justification." *Id.* at 7 (emphasis added). It

asserts that "there is *no statement of fact* in Plaintiffs' Complaint that specifies" bad faith. *Id.*

(emphasis added). On the consumer fraud count, it complains that "[t]here is *no statement of*

*fact*" as to a specific representation. *Id.* at 8 (emphasis added).

A central question on this motion, then, is whether the targeted counts may properly be

dismissed for an alleged failure to plead facts. Fortunately, that question has been answered

decisively, and repeatedly, by the federal courts:

> The respondents also argue that the complaint failed to set forth
> specific facts to support its general allegations of discrimination
> and that its dismissal is therefore proper. The decisive answer to
> this is that *the Federal Rules of Civil Procedure do not require a*
> *claimant to set out in detail the facts upon which he bases his*
> *claim.* To the contrary, all the Rules require is "a short and plain
> statement of the claim" that will give the defendant fair notice of
> what the plaintiff's claim is and the grounds upon which it rests.
> *** Such simplified "notice pleading" is made possible by the
> liberal opportunity for discovery and the other pretrial procedures
> established by the Rules to disclose more precisely the basis of

---

[2]   In its opening brief, Vigilant mistakenly says that the complaint contains five counts. D.I. 4 at
1. In fact, the complaint sets forth four counts, for declaratory judgment, breach of contract, bad
faith breach of contract and statutory consumer fraud.

> both claim and defense and to define more narrowly the disputed
> facts and issues.

*Conley*, 355 U.S. at 47-48 (quoting Fed. R. Civ. P. 8(a)) (emphasis added). In other words, "a

plaintiff need not plead facts." *Alston*, 363 F.3d at 233 n.6. The pleadings serve merely the

function of general notice-giving, and the facts are left to discovery. *Swierkiewicz v. Sorema*

*N.A.*, 534 U.S. 506, 512-13 (2002); *Enzo Life Sciences*, 295 F. Supp.2d at 426-27.

But let us move from the general to the specific: settled Delaware law holds that neither

bad faith nor statutory consumer fraud are subject to any heightened pleading standard.

Particularity is not required for either claim, both of which may be pled under the liberal notice-

giving regime of modern forms of pleading. *Desert Equities, Inc. v. Morgan Stanley Leveraged*

*Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993) ("[W]e hold that [plaintiff] is not

required to plead bad faith with particularity"); *State v. Publishers Clearing House*, 787 A.2d

111, 114-17 (Del. Ch. 2001) (statutory consumer fraud need not be pled with particularity).

Of course, the suggestion that the Homseys have "failed to plead facts" is nothing short of

fantastic. Indeed (and as shown below), it strains credulity to speak of such a detailed pleading

in terms of mere notice-giving. But notice-giving, and not the pleading of "specific facts," is all

that is required. For Vigilant to suggest that the Homseys' complaint has deprived it of "fair

notice of what the . . . claim is and the grounds upon which it rests" is simply outlandish.

In short, the Homseys' complaint has been pled with enough detail to choke a horse. But

under well established standards of pleading, it need not have been so pled. Because "a plaintiff

need not plead facts," *see Alston*, 363 F.3d at 233 n.6, Vigilant's motion -- based as it is on the

repeated refrain that the Homseys have failed to plead facts -- must fail.

### III. THE HOMSEYS HAVE SUCCESSFULLY PLED A CLAIM FOR BAD FAITH BREACH OF CONTRACT

#### A. Bad Faith is Easily Pled, and the Homseys Have Pled It In Spades

Vigilant's approach to the pleading of bad faith breach of contract is so riddled with error that in rebutting it, one hardly knows where to begin. But having reviewed above the liberal pleading standards that govern this motion, perhaps Vigilant's repeated demand for "particularity" is a good place to start.

Again, modern standards of notice pleading require (with limited exceptions) just "a short and plain statement of the claim showing that the pleader is entitled to relief," coupled with "a demand for judgment for the relief the pleader seeks." Fed. R. Civ. P. 8(a). The exceptions are found in Rule 9, which addresses the pleading of special matters. Under Rule 9(b), allegations of fraud or mistake must be stated with particularity. But neither bad faith breach of contract, nor any other species of breach, is subject to Rule 9(b)'s particularity requirement. That is why Vigilant fails to cite even a single authority that remotely supports a heightened pleading standard for bad faith claims.

To successfully plead breach of contract, meanwhile, one need only plead the existence of a contract, its breach, and damages:

> In alleging a breach of contract, a plaintiff need not plead specific facts to state an actionable claim. Rather, a complaint for breach of contract is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement must only give the defendant fair notice of a claim and is to be liberally construed.
>
> ***
>
> In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the

15

breach of an obligation imposed by that contract; and third, the
resultant damage to the plaintiff.

*VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611-12 (Del. 2003) (citations

omitted).

Bad faith breach of contract is likewise easy to plead. As the Delaware Supreme Court

has stated, an insurer "violates the duty of good faith and fair dealing when it delays or

terminates payment of a claim in bad faith." *Pierce v. Int'l Ins. Co. of Ill.*, 671 A.2d 1361, 1366

(Del. 1996) (citing *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 264 (Del. 1995)).

Thus, "this duty would create liability on the part of [an insurer] for unreasonable delay in

recognizing [a] rightful claim." *Pierce*, 671 A.2d at 1366. *Accord, Tackett*, 653 A.2d at 264

(bad faith arises where insurer's denial of benefits is without reasonable basis).

The Homseys' complaint alleges all this and more. It alleges the existence of the

insurance contract, identifying it by name and number while also describing its content and

quoting at length from its relevant terms. Compl. ¶¶6-10. The complaint also alleges the

contract's breach, detailing not only the underlying forgeries and thefts but also the Homseys'

coverage analysis and Vigilant's departure from the same. *Id.* ¶¶11-51. The complaint further

makes clear -- not just when read in a light most favorable to the Homseys, but in any neutral and

objective light -- the precise nature of Vigilant's bad faith:

> 47. By letter dated December 4, 2006 (nearly one full year after
> Mr. and Mrs. Homsey tendered to Vigilant their claim for coverage
> under the Policy's "Credit cards, forgery, and counterfeiting"
> coverage section) Vigilant tendered to Mr. Homsey the amount of
> $10,000, contending that this amount represents some "maximum
> payment" for "Credit cards, forgery, and counterfeiting" coverage.
> Vigilant has thus failed and refused to pay to Mr. and Mrs.
> Homsey the full value of their claim, and has instead adopted a
> construction of the "Credit cards, forgery, and counterfeiting"
> coverage section that is designed to minimize Vigilant's financial
> liability on the claim.

16

48.  Vigilant's construction of the "Credit cards, forgery, and counterfeiting" coverage section is particularly unreasonable as applied to Mr. and Mrs. Homsey's claim for loss caused by forgery.  That is, the Policy expressly promises coverage up to $10,000 for loss caused by "forgery or alteration of any check . . . ."  The reference to "any check" means *any one check* or *any single check*.  As a matter of standard English usage, it does not permit Vigilant to limit coverage to $10,000 for an aggregated group of multiple checks.

49.  Vigilant's handling of Mr. and Mrs. Homsey's claim for "Credit cards, forgery, and counterfeiting" coverage has thus been wrongful in two fundamental respects: *first, by virtue of the appalling delays in which Vigilant has engaged; and second, by virtue of its refusal to adopt a reasonable construction of its own Policy language.*

*Id.* ¶¶47-49 (emphasis added).

These allegations not only satisfy the actual (notice-giving) standard; they even satisfy Vigilant's fictitious (heightened) pleading standard.  Through these allegations Vigilant knows the precise insurance contract sued upon; the precise terms under which the claims are made; a detailed history of those claims; and the precise conduct that (according to the Homseys) constitutes unreasonable delay and denial of coverage.  Under the time-honored standards of liberal pleading that control this motion, it is simply unthinkable that the Homseys' bad faith count would be dismissed for lack of detail.  *See Alston*, 363 F.3d at 233 n.6 (confirming again that "a plaintiff need not plead facts.")

Finally, we note Vigilant's citation of *Fuller v. State Farm Fire & Cas. Co.*, 721 F. Supp. 1219 (M.D. Ala. 1989) for the proposition that bad faith cannot be found "where the [insurance] company's interpretation of its policy is reasonable and not contrary to any existing jurisprudence . . . ."  D.I. 4 at 6.  If this statement of Alabama law holds true in Delaware, then the converse must also be true: that the insurer is not free to indulge unreasonable interpretations of its policy

17

language, in contravention of settled standards of contract construction, without committing bad faith.  This is an important point, because here the Homseys have pled (and, if given the opportunity, will prove) that their interpretation of the word "any" as it appears in the Policy's reference to "any check" is reasonable, while Vigilant's is grossly unreasonable -- and even dishonest:

> By valuing Mr. and Mrs. Homsey's claim for "Credit cards, forgery and counterfeiting" coverage at just $10,000, Vigilant has necessarily construed the reference to "any check" (within the "Credit cards, forgery, and counterfeiting" coverage section) to mean "all aggregated checks."  ***This is a willfully perverse and unreasonable construction, and contrary to the plain meaning of "any" as commonly understood by ordinary speakers of standard English (including small children).***  For Vigilant to adopt such a construction as a means of avoiding its coverage obligations is willful, dishonest, and without reasonable justification.

Compl. ¶63 (emphasis added).  This is, again, a well pled allegation of bad faith even by Vigilant's crabbed standards.

## B.  **The Homseys Need Not Plead Compliance With Conditions Precedent**

Vigilant says that in order to successfully plead bad faith, a plaintiff must also plead satisfaction of conditions precedent.  But here again Vigilant conflates that which must be pled with that which must be proven.

Vigilant's sole authority for the supposed requirement of pleading conditions precedent is *Casson v. Nationwide Ins. Co.*, 455 A.2d 361 (Del. Super. Ct. 1982).  But *Casson* says nothing of the kind.  Rather, *Casson* requires that the insured be prepared to prove (if necessary) the satisfaction of conditions precedent ***on the merits***:

> In order for an insured to establish the contractual liability of an insurer for an alleged breach of an insurance agreement, he must show that (1) there was a valid contract of insurance in force at the time of the loss, (2) the insured has complied with all conditions

precedent . . . and (3) the insurer has failed to make payment as
required under the policy.

*Casson*, 455 A.2d at 365. *Casson* thus deals with the ultimate proofs to be "established" at trial,

and *not* the notice-giving function to be served by the pleadings. Small wonder that *Casson* was

decided not on a motion to dismiss, but on cross-motions for summary judgment. *Id.* at 363

(noting parties' cross-motions under Superior Court Civil Rule 56).

Nor is there any logic to Vigilant's argument. After all, the passage in *Casson* on which

Vigilant relies speaks in terms of the proof needed to establish breach of contract -- that is, not

bad faith breach of contract, but breach of contract generally. If *Casson* truly required that

satisfaction of conditions precedent be pled in the complaint, why then did Vigilant move to

dismiss only the bad faith claim? Why concede (as it has) the successful pleading of breach of

contract? If Vigilant were correct, would not both claims fail?

The answer is simple: *Casson* imposes no heightened pleading standard on any breach of

contract claim, bad faith or otherwise. The Homseys have pled bad faith in abundant detail; and

the supposed failure to plead satisfaction of conditions precedent is no true "failure" at all.

Lastly, we should note that satisfaction of conditions precedent is directly implied by the

Homseys' pleading. As noted above, the complaint directly alleges that Vigilant extended

coverage for the disputed claims (albeit in a grossly insufficient dollar amount). By conceding

that the claims are covered, Vigilant also conceded the satisfaction of conditions precedent.

## C.  Pleading Declaratory Judgment Is Not A Concession On the Merits

In a bizarre turn, Vigilant argues that by seeking declaratory relief -- or, more

specifically, alleging (as part of the claim for declaratory relief) the existence of an "actual

controversy of a justiciable nature" -- the Homseys have conceded the bad faith issue. Vigilant

cites no authority for the proposition that the existence of a ripe and justiciable dispute precludes the pleading of a bad faith claim; and clearly no such authority exists.

To the extent we can decipher Vigilant's argument, it appears to equate "actual controversy" with "*bona fide* dispute." But there is no basis in either law or English usage for Vigilant's odd equation. Indeed, entire World Wars have been fought over matters of "actual controversy," but this does not mean that the French regarded the Kaiser's world view as *bona fide*, or that the Allies felt that Hitler had some arguable right to European conquest.[3]

But to clarify: in the context of declaratory relief, an allegation of "actual controversy" merely asserts that the dispute is real, and not hypothetical; that it entails real, practical and fairly immediate consequences -- in other words, that the Court is not being asked to issue an advisory opinion. In this context, "actual" serves as antonym to "hypothetical" or "conjectural." It is not synonymous with *bona fide*; and thus "actual controversy" does not mean "good-faith dispute."

Even were this not so, the Homseys' allegation would necessarily be read (under a liberal pleading standard) as a pleading in the alternative -- such pleading being another staple of the modern forms of pleading that Vigilant overlooks. But as with so much of Vigilant's motion, the suggestion that the Homseys have conceded the bad faith issue by alleging the existence of an actual controversy borders on the frivolous.

---

[3]  We speak here only by analogy, and not to suggest any moral equivalence between insurance companies and dictators.

## IV. STATUTORY CONSUMER FRAUD NEED NOT BE PLED WITH PARTICULARITY

In a highly simplistic analysis, Vigilant argues that:

> By its very title, the "Delaware Consumer Fraud Act" requires an act of fraud. Acts of fraud must be pled specifically.

D.I. 4 at 8. In fact, the Delaware Supreme Court has long held that statutory consumer fraud does *not* require proof of common law fraud; and the Chancery Court has held that consumer fraud need not be pled with particularity.

The essential authority on the differences between the Delaware Consumer Fraud Act and common law fraud is *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069 (Del. 1983). In *Stephenson*, the Delaware Supreme Court enumerated these differences, holding that unlike common law fraud, statutory consumer fraud requires no proof of scienter, justifiable reliance or intent to induce reliance:

> The Consumer Fraud Act differs from the traditional legal and equitable actions [that is, common law fraud and equitable fraud] in three ways. First, the definition of unlawful practices [under the statute] incorporates the principle that a negligent misrepresentation is sufficient to violate the statute. The defendant need not have intended to misrepresent or to make a deceptive or untrue statement. *** Second, the plaintiff traditionally had to demonstrate that he reasonably or justifiably relied on the defendant's statements. An unlawful practice under section 2513(a), however, is committed regardless of actual reliance by the plaintiff. Finally, any misrepresentation had to be made with the intent to induce action or inaction by the plaintiff. The statute does not require proof of such intent.

*Stephenson*, 462 A.2d at 1074 (citations omitted).

In other words, statutory consumer fraud bears little resemblance to common law fraud. Vigilant's assertion that a violation of the statute "requires an act of fraud" is flatly wrong.

Equally wrong is Vigilant's claim that statutory consumer fraud must be pled with particularity. Indeed, in advancing this argument, Vigilant neglected to alert the Court to the decisive ruling on point: the reported (and analytically detailed) decision in *State v. Publishers Clearing House*, 787 A.2d 111 (Del. Ch. 2001). There Vice-Chancellor Lamb concluded that the essential features of the private right of action under Delaware's Consumer Fraud Act -- its historical origins, its legal elements, and its statutory purpose -- show that Rule 9(b)'s particularity requirement does not apply. The Vice-Chancellor's scholarly analysis deserves to be quoted at length:

> The State responds that the word "fraud" in the Consumer Fraud Act and the word "deceptive" in the Uniform Deceptive Trade Practices Act are merely descriptive terms and do not import into claims brought under those acts the elements of common law fraud. The State argues that "impos[ing] strict pleading requirements to consumer protection enforcement cases is contrary to law, and is inconsistent with the remedial objectives of these laws." It also argues that Rule 9(b)'s special pleading requirement be found inapplicable to an enforcement proceeding brought by the Attorney General under the CFA and the UDTPA.
>
> I recognize, as PCH argues, that other cases have applied Superior Court Rule 9(b)'s pleading standard to suits brought under the CFA or the UDTPA. Nevertheless, those cases did so without any explicit analysis of whether or not it was the proper standard to apply. For this reason, I do not regard those cases as authoritative on the question here presented. Moreover, neither the Delaware Supreme Court nor the General Assembly has spoken directly on the issue. Thus, I will treat it as one of first impression.
>
> Rule 9(b) is an exception to the liberal "notice pleading" standard applicable to most pleadings under Rule 8. Legal scholars have noted that Rule 9(b) "probably originated in equity pleading and reflected a reluctance to upset or investigate judgments, settled accounts and other completed transactions." In its modern form, the rule's purpose is described by the Delaware Supreme Court as " 'serv[ing] to discourage the initiation of suits brought solely for their nuisance value, and safeguard[ing] potential defendants from frivolous accusations of moral turpitude.' " In my view of this history and purpose, the court in *John P. Villano, Inc. v. CBS, Inc.*,

refused to apply Federal Rule of Civil Procedure 9(b) to a federal statutory claim of false advertising because "nothing in the language or history of rule 9(b) suggests that it is intended to apply, willy-nilly, to every statutory tort that includes an element of false statement."

The Delaware Supreme Court showed a similarly nuanced approach in deciding whether Rule 9(b)'s particularity requirements should be applied to an action for bad faith in *Desert Equities*. Noting that the essential elements of a bad faith claim bore little resemblance to the elements of a claim of fraud, the Supreme Court concluded that pleading with particularity was not required in that case. Applying the same mode of analysis here leads me to conclude that claims by the Attorney General brought under the CFA or the UDTPA are not sufficiently analogous to claims for common law fraud to justify the application of Rule 9(b)'s heightened pleading standard.

Common law fraud differs remarkably from "statutory fraud" under the CFA. Both the CFA and the UDTPA stem from the 1914 Federal Trade Commission Act and its later amendment in 1938. They are consumer protection laws and remedies for unfair competition, not simply codified versions of common law fraud. Referring to the policy behind the CFA, the Delaware Supreme Court stated in *Brandywine Volkswagen, Ltd. v. State, Dept. of Consumer Affairs*, "An obvious objective of the law is to raise the standards which the public has right to expect from all business enterprises . . . ."

***

Though sometimes referred to as "statutory fraud," an action under the CFA is not a "fraud" action in any ordinary sense.

***

Thus, the two actions are quite distinct. Scienter, intent to induce action, reliance, and damages are conspicuously missing from the elements of the CFA. "The [only] common law thread which runs through actions of fraud or deceit at law . . . and actions under 6 *Del. C.* §2513 is the making of a false or misleading statement or the concealment, suppression or omission of information, thereby creating a condition of falseness."

***

> I also take note of the legislature's intent that both of these acts be
> literally construed.
>
> ***
>
> I conclude that the remedial goals of these two acts are inconsistent
> with the application of the particularized pleading requirements of
> Rule 9(b) to enforcement actions brought by the Attorney General
> to protect the consuming public. Certainly, equity's original
> reluctance to upset legal judgments on grounds of fraud or mistake
> is irrelevant in such an action. Similarly, claims under the two acts
> do not involve charges of moral turpitude and are unlikely to be
> brought by the State for purposes of harassment. Thus, none of the
> purposes served by application of that rule to charges of fraud is
> implicated by claims under either statute.

*Publishers Clearing House*, 787 A.2d at 114-17 (citations and footnotes omitted).

It bears noting, too, that the Consumer Fraud Act is to be construed "to make uniform the law of those states which enact it." 6 *Del. C.* §2535. It is thus significant that federal and state courts have held that an identical Illinois statute is not subject to the particularity requirement. *Sotelo v. DirectRevenue, LLC*, 384 F. Supp.2d 1219, 1233-34 (N.D. Ill. 2005) (holding that Illinois Consumer Fraud Act "is not subject to the heightened pleading [standard] of Rule 9(b)"); *Strohmaier v. Yemm Chevrolet*, 211 F. Supp.2d 1036, 1043-44 (N.D. Ill. 2001) (same); *Zinser v. Rose,* 614 N.E.2d 1259, 1263-64 (Ill. App. Ct. 1993) (same).

Though the Homseys pled consumer fraud in abundant detail, that pleading is not subject to Rule 9(b)'s particularity requirement. Here again, Vigilant's arguments are an invitation to error.

## V. THE HOMSEYS HAVE PLED CONSUMER FRAUD WITH PLENTY PARTICULARITY

As shown above, the Homseys' pleading of statutory consumer fraud serves only the purpose of general notice-giving; it is not subject to any particularity requirement. But it should be noted that particularity is not, as Vigilant would have it, some unattainable ideal of absolute specificity -- a thing dreamt of, but rarely achieved in practice. Rather, it is a flexible (and fairly liberal) standard, and one that the Homseys' pleading easily meets. *See Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985).

In *Seville* the Third Circuit addressed a district court's dismissal of a fraud count for lack of particularity. Its analysis is instructive:

> We approach this question mindful of our recent admonition that in applying Rule 9(b), "focusing exclusively on its 'particularity' language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" We conclude that the district court subjected Seville's allegations of fraud to too strict a scrutiny. Rule 9(b) requires plaintiffs to plead with particularity the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them. *** The complaint [here] sets forth the nature of the alleged misrepresentations, and while it does not describe the precise words used, each allegation of fraud adequately describes the nature and subject of the alleged misrepresentation.

*Seville Indus.*, 742 F.2d at 791 (quoting *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 100 (3d Cir. 1983)).

If Vigilant were correct in positing a particularity requirement for the pleading of either bad faith or statutory consumer fraud, then *Seville*'s analysis would obviously be controlling.

25

Yet Vigilant makes no mention of the case. Perhaps more importantly, the intellectual flavor of *Seville* is altogether missing from Vigilant's motion. There the reader will find no warning against any "too narrow approach" to the particularity requirement; no reference to avoiding "too strict a scrutiny" of fraud allegations; and certainly no mention of the "simplicity and flexibility contemplated by the rules." Instead, Vigilant defines particularity by its own *ipse dixit*: particularity is lacking wherever and whenever Vigilant says so.

But applying the *Seville* standard -- which would actually control were particularity even required here -- we see that the Homseys' pleading is plenty particular. Again, the Homseys pled in detail the relevant policy-related information, including the specific terms at issue (which the Homseys quoted at length). They alleged a detailed history of each underlying claim, recounting the historical origins of their checking and credit cards accounts, and the history of the forgeries and thefts themselves. As noted above, they attached to the complaint hundreds of relevant checking account and credit card records. They then specified the misrepresentations that underlie the consumer fraud claim, and the precise source of their falsity:

> 67. The Policy contains Vigilant's promise of good faith and fair dealing in the handling of claims thereunder.
>
> 68. By selling and issuing the Policy, Vigilant promised to handle claims thereunder in good faith, and to deal fairly with Mr. and Mrs. Homsey.
>
> 69. By selling and issuing the Policy, Vigilant promised to provide "Credit card, forgery and counterfeiting" coverage consistent with the Policy's terms.
>
> 70. By engaging in the conduct alleged in paragraphs 31 through 49 above, Vigilant has created a condition of falsity in the promises it made in the course of the Policy's sale.
>
> 71. Vigilant's conduct, as alleged above, is in violation of 6 *Del. C.* §2513.

72. As a direct result of Vigilant's violation of *6 Del. C.* §2513, plaintiffs Coleman DuPont Homsey and Ellen Homsey have suffered and will suffer injury as heretofore alleged.

Compl. ¶¶67-72.[4]

In short, no particularity requirement applies to any aspect of this complaint, including statutory consumer fraud. But because the Homseys' complaint "sets forth the nature of the alleged misrepresentations," it easily meets the flexible standard under *Seville*. *Seville Indus. Machinery Corp.*, 742 F.2d at 791.

Finally, we note that Delaware's Superior Court has repeatedly held that where a claim for bad faith breach of contract is successfully pled against an insurer, the insured may also plead violation of the Consumer Fraud Act. *Thomas v. Harford Mut. Inc. Co.*, C.A. No. 01C-01-046HDR, 2003 WL 220511, at *3 (Del. Super. Ct. Jan. 31, 2003), *as modified*, C. A. No. 01C-01-046HDR, 2003 WL 21742143 (Del. Super. Ct. July 25, 2003) (collecting cases for the proposition that "[r]ecovery is available for consumers of insurance products" under the CFA) (Ex A); *Crowhorn v. Nationwide Mut. Ins. Co.*, C.A. No. 00C-06-010WLW, 2001 WL 695542, at *6 (Del. Super. Ct. Apr. 26, 2001) (to same effect) (Ex. B); *Mentis v. Delaware Amer. Life Ins. Co.*, C.A. No. 98C-12-023WTQ, 1999 WL 744430, at *6-7 (Del. Super. Ct. July 28, 1999) (same) (Ex. C). There can be no question that the Homseys may properly plead breach of the implied covenant of good faith and fair dealing as a predicate to consumer fraud.

---

[4] Vigilant wrongly asserts that the sole misrepresentation targeted by their consumer fraud claim is the breach of the implied promise of good faith and fair dealing. In fact, the Homseys also alleged a violation through Vigilant's (broken) promise to provide "Credit card, forgery and counterfeiting" coverage. *Id.* ¶69.

## **CONCLUSION**

For the reasons set forth above, plaintiffs Coleman DuPont Homsey and Ellen Homsey respectfully request that Vigilant's motion be denied in its entirety.

Respectfully submitted,

/s/ John S. Spadaro
John S. Spadaro, No. 3155
John Sheehan Spadaro, LLC
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

June 28, 2007

Attorney for plaintiffs Coleman DuPont
Homsey and Ellen Homsey

1438

28

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLEMAN DUPONT HOMSEY and ELLEN HOMSEY, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 07-338JJF |
| v. | ) ) | |
| VIGILANT INSURANCE COMPANY, | ) ) | |
| Defendant. | ) | |

## NOTICE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the

Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following:

Denise Seastone Kraft
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Wilmington, DE 19801

JOHN SHEEHAN SPADARO, LLC

/s/ John S. Spadaro
John S. Spadaro, No. 3155
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

Attorney for Coleman DuPont
Homsey and Ellen Homsey

June 28, 2007

1440

# EXHIBIT A

2003 WL 220511, Thomas v. Harford Mut. Ins. Co., (Del.Super. 2003)                                   **Page 1**

**\*220511**    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

**Duane Adam THOMAS, Plaintiff,**
v.
**HARFORD MUTUAL INSURANCE COMPANY and Concentra Managed Care, Inc., Defendants.**

**No. Civ.A. 01C-01-046 HD.**
Submitted Nov. 12, 2002.

Decided Jan. 31, 2003.

Upon Defendants Harford's and Concentra's Motions for Summary Judgment Granted in Part, Denied in Part.

John S. Spadaro, and Roger D. Landon, Murphy Spadaro & Landon, Wilmington, Delaware, for Plaintiff.

Kevin J. Connors, Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware and John C. Sullivan, Post & Schell, P.C., Philadelphia, Pennsylvania, for Defendant Harford Mutual Insurance Company.

James C. Strum, Stradley, Ronon, Stevens & Young, LLP, Wilmington, Delaware and Joseph D. Cronin, and Catherine A. Pajakinas, Stradley, Ronon, Stevens & Young, LLP, Philadelphia, Pennsylvania, for Defendant Concentra Managed Care, Inc.

OPINION

RIDGELY, President J.

**\*\*1**    Plaintiff Duane Thomas ("Thomas") has brought this bad faith claim against Defendants Harford Mutual Insurance Co. ("Harford") and Concentra Managed Care, Inc. ("Concentra"), based on the alleged delay in authorizing necessary medical treatments Harford was bound to provide as required by the Delaware Worker's Compensation Act. Specifically, Thomas contends that Harford and Concentra breached their duty of good faith and fair dealing when they failed to pre-approve payment for an evaluation for Reflex Sympathetic Dystrophy ("RSD") at Johns Hopkins and subjected him to

numerous medical examinations. Thomas further alleges a breach of the Delaware Insurance Fraud Prevention Act, the Consumer Fraud Act, and the Unfair Trade Practices Act, as well as intentional and negligent infliction of emotional distress, simple negligence, and tortious interference with contract. Defendants have moved for summary judgment. For the reasons that follow, Defendants motions are denied as to Counts I and VII and granted as to Counts II, III, IV, V and VI.

I. BACKGROUND

A. Facts

The facts at this stage must be read in the light most favorable to the nonmoving party, Mr. Thomas. (FN1 ) Thomas injured his knee in an industrial accident on June 15, 1998. Defendant Harford was his employer's worker's compensation insurer, and Concentra was employed to act as a case manager by Harford to interact directly with Thomas. Harford accepted Thomas's claim for that work related injury. In October, 1998, Thomas's orthopedist, Dr. Tooze, first diagnosed Thomas with RSD, a rare disorder of the sympathetic nervous system characterized by chronic, severe pain that, without proper treatment, can leave those suffering from the condition permanently disabled. Dr. Tooze contacted Concentra on October 29, 1998 and advised Concentra that he had diagnosed Thomas with RSD. His symptoms worsened in November, which caused Dr. Tooze to recommend Thomas be evaluated at Johns Hopkins' Multidisciplinary Pain Management Center; an appointment was arranged for January 5, 1999. However, Concentra arranged for Thomas to be examined by Dr. Gelman, an orthopedist, on January 29, 1999 to determine medical necessity of the evaluation. Concentra refused to pre-approve payment for the consultation fee at Johns Hopkins pending the examination by Dr. Gelman. Dr. Gelman's examination of Thomas confirmed his diagnosis of RSD and on March 26, 1999, Concentra pre-approved payment for Plaintiff to be examined by a neurologist, Dr. LeBel and arranged for that appointment to take place on July 12, 1999.

At some point during this period, Concentra's involvement ended, and on June 2, 1999, an attorney retained by Harford informed Thomas that he was to submit to another "Independent Medical Examination" ("IME") with Dr. Edelson (another neurologist) on August 10, 1999.

Before he could make it to that appointment,

© 2007 Thomson/West. No claim to original U.S. Govt. works.

Thomas's symptoms grew worse to the point that he was hospitalized at Hahnemann Hospital from June 30 through July 9, 1999 and again from July 23 through August 1, 1999 for severe symptoms of RSD. During these hospitalizations he was treated by Dr. LeBel, the neurologist Concentra had arranged for Thomas to see in July. His symptoms again worsened, necessitating an admission to Kent General Hospital's emergency department on August 9, 1999. This prevented his appearance at the "IME" with Dr. Edelson on August 10.

**\*\*2** Dr. LeBel recommended implantation of a morphine pump, which was scheduled for August 20, 1999; Harford refused to pre-approve this procedure until after Thomas was examined by Dr. Edelson, which was rescheduled for August 25, 1999. Thomas filed an emergency petition with the Industrial Accident Board on August 19, 1999, and Harford pre-approved payment for the morphine pump on August 27, following the examination by Dr. Edelson.

Thomas claims that the best chance of arresting the progression of RSD and avoiding its grave debilitating effects is through early intervention by a neurologist who specializes in the treatment of RSD. He alleges that Defendant's denial of preapproval of the Johns Hopkins evaluation resulted in progression of the RSD, leading to the severe debility he now suffers.

### B. Claims of the Parties

Thomas alleges that Defendants breached their contractual duty to administer his claim in good faith under the Worker's Compensation Act, (FN2) and as a result he suffered injury from alleged delays in pre-approving treatment for his RSD. Plaintiff asserts seven counts in this action: (I) bad faith breach of contract and (II) insurance fraud pursuant to the Delaware Insurance Fraud Prevention Act (FN3) ("DIFPA") and the Consumer Fraud Act (FN4) ("CFA") against Harford only; (III) intentional infliction of emotional distress, (IV) negligent infliction of emotional distress, and (V) deceptive and unlawful trade practices pursuant to the Unfair Trade Practices Act (FN5) ("UTPA") against both Harford and Concentra; and (VI) simple negligence and (VII) tortious interference with contract against Concentra.

Harford asserts that since no law requires pre-approval of medical consultations and the Worker's Compensation Act permits Harford to require Plaintiff submit to medical examinations, there can be no bad faith as a matter of law. Harford further contends that there is no private right of action under the DIFPA or the UTPA, and that damages for emotional distress are not available as a matter of law for bad faith breach of contract.

Concentra contends that Thomas lacks standing under the UTPA and fails to state a claim under the CFA; Concentra also joins Harford in its contention that there is no private right of action under the UTPA or the DIFPA.

### II. STANDARD OF REVIEW

Because references have been made to matters outside the pleadings, the motions will be treated as motions for summary judgment. Summary judgment is appropriate if, viewing the record in the light most favorable to the non-moving party, the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (FN6) As movants, the defendants bear the burden of showing that no genuine issue of material fact exists and they are entitled to judgment as a matter of law. (FN7) However, if the Court determines that further inquiry into the facts is necessary to clarify the application of the law, summary judgment will not be granted. (FN8) In viewing the facts in the light most favorable to the plaintiff, the court will accept as true any undisputed facts asserted by either party but accept the plaintiff's version of any disputed facts. (FN9)

### III. DISCUSSION

#### A. The Bad Faith Claim

**\*\*3** Defendants claim that Thomas cannot assert a bad faith breach of contract claim grounded in a Worker's Compensation action. The Delaware Supreme Court addressed this issue directly in *Pierce v. International Insurance Company of Illinois,* (FN10) which is controlling in the case at bar. The purpose of the Worker's Compensation Act is to provide for quick resolution of worker's compensation claims without resort to costly and uncertain litigation. The contract of insurance is between the employer and the insurance company, but it exists for the benefit of the employees. Employees are third party beneficiaries of the Worker's Compensation insurance contract by statute. As intended third-party beneficiaries of the contract, employees must be afforded standing to enforce their rights to prevent circumvention or exploitation of the system. (FN11)

The *Pierce* court went on to hold that "a duty of

© 2007 Thomson/West. No claim to original U.S. Govt. works.

good faith and fair dealing attaches to every contract, and this duty cannot be disclaimed." (FN12) In order to establish bad faith breach of contract in the insurance context, the plaintiff must show that the insurer failed to honor its contractual obligations without reasonable justification. (FN13) "Where the non-moving party brings forth facts which, if believed by the jury, would support a finding of a breach of the implied covenant of good faith, summary judgment is inappropriate." (FN14)

Because I find it desirable to inquire more thoroughly into the facts admissible at trial, summary judgment on the bad faith claim is denied at this time. (FN15)

### B. Consumer Fraud Act

Plaintiff next asserts a claim under the Consumer Fraud Act. (FN16) This statute provides for recovery by consumers for acts of "deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise." (FN17) Recovery is available for consumers of insurance products notwithstanding the exemption to matters subject to the Insurance Commissioner in section (b)(3). (FN18)

Defendants contend that Plaintiff has no standing under the CFA because he was not a party to the contract of insurance, and was not privy to representations or statements in connection with the sale of the policy.

While it is true that generally only a party to a contract has enforceable rights under it, an intended third-party beneficiary to a contract can also enforce his or her rights under a contract. (FN19) Worker's Compensation beneficiaries as intended third-party beneficiaries can enforce their rights under the Worker's Compensation insurance contract. (FN20) However, Plaintiff's allegations of fraud surround representations made by agents of Concentra, made at the time Concentra began as Thomas's "case manager." Thomas was not involved in the "sale or advertisement" of the policy; he was a beneficiary under the policy his employer had in force at the time of his work accident. Similarly, Concentra was not a party to the contract between Harford and Thomas's employer.

**4    Although the provisions of the Consumer

Fraud Act are to be liberally construed, (FN21) this Court must give effect to the language of the statute which restricts its application to deceptive practices "in connection with the sale or advertisement" of the merchandise. Given the clear language of the statute, this Court must hold that the post-sale representations made by Concentra were not connected to the sale or advertisement of the policy, and therefore do not fall within the constructs of the Consumer Fraud Act. (FN22) Accordingly, Defendants are entitled to summary judgment on this claim.

### C. Insurance Fraud Prevention Act

Thomas next contends Harford breached Delaware's Insurance Fraud Prevention Act (FN23) through its actions in administering his claim. (FN24) Because the DIFPA has been in effect a relatively short time, (FN25) there is a dearth of precedent guiding the application of this Act in civil suits. However, the DIFPA is similar in structure to the Unfair Trade Practices Act, (FN26) and the creation of a private right of action under the DIFPA can be evaluated in the same manner. Several factors, identified in *Moses v. State Farm,* (FN27) are relevant in this determination: (1) whether the plaintiff is a part of the class of specific persons the statute was enacted to protect; (2) whether there is any evidence of legislative intent to grant or deny a private cause of action under the statute; and (3) whether the presence of a private cause of action is consistent with the purpose of the legislation. (FN28)

Analysis of the DIFPA using the *Moses* factors demonstrates that the stated purpose of the Act is to "confront aggressively the problem of insurance fraud in the State by facilitating the detection of insurance fraud, reducing the occurrence of such fraud through administrative enforcement and deterrence, requiring the restitution of fraudulently obtained insurance benefits and reducing the amount of premium dollars used to pay fraudulent claims." (FN29) The purpose is to administratively control fraud, not provide a remedy for the class of persons who might be harmed by such acts.

Nowhere in the Act is a specific class of complainants established; instead, the Act creates the Delaware Insurance Fraud Prevention Bureau to carry out the Act's mandate. (FN30) This body is empowered to investigate, review complaints of fraud, and conduct independent examination of insurance fraud. (FN31) Section 2408 of the Act creates a mandatory reporting scheme that requires insurers to report suspected insurance fraud to the Bureau.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2003 WL 220511, Thomas v. Harford Mut. Ins. Co., (Del.Super. 2003)                                    Page 4

Additional provisions provide for administrative penalties and hearings before the Bureau and restitution for fraudulently paid claims. (FN32) The terms of the Act instill the Bureau with powers, while explicitly stating that criminal action shall not be precluded by imposition of administrative penalties. (FN33) By not addressing a private right of action, the Act has impliedly precluded private action under the DIFPA.

**5 Finally, similar to the UTPA, the language of the DIFPA does not mention any reasonable reliance element, nor does it require showing of damages. If the Act were construed as implying a private cause of action, it would have to be interpreted as a strict liability action against insurers. (FN34) This is clearly not the intent of the statute, and is inconsistent with a private cause of action.

Therefore, Defendant's motion for summary judgment as to Count II, insurance fraud pursuant to the CFA and the DIFPA is granted.

### D. Intentional and Negligent Infliction of Emotional Distress

Thomas next claims both Harford and Concentra are liable for negligent and intentional infliction of emotional distress. In *Pierce,* the Supreme Court held that an action for a breach of the covenant of good faith, which sounds in contract, does not allow recovery for emotional distress. (FN35) There is no evidence of intentional conduct on the part of the defendants to sustain an action for intentional tort. The claims in *Pierce* were substantially similar to this case, and *Pierce* is controlling, therefore Summary Judgment is granted in favor of Defendants on Counts III and IV of the Complaint.

### E. Deceptive and Unlawful Trade Practices

Thomas has conceded that the weight of authority holds that there is no private right of action under the Unfair Trade Practices Act, as this Court has held in *Moses* (FN36) and *Playtex v. Columbia Casualty Co.* (FN37) Summary judgment is granted for Defendants on Count V of the Complaint.

### F. Simple Negligence

Although Defendants generally aver that Plaintiff's Complaint should be dismissed in its entirety, Defendants have not articulated an argument for dismissal of Count VI, simple negligence. Even so, it is well-established that absent some relationship of trust and confidence, contract principles govern actions on insurance contracts and the Plaintiff's claim here sounds only in contract. (FN38) Accordingly, Defendants are entitled to summary judgment on the negligence claim.

### G. Tortious Interference With Contract

Thomas's final allegation is tortious interference with contract against defendant Concentra. This claim asserts that Concentra acted to interfere with Thomas's receipt of benefits to which he was entitled under the contract between Harford and Thomas's employer.

Delaware courts have adopted the Restatement of Torts (Second) to analyze the tort of intentional interference with contract relations . (FN39) To state a claim for tortious interference with contract, a plaintiff must plead facts that demonstrate the existence of: (1) a valid contract (2) about which defendant has knowledge, (3) an intentional act by defendant that is a significant factor in causing the breach of the contract, (4) done without justification, and (5) which causes injury. (FN40) The Restatement further supplies factors for determining whether interference is improper, which include:

(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. (FN41)

**6. In the instant case, a valid contract existed between Harford and Thomas's employer; Thomas was an intended third-party beneficiary of that contract to provide Worker's Compensation insurance. In order to vindicate the purpose of the Worker's Compensation Act, Thomas is able to enforce their rights under the contract of insurance, even though he is not in privity with the insurance carrier. (FN42) The second element, defendant's knowledge, is clearly met. The third and fourth elements are based on the factual contentions of the parties. Thomas contends that Concentra, through its case manager, prevented Thomas from receiving Worker's Compensation benefits due him under the contract and that Concentra delayed in approving payment for treatments that were later deemed

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2003 WL 220511, Thomas v. Harford Mut. Ins. Co., (Del.Super. 2003)    **Page 5**

medically necessary, when no physician ever opined that any treatment received or requested by Thomas was not reasonable and necessary. Concentra contends that its demands for "independent medical examinations" were justified by the Worker's Compensation Act, and that it did not unduly delay Thomas's care by its alleged bad faith denial of pre-approval of evaluations and treatments. The highlighted factual dispute does not permit the Court to grant summary judgment on this count at the current state of the record, therefore, summary judgment is denied as to Count VII.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is *DENIED* as to Counts I and VII, and *GRANTED* as to Counts II, III, IV, V and VI.

IT IS SO ORDERED.

(FN1.) *Shagrin v. Wilmington Medical Center,* 304 A.2d 61, 63 (Del.Super.Ct.1973).

(FN2.) 19 *Del. C.* §§ 2301-2397.

(FN3.) 18 *Del. C.* §§ 2401-2415.

(FN4.) 6 *Del. C.* §§ 2511-2527.

(FN5.) 18 *Del. C.* §§ 2301-2318. This should be distinguished from the *Uniform Deceptive Trade Practices Act* (6 *Del. C.* §§ 2531-2536), dealing with deceptive practices in the sale of goods or services, under which Plaintiff has made no claim.

(FN6.) Super. Ct. Civ. R. 56(c); *Borish v. Graham,* 655 A.2d 831, 833 (Del.Super.Ct.1994).

(FN7.) *Borish,* 655 A.2d at 833.

(FN8.) *Brown v. Liberty Mutual Ins. Co.,* 1999 Del.Super. LEXIS 525 at *6 (Del.Super.Ct.1999).

(FN9.) *Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 99-100 (Del.1992).

(FN10.) 671 A.2d 1361 (Del.1996).

(FN11.) *Id.* at 1366.

(FN12.) *Id.* at 1366.

(FN13.) *Casson v. Nationwide Ins. Co.,* 455 A.2d

361, 369 (Del.Super.Ct.1982).

(FN14.) *Merrill,* 606 A.2d at 102 (Del.1992).

(FN15.) *Brown,* 1999 Del.Super. LEXIS 525 at *8.

(FN16.) 6 *Del. C.* §§ 2511-2527.

(FN17.) 6 *Del. C.* § 2513(a).

(FN18.) *DiSimplico v. Equitable Variable Life Ins. Co.,* 1988 Del.Super. LEXIS 52 at *8 (Del.Super.Ct.1988); *Crowhorn v. Nationwide Mutual Ins. Co.,* 2001 Del.Super. LEXIS 358 at *22-3 (Del.Super.Ct.2001),*citing Mentis v. Delaware American Life Ins. Co.,* 1999 Del.Super. LEXIS 419 at *17 (Del.Super.Ct.1999).

(FN19.) *Madison Realty Partners 7, LLC v. AG ISA, LLC,* 2001 Del. Ch. LEXIS 37 at *14 (Del. Ch.2001).

(FN20.) *Pierce,* 671 A.2d at 1366.

(FN21.) 6 *Del. C.* § 2512, *see Pack & Process, Inc. v. Celotex Corp.,* 503 A.2d 646, 658 (Del.Super.Ct.1985).

(FN22.) *Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of North America,* 558 A.2d 1066, 1074 (Del.Super.Ct.1989), *aff'd,* 596 A.2d 1358 (Del.1991). *But see Lony v. E.I. duPont de Nemours & Co., Inc.,* 821 F.Supp. 956 (D.Del.1993) (plaintiff survived summary judgment, holding that after-sale statements by seller to purchaser could be viewed by a trier of fact as "in connection with the sale of merchandise"); *Pack & Process, Inc.,* 503 A.2d at 658 (statements made to second owner of warehouse by manufacturer of warehouse roof in connection with repairs on roof may be "in connection with sale" for purposes of surviving summary judgment.)

**6_  (FN23.) 18 *Del. C.* § 2401-2415.

(FN24.) Thomas claims Harford's conduct violated the following sections of the DIFPA:

(c) It shall be a fraudulent insurance act for any insurer or any person acting on behalf of such insurer to knowingly, by act or omission, with intent to injure, defraud or deceive:

(1) Present or cause to be presented to an insurance

© 2007 Thomson/West. No claim to original U.S. Govt. works.

claimant false, incomplete or misleading information regarding the nature, extent and terms of insurance coverage which may or might be available to such claimant under any policy of insurance, whether first or third party.

(2) Present or cause to be presented to any insurance claimant false, incomplete or misleading information regarding or affecting in any fashion the extent of any claimant's right to benefit under, or to make a claim against, any policy of insurance whether first or third party.

18 *Del. C.* § 2407(c).

(FN25.) The Act became effective June 17, 1997.

(FN26.) 18 *Del. C.* §§ 2301-2318.

(FN27.) *Moses v. State Farm Fire & Casualty Ins. Co.,* 1991 Del.Super. LEXIS 462 (Del.Super.Ct.1991).

(FN28.) *Id.* at *10, *citing Cort v. Ash,* 422 U.S. 66, 78 (1975).

(FN29.) 18 *Del. C.* § 2402.

(FN30.) 18 *Del. C.* § 2404.

(FN31.) *Id.*

(FN32.) 18 *Del. C.* § 2411.

(FN33.) 18 *Del. C.* § 2410(1), 18 *Del. C.* § 2413.

(FN34.) *Moses,* 1991 Del.Super. LEXIS 462 at *12.

(FN35.) *Pierce,* 671 A.2d at 1368.

(FN36.) 1991 Del.Super. LEXIS 462.

(FN37.) 1993 Del.Super. LEXIS 58 (Del.Super.Ct.1993).

(FN38.) *Pierce,* 671 A.2d at 1367.

(FN39.) *Grand Ventures, Inc. v. Paoli's Restaurant, Inc.,* 1996 Del.Super. LEXIS 3 at *8 (Del.Super.Ct.1996), *citing Irwin & Leighton v. W.M. Anderson Co.,* 532 A.2d 983 (Del. Ch.1987).

(FN40.) *Madison Realty Partners 7, LLC,* 2001 Del. Ch. LEXIS 37 at *21-2.

(FN41.) *Grand Ventures,* 1996 Del.Super. LEXIS 3 at *9, *citing* Restatement (Second) of Torts § 767.

(FN42.) *Pierce,* 671 A.2d at 1364, *citing Correa v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 618 F.Supp. 915, 924 (D.Del.1985).

© 2007 Thomson/West. No claim to original U.S. Govt. works.

# EXHIBIT B

2001 WL 695542, Crowhorn v. Nationwide Mut. Ins. Co., (Del.Super. 2001)    **Page 1**

**\*695542**    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

**James M. CROWHORN, on behalf of himself and all others similarly situated, Plaintiff,**
v.
**NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant.**

No. Civ. A00C-06-010 WLW.
Submitted Jan. 16, 2001.

Decided April 26, 2001.

Upon Defendant's Motion to Dismiss and Motion to Strike or in the Alternative a Motion for More Specific Pleadings. Denied in Part. Granted in Part.

John S. Spadaro, Murphy, Spadaro & Landon, Wilmington, Delaware, for the Plaintiff.

Keith E. Donovan and Nicholas E. Skiles, Swartz, Campbell & Detweiler, Wilmington, Delaware, for the Defendant.

ORDER

WITHAM, J.

**\*\*1**    James M. Crowhorn ("Crowhorn" or "Plaintiff") has filed this class action complaint against Nationwide Mutual Insurance Company (" Nationwide"). Crowhorn, on behalf of himself and all those similarly situated, alleges that Nationwide breached their insurance contracts, violated 21 *Del. C.* § 2118B and 6 *Del. C.* § 2513, committed common law fraud, and wrongfully refused to honor their contractual obligations arising under certain automobile insurance policies.

Crowhorn was injured in a motor vehicle collision on March 8, 1999, and claims that he was submitted to the "systematic practices" of Nationwide in denying him his first-party insurance or Personal Injury Protection ("PIP") benefits. Crowhorn alleges that Nationwide's practices, ongoing since at least 1994, are fraudulent and in violation of Delaware statutes. The bad practices alleged by Crowhorn in his Complaint include the following: (1) The Thirty-Day Violation: systematic delay or denial of Personal Injury Protection ("PIP") benefits to Delaware claimants within the thirty-day statutory period under 21 *Del. C.* § 2118B; (2) The Lost Earnings Delay: delay of these payments; (3) The IME Fraud: improper use of Independent Medical Examinations (IME's) to reduce and limit PIP benefits, and Nationwide's use of their own definitions of clinical medical terms; (4) The "Usual and Customary" Fraud: use of a "usual and customary" standard instead of the statutory "reasonable and necessary" standard when paying medical expenses and that these practices affect the doctor-patient relationship by discouraging proper treatment for fear of no payment; (5) The "Pre-certification" Fraud: claiming Nationwide sometimes claims that pre-certification and preauthorization of PIP benefits is unavailable to claimants; (6) The "Prior Impairment" Reduction: securing IME doctors' opinions on the existence of and prior impairments to limit PIP benefits; and (7) Other Bad Practices: inadequate training of adjusters with respect to medical terminology, indoctrination of adjusters that Delaware PIP claimants are dishonest and greedy, and avoiding prompt communication with insureds.

Plaintiff alleges that this nucleus of allegations is the same for all of the counts of his complaint. Specifically, Crowhorn claims that out of the above "Systematic Practices" of Nationwide, he was submitted to all of them except "The 'Precertification' Fraud" and "The 'Prior Impairment' Reduction" claims. The relief sought by Plaintiff is contained within six counts as follows: Declaratory Judgment in Count I; Breach of Contract in Count II; Bad Faith Breach of Contract in Count III; Breach of the Duty of Fair Dealing in Count IV; Common Law Fraud in Count V; Consumer Fraud in Count VI; and prior to amendment, Racketeering Activity in Count VII. The action was originally filed in the Superior Court of Delaware and then removed to federal court by Nationwide because of the alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Federal court remanded the state law claims back to the Superior Court. Plaintiff then amended the Superior Court complaint by striking the federal RICO claims of Count VII from the complaint.

**\*\*2**    The underlying gravamen of the Plaintiff's complaint is that Nationwide systematically delayed and/or denied the payment of PIP claims and benefits of Delaware automobile insurance policies. More specifically, Plaintiff alleges that such claims were denied or delayed without providing the insured with a reasonable, written explanation within thirty (30)

© 2007 Thomson/West. No claim to original U.S. Govt. works.

days as required in 21*Del. C.* § 2118B ("Thirty-days Provision"). Crowhorn and/or his healthcare providers have submitted PIP benefit claims for healthcare coverage and lost wages which allegedly have been improperly delayed or denied. Nationwide's response to the complaint is that the insurance contract between Nationwide and Crowhorn does not contain any express terms or provisions stating that PIP benefit payments would be made within thirty (30) days. Therefore, Nationwide brought this Motion to Dismiss and Motion to Strike or in the alternative a Motion for More Specific Pleadings.

I. Nationwide's Motion to Dismiss or in the Alternative a Motion for a More Definite Statement.

The test for sufficiency of a complaint challenged by a motion to dismiss under Superior Court Civil Rule 12(b)(6) is a general, broad test. Simply put, the test is "whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint." (FN1) When applying this test, all of the well-pleaded allegations must be accepted as true by the Court. (FN2) In addition the Court may consider documents attached to or incorporated by reference into the complaint, matters of public record and undisputably authentic documents upon which the claims are based. (FN3) Nationwide has attached a copy of Crowhorn's insurance policy to their motion to dismiss for the Court to consider. An alternative to dismissing a complaint, or any part thereof, is to require a party to file a more definite statement under *Superior Court Civil Rule 12(e)*. Under *Superior Court Civil Rule 12(e)*, the Court evaluates the complaint to see if "it appear[s] to be so vague or ambiguous as to make it unreasonable to require the defendant to frame a responsive pleading." (FN4) If the complaint is found to be vague or ambiguous, the Plaintiff will be required to correct any defects with a more definite statement. Using these principles the Court will evaluate Nationwide's Motion to Dismiss and evaluate the complaint to see if more specific pleadings are required.

A. Review of Counts I & II: Declaratory Judgment and Breach of Contract.

Plaintiff alleges a breach of the insurance contract between Nationwide and himself (and the proposed class of plaintiffs) for the delay or denial of PIP benefits. Based on the underlying insurance contract and the alleged breach, Plaintiff seeks a declaratory judgment determining the rights and obligations of the parties as well as damages for breach of contract. In *Moore Business Forms, Inc. v. Cordant Holdings Corp.*, the Court stated that "to survive a motion to dismiss, a complaint for breach of contract must identify a contractual obligation, whether express or implied, a breach of that obligation, and resulting damages to the plaintiff." (FN5) Therefore, when evaluating Nationwide's Motion to Dismiss the Court will be determining if there are three essential elements: (1) the existence of a contractual obligation, (2) an alleged breach of that obligation, and (3) damages resulting from the alleged breach. Nationwide's motion to dismiss challenges Crowhorn's claim on the first element, the existence of a contractual obligation. Nationwide contends that the insurance contract in question does not contain any provision that PIP payments will be made within thirty (30) days of submission. After careful review of the contract in question, the Court agrees that the insurance contract does not contain a thirty-days provision. Instead, the insurance policy states that "payments of expenses under Personal Injury Protection coverage shall be made as soon as practical." However, under 21*Del. C.* § 2118B, insurance companies must pay first-party (PIP) claims or give written reason for denial within thirty (30) days. (FN6)

**3** The underpinning of much of Plaintiff's Complaint rests on the incorporation of 21 *Del. C.* § 2118B's thirty-day provision into the insurance contract in question. Plaintiff argues that the thirty-days provision is part of the insurance contract by law. According to the Plaintiff, the Delaware Supreme Court has held that the terms of the legislative statutory scheme are part of the insurance contract. (FN7) In *Harris v. Prudential Prop. & Cas. Ins. Co.*, the Supreme Court stated that it "has struck down various exclusions in insurance policies as violative of the public policy which favors full compensation to victims of automobile accidents." (FN8) The Court in *Harris* found that such public policy considerations were not implicated in their case and the insurer was permitted to "raise an insured's non-cooperation as a defense to liability for coverage above the statutory minimum." (FN9) Delaware law does not recognize contract provisions that limit, exclude or conflict with the legislature's statutory scheme; (FN10) however, the law has not gone so far as to state that the statute becomes integrated or incorporated into the contract, thereby allowing contractual claims for statutory violations. Given the general pleading requirements by which a complaint is reviewed, the Court finds that the complaint has alleged a contractual obligation, breach

© 2007 Thomson/West. No claim to original U.S. Govt. works.

of that obligation and damages resulting from that breach. (FN11) Therefore, Counts I and II will not be dismissed from the complaint.

Nationwide's motion also requested that paragraph 85 of Plaintiff's Complaint be dismissed. (FN12) Nationwide correctly recounts that Delaware law does not generally recognize pain and suffering damages under a contract claim. (FN13) However, in *Tackett v. State Farm Fire Ins. Co.*, the Court stated that "an insured may be entitled to the recovery of punitive damages in a bad faith action if the insurer's breach is particularly egregious." (FN14) Plaintiff concedes that punitive damages are not available for an ordinary contract claim, but argues that the complaint states a viable claim for punitive damages through the allegations of bad faith breach of contract, breach of the duty of fair dealing, and statutory and common law fraud. Plaintiff argues that it is proper for a fact finder considering punitive damages to know the consequences of Nationwide's behavior including, "pain, suffering and exacerbation of injury." (FN15) The Court agrees that it is proper for the fact finder to consider the breach and its consequences when awarding punitive damages; therefore, paragraph 85 will not be dismissed or stricken from the complaint.

B. Counts III & IV: Bad Faith Breach of Contract, Breach of the Duty of Fair Dealing.

Under Delaware law, insurance companies owe a duty of good faith and fair dealing to their insureds. In *Tackett v. State Farm Fire & Casualty Ins. Co.*, the Court stated that Delaware law was aligned "with those jurisdictions which have concluded that 'there is no sound theoretical difference between a first-party insurance contract and any other contract.' " (FN16) The Court went on to state that "[w]here an insurer fails to investigate or process a claim or delays payment in bad faith, it is in breach of the implied obligations of good faith and fair dealing underlying all contractual obligations." (FN17) The standard by which the duties of good faith and fair dealing are evaluated is whether the insurance company acted with "reasonable justification" in dealing with its insureds. Therefore, for the Plaintiff to prove that Nationwide breached the duty of good faith and fair dealing, he must show that Nationwide's delay and/or denial of PIP benefits was "clearly without any reasonable justification." (FN18)

**4 Plaintiff correctly alleges in the complaint that the insurance contract in question contains an implied covenant of good faith and fair dealing. In Counts III and IV of the Complaint, Plaintiff alleges that

Nationwide's breach of contract was without reasonable justification and therefore done in breach of the duty of good faith and fair dealing. Nationwide again recounts that under the terms of the insurance contract in question, there is no thirty-days provision. Without such a provision, Nationwide claims they could not have breached their implied contractual duties of good faith and fair dealing. According to the Plaintiffs, in order for Nationwide to act with reasonable justification, they must comply with § 2118B, because as noted earlier Plaintiff argues that this provision is incorporated by law into the contract. Nationwide also argues that they have a statutory right to delay and/or deny PIP benefits and that such a denial or delay is not *per se* bad faith. However, a claim for breach of the duty of good faith and fair dealing does not depend upon a *per se* violation of a statute or contract. The Court also recognizes that Nationwide's *per se* argument may be based on the lack of specificity with respect to Crowhorn's circumstances. Essentially, Nationwide is saying that without more specifics about Crowhorn's delay or denials in the payment of his PIP benefits they cannot fashion a response with affirmative defenses such as their "reasonable justifications." The Court will address the specificity of Crowhorn's complaint with more detail in the next section. As the duty of good faith and fair dealing are implied in every insurance contract, Counts III and IV will not be dismissed from the complaint.

C. Counts V & VI: Common Law Fraud & Consumer Fraud.

According to *Superior Court Civil Rule 9(b)*, "in all averments of fraud, negligence or mistake, the circumstances constituting fraud, negligence or mistake shall be stated with particularity." Rule 9(b) states that the "circumstances" of the fraud must be plead with "particularity." The "circumstances" include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation as well as what he obtained thereby." (FN19) This has been called the "who, what, where, when and how" of fraud pleading. (FN20) While the circumstances of a fraud complaint must be plead with particularity, "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally." (FN21) Plaintiff's complaint alleges that Nationwide committed both common law and consumer fraud. In *Nutt v. A.C. & S.*, the Court stated that "[f]raud must be plead with sufficient particularity so that the parties may know what claims have been adjudicated. If a pleading is so vague or ambiguous as to make it difficult for a

© 2007 Thomson/West. No claim to original U.S. Govt. works.

defendant to frame a responsive pleading, a more definite statement is required." (FN22) The Court in *Nutt* stated further that "[i]t may not be necessary that all evidence of fraud within the knowledge of the plaintiffs be disclosed short of discovery but it is essential that the precise theory of fraud with supporting specifics appear in the complaint."

**\*\*5** Both parties agree that *Stephenson v. Capano Development, Inc.* (FN23) contains the appropriate checklist for determining the sufficiency of a fraud complaint. According to *Stephenson*, Delaware common law requires allegations and proof of the following elements:

1) a false representation, usually of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance. (FN24)

Nationwide argues that Plaintiffs improperly allege fraud based upon a "silent foreknowledge" that PIP claims would be handled in violation of Delaware statutes. In addition, Nationwide claims that the fraud allegations within the complaint are merely the Plaintiff's interpretation of Nationwide policy, do not constitute sufficient particularity to allow a responsive pleading and in reality are merely a fishing expedition. Plaintiff argues that when pleading fraud, it is "necessary only to allege ultimate facts." (FN25) In *Strasburger v. Mars, Inc.*, the Court went on to state that to require more than the pleading of ultimate facts "is tantamount to saying that the evidence upon which the ultimate facts are based must also be pleaded," and this destroys "the distinction between ultimate facts, which alone must be pleaded, and the evidence and proof upon which these facts are based." (FN26) In *Strasburger*, the Court denied the motion to dismiss but noted that if the defendant cannot file a responsive pleading, the relief of Rule 12(e) is available to them. (FN27)

Comparing the fraud allegations in the complaint to the *Stephenson* standard, the Court will not dismiss the fraud counts from the complaint. First, there must be a false representation of fact. In paragraphs 92-96 the complaint alleges that the insurance contract sold by Nationwide to Crowhorn contained representations of fact including that "covered PIP benefits would be paid." Second, a fraud claim must allege the

defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth. In paragraphs 97-100 Plaintiff alleges that Nationwide's representations were false, Nationwide knew they were false, Nationwide believed they were false and Nationwide made the statements with reckless indifference to the truth. Third, a fraud claim must allege an intent to induce the plaintiff to act or to refrain from acting. In paragraph 101 Plaintiff alleges that Nationwide made the subject representation with the intent to induce Crowhorn (and the proposed class members) to enter into insurance contract with Nationwide and pay premiums for such insurance. Fourth, a fraud claim must allege that the plaintiff's action or inaction was taken in justifiable reliance upon the representation. In paragraphs 102-104 plaintiff alleges that he justifiably relied upon Nationwide's false representation. Fifth, a fraud claim must allege that plaintiff was damaged as a result of such reliance. In paragraph 105 the plaintiff alleges injury stemming from Nationwide's action.

**\*\*6** Crowhorn's complaint follows the enumerated steps required of a fraud complaint in Count V. Plaintiff claims that the common nucleus of facts alleged in paragraphs 38-56 supplies the necessary particularity which coupled with the ultimate facts/ allegations in Count V establish a proper fraud complaint. Paragraphs 38-56 allege the following: 1) "The Thirty-Day Violation," 2) "The Lost Earnings Delay," 3) "The IME Fraud," 4) "The Usual and Customary Fraud," 5) "The Precertification Fraud," 6) "The Prior Impairment Reduction," and 7) "Other Bad Practices." The complaint goes on to state the allegations which are specific to Crowhorn in paragraphs 59-66. Of the above enumerated list, Crowhorn alleges that he was submitted to all but five and six.

The difficulty faced by the Court is in balancing the requirement of ultimate facts with the particularity of circumstances required in Rule 9(b). After careful review of the Complaint, the Court finds that the Complaint meets the technical elements of a fraud claim and will not be dismissed. The remaining issue is whether a more definite statement is required under *Superior Court Rule 12(e)*. The Court believes that the complaint does not supply Nationwide with sufficient particularity to file a responsive pleading. The Complaint states broad, general allegations against Nationwide and then states that Crowhorn was subjected to these "systematic practices." Plaintiff may have been attempting to style the complaint in the best fashion for the proposed class action, but

© 2007 Thomson/West. No claim to original U.S. Govt. works.

before any proposed class may be certified, the Court must be satisfied that Crowhorn himself has a complaint. Because the Plaintiff met the technical elements of a fraud claim under *Stephenson*, the fraud alleged in Counts V and VI will not be dismissed; however, the Court will require a more definite statement pursuant to Rule 12(e). (FN28)

D. Nationwide claims that no private cause of action exists for alleged statutory violations of 6 *Del. C.* § 2513.

Plaintiff's consumer fraud allegations in Count VI fall under the Prohibited Trade Practices Act or Consumer Fraud Act, specifically 6 *Del. C.* § 2513. Nationwide claims that the allegations brought by the Plaintiff under 6 *Del. C.* § 2513 do not give rise to a private cause of action. The Consumer Fraud Act states at § 2513(b) that "This section shall not apply: ... (3) To matters subject to the jurisdiction of the Public Service Commission, or of the Insurance Commissioner of this State." In *Mentis v. Delaware American Life Ins. Co.*, the Court stated that "a consumer may bring a private cause of action under the Consumer Fraud Act against an insurance company, notwithstanding § 2513(b)(3)." (FN29) Delaware common law has determined that the effect of § 2513 is to preclude the State from bringing a consumer fraud action against an insurance company; however, it does not preclude a private cause of action. (FN30) Therefore, the Plaintiff in this action may bring a private cause of action under the Consumer Fraud Act, § 2513.

**\*\*7** In addition, Nationwide argues that no private cause of action lies for actions based on 18 *Del. C.* § 2304. Plaintiffs responded that they are not bringing an action based on 18 *Del. C.* § 2304, and that the statute was only used for illustrative purposes in their complaint. Based on the Plaintiff's response, there is agreement that § 2304 does not support a private cause of action. The references to 18 *Del. C.* § 2304 in paragraphs 25 and 70 may remain in the complaint to the extent they do not conflict with the other requirements set forth in this opinion.

II. Motion to Strike Paragraphs of the Complaint Which Fall Under the Headings "The Insurance Commissioner's Betrayal of § 2118B" and "The Insurance Commissioner's Abrogation and Oversight."

Paragraphs 14-37 of the Plaintiff's Complaint detail the alleged role the Insurance Commissioner has played in "Betraying § 2118B" and generally in

"Abrogating" her duties. These paragraphs note where the Insurance Commissioner received her campaign funds, allege that the Insurance Commissioner supplies her own definition of "bad faith" in § 2118B instead of using the one supplied by the Delaware Supreme Court, and allege that the Insurance Commissioner has abrogated her duty to convene evidentiary hearings whenever he or she has reason to believe that an insurer has engaged in any unfair or deceptive act or practice. Crowhorn then alleges that despite the number and persistence of consumers' complaints and the Insurance Commissioner's broad statutory powers, essentially nothing is done. Nationwide asks the Court to strike these paragraphs (14-37) from the Complaint pursuant to Superior Court Civil Rule 12(f) because they are irrelevant and inflammatory. In addition, Nationwide argues that they should not be required to litigate claims levied against the State's Department of Insurance. Essentially, Nationwide is arguing that these paragraphs are irrelevant to the complaint. Plaintiff argues that the allegations in question are an important part of their case because they show why the regulatory provisions are failing, thereby demonstrating the necessity of the Court adjudicating their claim.

On a motion to strike under *Superior Court Civil Rule 12(f)*, "the Court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike under Rule 12(f) are traditionally disfavored. (FN31) A motion to strike "may be denied where there is no showing of prejudice to the moving party if the attacked allegations are left in the pleadings." (FN32) "Motions to strike are not favored and are granted sparingly, and then only if clearly warranted, with doubt being resolved in favor of the pleading." (FN33) As the Court in *Pack & Process, Inc. v. Celotex Corp.* recounts from *Wooley on Delaware Practice*,

> [t]he Court must consider whether the pleaded matter has some relevancy to the cause of action, is directly in reply to the matter which is pleaded and is offered in support of a direct issue. Thus, "a plea which does not set out any issuable fact ... will be ordered stricken out." (FN34)

**\*\*8.** In the matter *sub judice*, the Court questions what connection can be made from the numerous allegations in the complaint against the Insurance Commissioner or the value or relevancy that can be derived from them. Paragraphs 14-37 state specific allegations which may give rise to a cause of action

© 2007 Thomson/West. No claim to original U.S. Govt. works.

against the Insurance Commissioner but are not at issue in this suit against Nationwide. Therefore, in amending their complaint, Plaintiffs must either strike the allegations against the Insurance Commissioner from the complaint, or use the allegations in Paragraphs 14-37 to name the Insurance Commissioner as a defendant in the lawsuit.

III. Conclusion.

Nationwide's Motion to Dismiss is DENIED. The alternative Motion for More Definite Statement is GRANTED and also applies to paragraphs 14-37 of the complaint pertaining to the Insurance Commissioner.

IT IS SO ORDERED.

(FN1.) *Spence v. Funk,* Del.Supr., 396 A.2d 967, 968 (1978).

(FN2.) *Id.*

(FN3.) *See PBGC v. White,* 998 F.2d 1192, 1196 (3 rd Cir.1993).

(FN4.) *Twin Coach Co. v. Chance Vought Aircraft, Inc.,* Del.Super., 163 A.2d 278, 283 (1960).

(FN5.) *Moore Business Forms v. Cordant Holdings Corp.,* Del. Ch., C . A. No. 13911, Jacobs, V.C. (Nov. 2, 1995), Mem. Op. At 7.

(FN6.) "When an insurer receives a written request for payment of a claim for benefits pursuant to § 2118(a)(2) of this title, the insurer shall promptly process the claim and shall, no later than 30 days following the insurer's receipt of said written request for first-party insurance benefits and documentation that the treatment or expense is compensable pursuant to § 2118(a) of this title, make payment of the amount of claimed benefits that are due to the claimant or, if said claim is wholly or partly denied, provide the claimant with a written explanation of the reasons for such denial." 21 *Del. C.* § 2118B.

(FN7.) Plaintiffs point the Court to four cases: *Harris v. Prudential Prop. & Cas. Ins. Co.,* Del.Supr., 632 A.2d 1380 (1993); *Hudson v. State Farm Mutual Ins. Co.,* Del.Supr., 569 A.2d 1168 (1990); *Bass v. Horizon Ins. Co.,* Del.Supr., 562 A.2d 1194 (1989); *State Farm Mutual Automobile Ins. Co.,* Del.Supr., 541 A.2d 557 (1988).

(FN8.) *Harris* at 1381-1382.

(FN9.) *Id.*

(FN10.) *Harris* at 1381-1383 (holding that insurer was only liable for mandatory minimum under the statute because of insured's non-cooperation). In *Harris,* the Supreme Court summarized these opinions as follows:

In *Wagamon,* we held that a household exclusion in an automobile policy which excluded liability coverage for claims brought by certain members of the insured's family was contrary to public policy. 541 A.2d at 561. Similarly, in *Bass,* we ruled that driving under the influence (DUI) exclusion was contrary to the public policy of providing insurance regardless of fault under 21 *Del.C.* § 2118. 562 A.2d at 1198. Finally, in *Hudson,* we held that an implied exclusion for reckless or intentional conduct by the insured was contrary to the public policy underlying the Financial Responsibility Laws. 569 A.2d at 1171-72.

*Id.*

(FN11.) The Court is not, however, ruling on the actual existence of a contractual obligation based on statutory requirements. The Court expects the parties to address this legal issue in more detail as the litigation progresses.

(FN12.) Crowhorn's Complaint, Paragraph 85 states in part, "As a further result of Nationwide's breaches of contract, plaintiff James M. Crowhorn and all others similarly situated have been deprived of necessary medical care, with resulting pain and suffering and exacerbation of injury."

(FN13.) *Tackett v. State Farm Fire Ins. Co.,* Del.Supr., 653 A.2d 254, 264-265 (0995) (recounting Delaware's common law with respect to the *Hadley v. Baxendale* standard for awarding contract damages).

(FN14.) *Id.* at 265.

(FN15.) *Rowlands v. PHICO Ins. Co.,* D. Del., C.A. No. 00-477-GMS, Sleet, J., (July 27, 2000), Mem. Op. at 6-7; *Tackett* at 264-266.

**8_ (FN16.) *Tackett* at 264.

(FN17.) *Id.*

© 2007 Thomson/West. No claim to original U.S. Govt. works.

(FN18.) *Id. quoting from, Casson v. Nationwide Ins. Co.,* Del.Super., 455 A.2d 361, 369 (1982).

(FN19.) *Nutt v. A.C. & S., Inc.,* Del.Super., 466 A.2d 18, 23 (1983), *quoting Autrey v. Chemtrust Industries Corp.,* D.Del., 362 F.Supp. 1085, 1092, 1093 (1973).

(FN20.) *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7 th Cir.), cert. denied, 498 U.S. 941 (1990).

(FN21.) *Superior Court Civil Rule 9(b).*

(FN22.) *Nutt v. A.C. & S.,* Del.Supr., 466 A.2d 18, 23 (1983).

(FN23.) *Stephenson v. Capano Development, Inc.,* Del.Supr., 462 A.2d 1069 (1983).

(FN24.) *Id.* at 1074.

(FN25.) *Strasburger v. Mars, Inc.,* Del.Super., 83 A.2d 101, 104 (1951).

(FN26.) *Id.*

(FN27.) *Id.*

(FN28.) The Court is requiring the Plaintiff to supply a more definite statement of the "Systematic Practices" of Nationwide through Crowhorn's specific circumstances. Crowhorn's circumstances include dates of submission and any response or lack thereof by Nationwide, etc. The complaint does not have to be detailed to the extent of discovery, but the facts surrounding Crowhorn's individual complaint need to be presented to the Court. If Plaintiff believes that the more general yet applicable allegations are necessary for class certification purposes, they may remain in the complaint.

(FN29.) *Mentis v. Delaware American Life Ins. Co.,* Del.Super., C.A. No. 98C-12-023, Quillen, J. (July 28, 1999), Letter Op. at 6 (citations omitted).

(FN30.) *Id.* at 7.

(FN31.) *Pack & Process, Inc. v. Celotex, Corp.,* Del.Super., 503 A .2d 646, 660 (1985).

(FN32.) *Fowler v. Mumford,* Del.Super., 102 A.2d 535, 538 (1954).

(FN33.) *Phillips v. Delaware Power and Light,* Del.Super., 194 A.2d 690 (1963).

(FN34.) *Pack & Process, Inc.* at 660.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

# EXHIBIT C

1999 WL 744430, Mentis v. Delaware American Life Ins. Co., (Del.Super. 1999)                    **Page 1**

**\*744430**    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

Anthony P. **MENTIS**, individually and on behalf of all others similarly situated

v.

**DELAWARE AMERICAN LIFE INSURANCE COMPANY**

No. C.A. 98C-12-023 WTQ.

July 28, 1999.

*RE: Letter Opinion and Order on Defendant's Motion to Dismiss--GRANTED in part and DENIED in part*

QUILLEN, J.

Dear Ms. Iorii, Mr. Trainer, and Mr. Monhait:

**\*\*1** This is the Court's Opinion on Defendant's Motion to Dismiss. For the reasons stated herein, the Motion is GRANTED with respect to Count I (breach of fiduciary duty) and Count IV (unfair trade practices), and DENIED with respect to Count II (breach of contract), Count III (consumer fraud) and the statute of limitations.

FACTS

This purported class-action suit arises from the alleged use of deceptive sales practices during the sale of life insurance polices in the 1980s and early 1990s. The primary issue is whether the Plaintiff has stated a colorable cause of action. Given the procedural posture of this case, all facts will be viewed in a light most favorable to the Plaintiff.

Beginning in 1982, Defendant Delaware American Life Company and its affiliates (collectively "DelAm") began a solicitation campaign revolving around "vanishing premium" insurance policies. These insurance polices were market dependent, meaning the interest and dividends earned greatly effected the policy's viability and value. During this period of solicitation, these polices were apparently performing very well.

DelAm solicited customers with pre-existing life insurance policies and informed them that

accumulated dividends and interest on their existing policies were sufficient to fund a higher coverage policy without an increase in their current premiums. In short, they would continue to pay the same premiums, but would receive more coverage.

DelAm solicited new customers by informing them that if they purchased a new policy, the interest and dividends on the policy would eventually pay for future premiums. This means the policy would eventually become self-funded, and future premiums would "vanish." DelAm also informed prospective purchasers of "flexible premium whole life" and "universal life" policies that a minimum premium would be sufficient to maintain a fixed amount of death benefits until the policy holder reached the age of 95.

During its solicitations efforts, it is alleged that DelAm utilized deceptive and inaccurate representations and illustrations. It is further alleged that customers were led to believe that "interest and dividends" would continue to fund their future premiums, regardless of any rate fluctuations. In short, customers were not informed that their policies were market dependent.

Among these customers was the Plaintiff, Anthony Mentis. In 1984, Mentis owned a $40,000 life insurance policy issued by Travelers. His premiums were $250 a month. In 1985, Mentis was solicited by DelAm to purchase a new policy. Mentis was allegedly told that if he surrendered his Travelers policy, which was then worth several thousand dollars, he could purchase a $50,000 policy from DelAm and maintain the same premiums ($250 a month). In connection with this solicitation, DelAm provided an illustration. The illustration showed that at the current rate of return (12%), Mentis could maintain a $50,000 policy for the same premiums he was currently paying. Mentis alleges that it was never made clear that if the rate of return changed, his payments of $3,000 a year would be insufficient to maintain a $50,000 policy. In fact, Mentis alleges that DelAm fostered the mistaken belief that his premiums would remain the same, regardless of whether interest and dividend rates fluctuated.

**\*\*2** Everything appeared to go well for the next fourteen years. Then, in August 1998, DelAm informed Mentis that due to a reduction in interest and dividends, he would have to increase his premiums by more than 100% to maintain $50,000 of coverage. Mentis was also told that if he did not increase his premiums, the value of his policy would

© 2007 Thomson/West. No claim to original U.S. Govt. works.

be reduced to $25,000. By this time, Mentis had paid premiums amounting to over $42,000. In December 1998, Mentis filed suit against DelAm individually, and on behalf of all others similarly situated. Plaintiff's suit alleges that DelAm: (1) breached its fiduciary duty to its customers by utilizing deceptive sales practices (Count I); (2) breached its contract with its policy holders (Count II); (3) committed consumer fraud under 6 *Del. C.* § 2513 (Count III); and (4) committed unfair trade practices under 18 *Del. C.* §§ 2304(1) and (20) (Count IV). Mentis seeks certification as a class action pursuant to Superior Court Civil Rule 23(b)(3), compensatory and punitive damages, a declaration of the policy's death benefits and attorneys' fees and costs. In lieu of filing an answer, DelAm filed a Motion to Dismiss, asserting that Mentis has failed to state a colorable claim and that the action is barred by the statute of limitations.

### STANDARD OF REVIEW

In evaluating a Motion to Dismiss under Superior Court Civil Rule 12(b)(6), the Court must assume all well pleaded facts in the Complaint to be true. *Nix v. Sawyer,* Del.Super., 466 A.2d 407, 410 (1983) (citing *Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* Del.Supr., 372 A.2d 168 (1976)). For purposes of a Motion under Rule 12(b)(6), all allegations in the Complaint must be accepted as true. *State use of Certain-Teed Products Corp. v. United Pacific Ins. Co.,* Del.Super., 389 A.2d 777, 778 (1978). A Complaint will not be dismissed unless the Plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof. *Nix,* 466 A.2d at 410 (citing *Diamond State Tel. Co. v. University of Del.,* Del.Supr., 269 A.2d 52 (1970)). A Complaint may not be dismissed unless it is clearly without merit, which may be a matter of law or fact. *Diamond State,* 269 A.2d at 58.

### DISCUSSION

#### A. Breach of Fiduciary Duty--Count I

Count I of the Complaint alleges that DelAm breached its fiduciary duty with its customers by luring them into a position of trust and then utilizing deceptive sales practices. DelAm contends that no fiduciary relationship exists between an insurer and an insured (or a prospective insured), especially in a sales context. Plaintiff asserts that the legal relationship between an insurer and an insured is a question of fact, and that this question cannot be

determined on a Motion to Dismiss. Plaintiff asserts that the critical question is whether DelAm held itself out as one possessing superior knowledge, therefore allowing the Plaintiff to rely upon the representations made.

**\*\*3** Although Delaware law recognizes a contractual duty of good faith and fair dealing between an insured and an insurer, it does not recognize a fiduciary relationship between the two. *Corrado Bros. v. Twin City Fire Ins. Co.,* 562 A.2d 1188, 1192 (1989); *Abex, Inc. v. Koll Real Estate Group, Inc.,* Del. Ch., C.A. No. 13462, 1994 WL 728827, Jacobs, V.C. (Dec. 22, 1994). "[T]he term fiduciary overstates the essential relationship arising out of a contract of insurance." *Corrado,* 562 A.2d at 1192. As the Supreme Court stated in *Corrado:*

> The concept of a fiduciary relationship, which derives from the law of trusts, is more aptly applied in legal relationships where the interests of the fiduciary and the beneficiary incline toward a common goal and in which the fiduciary is required to pursue solely the interests of the beneficiary in the property. *Cf. Loft, Inc. v.. Guth,* 23 Del. Ch. 138, 2 A.2d 225, 238-39 (1938) *aff'd,* Del.Supr., 255, 5 A.2d 503 (1939). The relationship of insurer and insured, however, arises contractually.... This expected clash of interests is clearly not compatible with the concept of a fiduciary.

*Id.* (parenthetical omitted).

The Complaint alleges that DelAm solicited both individuals with existing DelAm policies and those without, in an attempt to sell new insurance policies. In essence, all DelAm did was solicit new and existing customers in an attempt to sell a new product. With respect to those individuals without existing DelAm policies, the transaction was nothing more than an arm's length negotiation concerning the purchase of insurance, wherein both parties were strangers to one another. This type of buyer-seller relationship, with some inherent adversarial nature, does not give rise to fiduciary duties because the interests of the parties are not "incline[d] toward a common goal." *Id.*

With respect to the individuals with existing DelAm polices, the transaction was not between strangers, but instead between those with an insurer-insured relationship. This was not, however, the typical situation where an insurer was failing to pay for treatment, settle a claim, or provide a defense. In

© 2007 Thomson/West. No claim to original U.S. Govt. works.

those situation, the insurer is held to the duty of good faith and fair dealing as a result of its specific contractual obligations to undertake those burdens. *See Pierce v. International Ins. Co. of Ill.,* Del. Supr., 671 A.2d 1361, 1367 (1996) (stating that an insurer's obligations arise from the insurance contract). In the situation where an insurer is soliciting an existing customer to purchase a new insurance policy, and create a new contract, there is no specific contractual obligation called into play. Although a general obligation to act in good faith may arise, this obligation, if any, falls short of a fiduciary duty in the traditional sense As before, the interests of the parties are not sufficiently aligned to create a situation of unwavering trust between the parties and no fiduciary duty exists.

**4  Although this Court declines to impose a fiduciary duty upon the insurer-insured relationship, this does not mean that insurers, when soliciting existing and potential customers, are given free reign to utilize deceptive sales practices. This Court simply feels that the deceptive practices alleged in the Complaint are better addressed by the laws designed to protect consumers, i.e. consumer fraud and insurer bad faith, not the laws designed to protect stockholders and trust beneficiaries, i.e. fiduciary duties. (FN1) This Court is also aware that many cases from other jurisdictions, involving similar "vanishing premiums" class actions, hold that the existence of a fiduciary duty in this situation is a fact specific question. *See, e.g., Parkhill v. Minnesota Mut. Life Ins. Co.,* D. Minn, 995 F.Supp. 983, 992 (1998); *Grove v. Principal Mut. Life Ins. Co.,* S.D. Iowa, 14 F.Supp.2d 1101, 1111 (1998) (finding the existence of a fiduciary duty a question of fact). Again, this Court feels that the arenas of consumer protection and insurer bad faith are better equipped to remedy deceptive sales practices than fiduciary duties. Fiduciary duties are the highest imposes by law, and should be cautiously imposed by Courts. This is not such a case.  Accordingly, Defendant DelAm's Motion to Dismiss with respect to Count I (breach of fiduciary duty) is GRANTED. IT IS SO ORDERED.

### B. Breach of Contract--Count II

Count II of the Complaint alleges that DelAm made representations, via its sales agents, that if the Plaintiff continued to make the same monthly payments of $250, the policy would retain its $50,000 value. Defendant contends that the insurance contract is a fully integrated document that "explicitly" illustrates the policy's market dependent nature. It contends that any illustrations and representations

made by sales representatives are not part of the contract and should be excluded as irrelevant extrinsic evidence. Plaintiff asserts that the written policy was so cumbersome and complex as to make it incomprehensible to the ordinary customer, and that the representations of the insurer's sales agents should be taken into account when construing the policy.

The policy is over twenty pages long. On the first page of the policy, it states that it "may end before the insured reaches the age of 95 if either (1) no premiums are paid after the initial premium or (2) subsequent premiums are not sufficient to continue this policy in force until that time." (FN2) The determination of the policy's benefits are described on pages nine and ten as follows:

Actual Amount of Proceeds.  The actual amount of proceeds will depend on:

the life insurance proceeds determined as above;

the use of the account value during the Insured's life;

any withdraws;

any additional insurance provided by rider;

any increase or decrease in existing coverage;

the insured's suicide during the first 2 policy years; and

a mistake in the Insured's age.

\* \* \*

\* \* \*

**5  Determining the Account Value. The account value on any monthly due date is determined as follows:

the account value on the prior monthly due date; less any withdraws since the prior monthly due dates; less the monthly deduction for the prior month; plus one month's interest; plus all premiums received since the prior monthly due date.

\* \* \*

\* \* \*

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1999 WL 744430, Mentis v. Delaware American Life Ins. Co., (Del.Super. 1999)    **Page 4**

Interest. The guaranteed interest rate on account values is shown on the Information page [.36748% compounded monthly]. We may use an interest rate in excess of the guaranteed rate in a manner we determine. (FN3)

On the subject of integration and modification, the policy states that "[t]his policy and application(s) constitute the entire contract between you and us.... This policy can only be changed, in writing, by one of our executive officers. No other person, including an agent, has any authority to change or reinstate this policy." (FN4) Nowhere in this cumbersome policy is it clearly (or even unclearly) stated that the monthly premiums will increase if the interest rates earned by the policy fall.

The interpretation of contractual language is a question of law to be decided by the Courts. *Pellaton v. Bank of New York*, Del.Supr., 592 A.2d 473, 478 (1991) (quoting *Klair v. Reese*, Del.Supr., 531 A.2d 219, 222 (1987)). If the relevant language is clear and unambiguous, Courts must give the language its plain meaning. *Phillips Home Builders v. The Travelers Ins. Co.*, Del.Supr., 700 A.2d 127, 129 (1997). A contract is not rendered ambiguous simply because the parties do not agree on its meaning. *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Insurance Co.*, Del.Supr., 616 A.2d 1192, 1196 (1992). Rather, a contract is ambiguous if the provisions are reasonably susceptible to two or more meanings. *Id.*

A contract is not ambiguous if "the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." ' *Id.* (quoting *Holland v. Hannan*, D.C.App., 456 A.2d 807, 815 (1983)). Courts will not torture contractual terms to create an ambiguity. *Rhone-Poulenc*, 616 A.2d at 1196. In determining the meaning of a contract, "[t]he true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* If a contract is deemed ambiguous, extrinsic evidence is admissible to help determine the proper construction of the contract. *Eagle Industries v. DeVilbiss Health Care*, Del.Supr., 702 A.2d 1228, 1232 (1997).

This policy is ambiguous and falls painfully short of placing a reasonable insured on notice that the premium rates would drastically increase if the policy's rate of return faltered. Although the language of the policy, when read closely, may lead to the

"inference" that the premiums may rise, it is certainly not so clear as to place an individual on notice that representations made by the insurer's sales agent regarding policy performance should be completely ignored. The fact that the premiums on this policy may substantially increase is of *critical importance*, and to obscure this fact under pages of policy ink, as opposed to making it crystal clear, leads this Court to the conclusion that the representations made by the insurer's sales agents are relevant when construing the true terms of this policy. This Court is not, however, inclined to construe the contract at this time, that is, on the Defendant's Motion to Dismiss. The Court simply feels that illustrations and representations made by agents of the insurer are relevant to that construction. Because these alleged representations specify that premiums would not rise, and this representation may be utilized in construing the contract, Plaintiff has pleaded facts sufficient to paint a colorable claim for breach of contract. Accordingly, Defendant's Motion to Dismiss with respect to Count II (breach of contract) is DENIED. IT IS SO ORDERED.

### C. Consumer Fraud--Count III

**\*\*6** The Complaint alleges that DelAm committed consumer fraud when it utilized deceptive sales practices, and omitted material facts, to foster the mistaken belief that its premiums would remain the same throughout the life of the policy. DelAm's counter is two fold. First, it argues that the Consumer Fraud Act does not apply to the insurance industry. (FN5) Second, it asserts that expressions of future performance are merely opinions, and not subject to the Consumer Fraud Act.

The Consumer Fraud Act, 6 *Del. C.* § 2513, states that:

(a) The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

\* \* \*

\* \* \*

(b) This section shall not apply:

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1999 WL 744430, Mentis v. Delaware American Life Ins. Co., (Del.Super. 1999)                              **Page 5**

* * *

* * *

(3) To matters subject to the jurisdiction of the Public Service Commission, or of the Insurance Commissioner of this State.

This Act is to be liberally construed to promote the underlying purpose of protecting consumers. 6 *Del. C.* § 2512.

### 1. The Preemptive Effect of the Insurance Code

A consumer may bring a private cause of action under the Consumer Fraud Act against an insurance company, notwithstanding Section 2513(b)(3). *Grand Ventures, Inc. v. Whaley,* Del.Super., 622 A.2d 655, 663 (1992), *aff'd,* 632 A.2d 63 (1993); *DiSimplico v. Equitable Variable Life Ins. Co.,* Del.Super., C.A. No. 85C-01-079, 1988 WL 15394, Babiarz, J. (Jan. 29, 1988). As the *DiSimplico* Court stated:

[T]he Delaware legislature, in authorizing the [Insurance] Commissioner to deal with unfair trade practices in the insurance industry, did not intend to preempt other methods of redressing unfair trade practices, including private party suits against insurance carriers. Rather, the Court believes that the provision evinces a legislative intent to provide an additional, supplementary means of controlling and eradicating misconduct by insurers. Read in conjunction with the purpose of the [Consumer Fraud] Act as articulated in 6*Del. C.* § 2512, this Court concludes that plaintiff may maintain a private cause of action for fraud against [an insurer] pursuant to the [Consumer Fraud] Act.

*Id.* at *2 (footnote omitted).

The Unfair Trade Practices Act, 18 *Del. C.* § 2301 *et seq.,* grants the Insurance Commissioner the authority to regulate unfair practices in the insurance industry. This Act begins by enumerating actions which are deemed unfair methods of competition. 18 *Del. C.* § 2304. It then provides the Insurance Commissioner with the power to "examine and investigate" those participating in the insurance industry to ascertain whether those persons are utilizing unfair methods of competition. 18 *Del. C.* § 2306. If the Insurance Commissioner determines that a person is committing an unfair act, he or she may issue a cease and desist order and/or assess penalties

and fines. 18*Del. C.* §§ 2308, 2311. The powers vested in the Commissioner were intended to be in addition to all other remedies available at law. 18 *Del. C.* §§ 2308(h), 2313. This Act does not permit a private cause of action. *Yardley v. U.S. Healthcare, Inc.,* Del.Super., 698 A.2d 979, 988 (1996),*aff'd,* 693 A.2d 1083 (1997).

**7 The Unfair Trade Practices Act is regulatory in nature, and grants only the State the power to enforce the act. The Unfair Trade Practices Act is also designed to supplement other remedies available at law, not displace them. These remedies would certainly include consumer fraud. Section 2513(b)(3) of the Consumer Fraud Act states that it does not apply to "matters subject to the jurisdiction of ... the Insurance Commissioner." In light of: (1) the Unfair Trade Practices Act's regulatory nature, (2) the absence of a private cause of action under the Unfair Trade Practices Act, (3) the Unfair Trade Practices Act's express statement that it does not intend to displace other remedies available at law, and (4) the Consumer Fraud Act's express statement that it be liberally construed, this Court holds that the only reasonable interpretation of Section 2513(b)(3) is that it only precludes the State from bringing a consumer fraud action against an insurance company; it does not preclude a private cause of action. *Grand Ventures,* 622 A.2d at 663. The Plaintiff in this action may therefore bring a private cause of action under the Consumer Fraud Act.

### 2. Expressions of Opinions

Although fraud generally arises from an overt misrepresentation, it may also occur through deliberate concealment of a material fact in the face of a duty to speak. *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149 (1987). A duty to speak can be created by a pre-existing relationship between the parties or a partial disclosure of facts that requires the disclosure of additional facts to prevent a misleading impression. *Stephenson v. Capano Development, Inc.,* Del.Super., 462 A.2d 1069, 1074 (1983). The "mere expressions of opinion as to probable future events cannot be deemed fraud or misrepresentation." *Biasotto v. Spreen,* Del.Super., C.A. No. 96C-04-030, 1997 WL 527956, Quillen, J. (July 30, 1997) Letter Op. at 12 (citing *Consolidated Fisheries Co. v. Consolidated Solubles Co.,* Del.Supr., 112 A.2d 30, 37 (1955)).

Whether or not DelAm's sales agents expressed "opinions" or outright misleading facts is a question of fact, and cannot be determined on a Motion to Dismiss. The facts alleged in the Complaint, if

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1999 WL 744430, Mentis v. Delaware American Life Ins. Co., (Del.Super. 1999)                              **Page 6**

proven, could very well make out a case for consumer fraud. Accordingly, Defendant's Motion to Dismiss with respect to Count III (consumer fraud) is DENIED. IT IS SO ORDERED.

### D. Unfair Trade Practices Act

As stated earlier, the Unfair Trade Practices Act does not provide a private cause of action. *Yardley,* 698 A.2d at 988; *Moses v. State Farm Fire & Cas. Ins. Co.,* Del.Super., C.A. No. 90C-10-020, 1991 WL 269886, Lee, J. (Nov. 20, 1991). As Judge Lee stated in *Moses:*

> The purpose of the [Unfair Trade Practices] Act was to regulate trade practices in the insurance industry, not to protect a specific class of persons. *See* 18 *Del. C.* § 2301(a). As such, the law is aimed at curbing unfair trade practices and not at providing a remedy for the class of persons which might be harmed by such acts.

**8** Nowhere in the Act is a class of specific complainants established. To the contrary, the Act provides for prosecution of its provisions by the Insurance Commissioner ("Commissioner"), omitting any reference to private actions. *See* 18 *Del.C.* § 2304, *et seq.*

> The terms of the Act itself persuade that a private cause of action is impliedly, if not explicitly, not extended. The Act outlines proscribed practices in § 2303 through § 2305, and then, in § 2306, instills the Commissioner alone with the power to investigate wrongdoing under the Act.

*Id.* at 8-9. Accordingly, Plaintiff does not have standing to bring a claim under the Unfair Trade Practices Act and Defendant's Motion to Dismiss with respect to Count IV (unfair trade practices) is GRANTED. IT IS SO ORDERED.

### E. Statute of Limitations

The remaining two Counts are breach of contract (Count II) and consumer fraud (Count III). Defendant contends that because the alleged deception occurred in or around 1984, that these claims are barred by the statute of limitations. Plaintiff asserts that the actual harm resulting from the deceptive sales practices did not accrue until August of 1998, when the Plaintiff was informed that he needed to substantially increase his premiums in order to maintain his policy's value.

A three-year statute of limitation under 10 *Del. C.* §

8106 governs breach of contract claims. "An action for breach of contract accrues at the time of the breach." *Ensminger v. Merritt Marine Construction, Inc.,* Del.Super., 597 A.2d 854, 856 (1988) (citing *Nardo v. Guido DeAscanis & Sons, Inc.,* Del.Super., 254 A.2d 254 (1969)). The gist of Plaintiff's breach of contract claim is that DelAm represented that so long as the Plaintiff paid $250 a month, he would retain $50,000 in benefits. This alleged contract was not breached until DelAm demanded more than $250 a month in 1998. The breach of contract claim is therefore timely.

A three-year statute of limitation under 10 *Del. C.* § 8106 also governs claims of fraud. The time of discovery rule provides that in certain cases, a cause of action does not accrue until a party has reason to know that he or she has a cause of action. *Pack & Process, Inc. v. Celotex Corp.* Del.Super., 503 A.2d 646, 650-51(1985). Therefore, the limitation period does not begin to run until the Plaintiff has reason to know that a wrong has been committed, provided the injuries are "inherently unknowable" and sustained by a "blamelessly ignorant" Plaintiff. *Kaufman v. C.L. McCabe & Sons, Inc.,* Del.Supr., 603 A.2d 831, 835 (1992). It is not the actual discovery of the reason for the injury that starts the clock, but the discovery of facts sufficient to put a person of ordinary intelligence on inquiry which, if pursued, would lead to discovery. *Becker v. Hamada,* Del.Supr., 455 A.2d 353, 356 (1982) (quoting *Omaha Paper Stock Co. v. Martin K. Eby Constr. Co.,* Neb.Supr., 230 N.W.2d 87, 89-90 (1975)).

**9.** The alleged fraud occurred when the DelAm sales agents solicited existing and potential customers. This occurred more than three years ago. The fraud alleged in the Complaint is that DelAm's sales agents represented that so long as the Plaintiff paid $250 a month, the Plaintiff's coverage would remain at $50,000. This Court has already determined that a reasonable person may not have been placed on notice that the insurance policy was market dependent because the policy language is not clear. Whether the Plaintiff should have been aware, by reading the policy, that premiums may drastically increase, is a question of fact that cannot be determined on a Motion to Dismiss. Accordingly, as to both the contract count and the fraud count, Defendant's Motion to Dismiss the Complaint as barred by the statute of limitations is DENIED. IT IS SO ORDERED.

### F. Class Action Certification

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1999 WL 744430, Mentis v. Delaware American Life Ins. Co., (Del.Super. 1999)        **Page 7**

Having determined that the Plaintiff has stated colorable causes of action, the next issue is whether this action should be certified as a class action under Superior Court Civil Rule 23(b)(3). The Court requests that both parties address this issue shortly after the Defendant files its Answer. *See* Superior Court Civil Rule 23(c).

(FN1.) The facts alleged in Count I, for example, appear to state a claim for common law fraud or deceit. If any modification is needed for such an allegation, it would be modest. Such a claim, however, would be redundant in light of the claim for statutory consumer fraud (Count III), a cause of action less arduous than common law fraud. 6 *Del. C.* § 251; *Stephenson v. Capano Development, Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983).

(FN2.) DelAm Insurance Policy, Defendant's Motion to Dismiss, Exhibit A, at 1 (Dkt. No. 7).

(FN3.) *Id.* at 9-10

(FN4.) *Id.* at 16.

(FN5.) As noted in footnote 1, *supra,* the Complaint appears (perhaps with modest modification) sufficient in its factual allegations to set forth a cause of action in common law fraud and, if for any reason the statutory fraud count failed as a matter of law, the Court would be inclined to permit the case to proceed on a common law basis, including any required or desirable amendment to the pleadings.

© 2007 Thomson/West. No claim to original U.S. Govt. works.