## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COLEMAN DUPONT HOMSEY and             )
ELLEN HOMSEY,                          )
                                       )
                    Plaintiffs,        )
                                       )        C.A. No. 07-338JJF
v.                                     )
                                       )
VIGILANT INSURANCE COMPANY,            )
                                       )
                    Defendant.         )

### HOMSEY PLAINTIFFS' OPENING BRIEF IN SUPPORT
### OF THEIR MOTION FOR SUMMARY JUDGMENT
### ON THE NUMBER OF LOSSES AND THEFTS

John S. Spadaro, No. 3155
John Sheehan Spadaro, LLC
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

December 5, 2007

Attorney for plaintiffs Coleman DuPont
Homsey and Ellen Homsey

1649

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ............................................................1

SUMMARY OF ARGUMENT ................................................................................2

STATEMENT OF FACTS ....................................................................................3

    A. The Parties ..........................................................................................3

    B. The Disputed Insurance Contract ...............................................................3

    C. Vigilant's Reductionist Approach to Claims Handling ......................................5

ARGUMENT ...................................................................................................9

I. AMBIGUITY FAVORS THE INSURED ................................................................9

II. THE POLICY'S PLAIN TERMS REQUIRE PAYMENT
    FOR EACH LOSS AND THEFT ........................................................................10

III. VIGILANT HAS ADMITTED AMBIGUITY .........................................................11

IV. COURTS LOOK TO THE PRESENCE OR ABSENCE
    OF A DEEMER CLAUSE ...............................................................................14

    A. The Nature of "Deemer" Clauses ..............................................................14

    B. The Presence (And Absence) of Deemer Clauses in the
        "Chubb Masterpiece Policy" ....................................................................15

    C. Under Prevailing Case Law, the Absence of a Deemer Clause is Dispositive ...........16

    D. *Faraday* Supports a Finding of Multiple Losses and Thefts .............................19

CONCLUSION................................................................................................21

## TABLE OF AUTHORITIES

*Abex Corp. v. Maryland Cas. Co.*, 790 F.2d 119 (D.C. Cir. 1986) .................................................. 15

*American Commerce Ins. Brokers, Inc. v. Minnesota Mut. Fire & Cas. Co.*,
551 N.W.2d 224 (Minn. 1996) .......................................................... 17

*AT&T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104 (Del. 2007) ............................................. 19, 20

*B.H.D., Inc. v. Nippon Ins. Co. of Europe*, 46 Cal. App.4th 1137
(Cal. Ct. App. 1996)............................................................ 17, 18, 19

*Business Interiors, Inc. v. Aetna Cas. & Sur. Co.*, 751 F.2d 361 (10th Cir. 1984)......................... 17

*Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Systems Co.*,
708 A.2d 989 (Del. 1998) ............................................................ 11

*Hercules Inc. v. AIU Ins. Co.*, 784 A.2d 481 (Del. 2001)........................................................ 9

*Lexington Ins. Co. v. Travelers Indem. Co. of Illinois*, No. 00-15407, 2001
WL1132677 (9th Cir. Aug. 16, 2001) ..................................................... 19

*O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281 (Del. 2001) ...................................... 9

*Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146 (Del. 1997)........................................ 9, 10

*Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*,
616 A.2d 1192 (Del. 1992) ............................................................ 9, 14

*Twin City Fire Ins. Co. v. Delaware Racing Assn.*, 840 A.2d 624 (Del. 2003)........................... 9, 13

*Universal Underwriters Ins. Co. v. Jones Ford, Lincoln-Mercury, Inc.*,
734 So.2d 173 (Miss. 1999)....................................................... 16, 17, 19

*Woodward v. Farm Family Cas. Ins. Co.*, 796 A.2d 638 (Del. 2002)........................... 9, 13-14

### Other authorities

Howard B. Epstein, Theodore A. Keyes, *Beware of Deemer Clauses
Treating Related Claims as Single Claims*, NEW YORK LAW JOURNAL,
November 8, 2004................................................................ 14-15

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993)..................... 11, 12, 13

## NATURE AND STAGE OF THE PROCEEDINGS

This consumer coverage case was filed in Delaware's Superior Court on April 20, 2007, and later removed to this Court. The plaintiffs Coleman DuPont Homsey and Ellen Homsey proceed under a policy of insurance denominated as a "Chubb Masterpiece Policy," sold to them by the defendant Vigilant Insurance Company (a Chubb affiliate). The Homseys seek, among other relief, a declaration that Vigilant must pay their legal obligations for losses caused by 1) thefts of certain credit cards and/or credit card numbers, up to a total of $10,000 for each such theft, and 2) the forging of certain checks, up to a total of $10,000 for each such check. The Homsey plaintiffs now move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on the "number of losses" and "number of thefts" issue. Specifically, they ask this Court to hold that Vigilant's contractual promise of "Credit cards, forgery, and counterfeiting" coverage requires the insurer to pay up to $10,000 for each theft of a credit card or card number, and each forged check.

## SUMMARY OF ARGUMENT

1.  A reasonable reading of Vigilant's "Credit cards, forgery, and counterfeiting" provision requires Vigilant to pay up to $10,000 for each individual loss or theft covered thereunder.

2.  Believe it or not, Vigilant has actually argued in this case that its "Credit cards, forgery and counterfeiting" provision is susceptible to more than one reasonable reading; and it admits that under one such reasonable reading, Vigilant must pay up to $10,000 for *every* covered loss or theft. *See* D.I. 10 at 5.  But under Delaware law, a contract term susceptible to more than one reasonable meaning is ambiguous as a matter of law.  In cases such as this -- involving a standardized, preprinted policy form inserted by the insurer into a consumer adhesion contract -- Delaware law applies the doctrine of *contra proferentem*.  Vigilant has thus admitted ambiguity; and the ambiguity must be construed in the Homseys' favor.

3.  The prevailing case law likewise supports the Homseys.  In cases involving multiple (but related) criminal acts, courts look to whether the insurer has employed a "deemer clause" -- a clause that expressly deems related losses as a single unitary loss.  In the absence of such a deemer clause (which Vigilant failed to include in the coverage at issue here), courts treat each related theft as a discrete and individual loss.

## STATEMENT OF FACTS

### A. The Parties

Plaintiffs Coleman DuPont Homsey and Ellen Homsey are natural persons and husband and wife. They reside at 466 Snuff Mill Lane, Hockessin, Delaware 19707. The disputed insurance policy expressly extends coverage to Mr. Homsey as "the person named in the [policy's] Coverage Summary," along with "a spouse who lives with that person" -- meaning, in this instance, plaintiff Ellen Homsey. Mrs. Homsey is thus an insured person under the disputed policy. A9.[1]

The defendant Vigilant Insurance Company is a New York corporation with a principal place of business in Warren, New Jersey. It is engaged in the business of insurance and regularly sells insurance in Delaware. D.I. 15 ¶5 (Vigilant's amended answer to complaint.)

### B. The Disputed Insurance Contract

Vigilant issued to Mr. Homsey its "Chubb Masterpiece Policy" no. 12680929-01 (the "Policy"). The Policy has been in effect at all times relevant to this action. D.I. 15 ¶6. It provides a variety of coverages, including Deluxe House Coverage, Standard Contents Coverage and Personal Liability Coverage. A1-97 (copy of policy as produced by Vigilant).

Beginning at page "T-1" the Policy sets forth the terms and conditions of its Personal Liability Coverage. A28. At page T-4 the Policy sets forth certain "Extra Coverages" as part of the Personal Liability Coverage section. Among these "Extra Coverages" is one titled "Credit cards, forgery and counterfeiting," which appears at page T-6 of the Policy. A33. This coverage -- on which the entire litigation hinges -- provides as follows:

---

[1] References to the alphanumeric sequence beginning with "A__" are to the accompanying appendix.

3

**Credit cards, forgery, and counterfeiting**

We cover a covered person's legal obligation, up to a total of $10,000 for:

· loss or theft of a credit or bank card issued to you or a family member, provided that all the terms for using the card are complied with;

· loss caused by theft of a credit card number or bank card number issued to you or a family member when used electronically, including use on the Internet, provided that all the terms for using the card are complied with;

· loss caused by forgery or alteration of *any check* or negotiable instrument; or

· loss caused by accepting in good faith any counterfeit paper currency.

We will defend a claim or suit against you or a family member for loss or theft of a credit card or bank card.  We have the option to defend a claim or suit against you or a family member (or against a bank, with respect to this coverage) for forgery or counterfeiting.

We may investigate, negotiate and settle any such claim or suit at our discretion.  Our obligation to defend ends when our payment for the loss equals $10,000.

In the event of a claim, the covered person shall comply with the duties described in Policy Terms, Property Conditions, Your duties after a loss and Policy Terms, Liability Conditions, Your Duties after a loss.  In addition, the covered person shall notify the credit card service company or the issuing bank.

This coverage does not apply to losses covered under Identity fraud.

A33 (emphasis added).

Under any fair reading of this language, the policy promises up to $10,000 for "loss caused by forgery . . . of any check," and loss caused by theft of a credit card or credit card number.  The issue, then, is whether Vigilant may properly rewrite this language to limit its

liability to $10,000 for a) *all* losses caused by forgery of *all* checks (as opposed to "any check");

and b) *all* losses caused by theft of *all* credit cards (as opposed to "a credit card").

### C. Vigilant's Reductionist Approach to Claims Handling

By letter dated December 29, 2005 and sent by hand delivery and FedEx from the

Homseys' attorney to Weymouth & Smith Insurance, Inc. (Vigilant's agent for receipt of notice

of claims under the Policy), the Homseys tendered to Vigilant their claim for coverage under the

"Credit cards, forgery, and counterfeiting" coverage section.[2]  They provided Vigilant's agent

with a detailed account of the thefts and losses:

> Coleman and Ellen Homsey and their son, Walter Homsey, are
> holders of a Capital Advantage Account (no. 1064-8599) at
> Wilmington Trust Bank.  In addition, they were each holders of a
> credit card issued by Wilmington Trust prior to December 2004
> (when the card was cancelled).
>
> In December 2004 Ellen Homsey began to suspect that
> unauthorized transactions had been charged to the Wilmington
> Trust credit card.  She had the card cancelled and began to
> investigate.  This led to the discovery that Walter Homsey's
> estranged wife, Marcia, had made unauthorized use of the credit
> card for approximately $12,000 in charges.
>
> The discovery that Marcia Boyer Homsey had misappropriated the
> Wilmington Trust credit card number led to a broader inquiry
> regarding her activities; and in January 2005, the Homseys
> concluded that she had also forged and negotiated multiple checks
> under the Wilmington Trust checking account.  The forged checks
> were presented for payment between March 2003 and November
> 2004.  By present calculations they total $218,733.40.  These
> include individual checks written for as little as $300, or as much
> as $35,000.

A98-99.  The December 2005 letter also provided Vigilant with copies of the forged checks

themselves, and an itemized summary of the forgeries.  A100-18.  On February 28, 2006, the

---

[2] Though Vigilant denies Weymouth & Smith's agency status, *see* D.I. 15 ¶31, the Policy clearly
designates Weymouth as Vigilant's agent for receipt of claim notices.  A2, A3, A43.

Homseys provided Vigilant (through Weymouth) with additional evidence of multiple thefts of the Homseys' credit card and bank card numbers. A119-200.

A comparison of the pleadings, meanwhile, shows that for a full year after receiving notice of the claim, Vigilant essentially ignored it -- barely even communicating with the Homseys' attorney, and never offering a dime in payment:

> Compl. ¶33. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during January 2006.
>
> Ans. ¶ 33. Defendant admits the averment in Paragraph 33.
>
> ***
>
> Compl. ¶35. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during February 2006.
>
> Ans. ¶ 35. Defendant admits the averment in Paragraph 35.
>
> Compl. ¶36. Vigilant did not communicate with the Homseys or their attorney regarding the tendered claim for "Credit card, forgery, and counterfeiting" coverage during March 2006.
>
> Ans. ¶ 36. Defendant admits the averment in Paragraph 36.
>
> Compl. ¶37. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during March 2006.
>
> Ans. ¶ 37. Defendant admits the averment in Paragraph 37.
>
> ***
>
> Compl. ¶39. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during April 2006.
>
> Ans. ¶ 39. Defendant admits the averment in Paragraph 39.

Compl. ¶40.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during May 2006.

Ans. ¶ 40.  Defendant admits the averment in Paragraph 40.

Compl ¶41.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during June 2006.

Ans. ¶ 41.  Defendant admits the averment in Paragraph 41.

Compl. ¶42.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during July 2006.

Ans. ¶ 42.  Defendant admits the averment in Paragraph 42.

Compl. ¶43.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during August 2006.

Ans. ¶ 43.  Defendant admits the averment in Paragraph 43.

Compl. ¶44.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during September 2006.

Ans. ¶ 44.  Defendant admits the averment in Paragraph 44.

Compl. ¶45.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during October 2006.

Ans. ¶ 45.  Defendant admits the averment in Paragraph 45.

Compl. ¶46.  Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during November 2006.

Ans. ¶ 46.  Defendant admits the averment in Paragraph 46.

*Compare* Compl. ¶¶33, 35-37, 39-46 *with* D.I. 15 ¶¶33, 35-37, 39-46.

Having remained virtually silent and almost entirely inactive on the claim for a full year, Vigilant then tendered just $10,000 to the Homseys for their six-figure claim. A201-03. A letter accompanying this payment advised that according to Vigilant, $10,000 represented some allegedly "maximum payment" under the "Credit cards, forgery and counterfeiting" coverage. A201. This letter, which constitutes the sole pre-litigation writing from Vigilant to the Homseys on the subject of their claim, set forth no reservation of rights. Rather, the claim was simply covered -- and according to Vigilant, covered in full. *See, e.g.*, D.I. 15 ¶56 (Vigilant pleads that it "has fully paid Homsey (sic) on this claim in accordance with the Policy.")

Because Vigilant's *de minimis* payment is inconsistent with the plain terms of the "Credit cards, forgery, and counterfeiting" coverage, and because it cheats the Homseys of the "masterpiece" protection they purchased, the Homseys now move for summary judgment to this effect: that Vigilant must pay the Homseys up to $10,000 for each theft of a credit card or card number, and each forged check.

**ARGUMENT**

## I. AMBIGUITY FAVORS THE INSURED

Under Delaware law, contract construction is a pure question of law. *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 286 (Del. 2001); *Hercules Inc. v. AIU Ins. Co.*, 784 A.2d 481, 489 (Del. 2001); *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). The Delaware approach to contract construction is objective and textual, the goal being to "determine the intent of the parties from the language of the contract." *Twin City Fire Ins. Co. v. Delaware Racing Assn.*, 840 A.2d 624, 628 (Del. 2003). *Accord, Hercules*, 784 A.2d at 489-90 (to same effect). Unilateral intent is thus irrelevant:

> The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

*Rhone-Poulenc*, 616 A.2d at 1196.

A contract term is ambiguous when it can be assigned more than one reasonable meaning. *Twin City*, 840 A.2d at 628; *Woodward v. Farm Family Cas. Ins. Co.*, 796 A.2d 638, 642 (Del. 2002); *Hercules*, 784 A.2d at 490. Where one party to a contract acts as the agreement's drafter, Delaware law applies the doctrine of *contra proferentem*. Thus, ambiguities in an insurance contract "will be construed 'most strongly against the insurance company that drafted it.'" *Woodward*, 796 A.2d at 642 (quoting *Rhone-Poulenc*, 616 A.2d at 1196). *Accord, O'Brien*, 785 A.2d at 288 (noting the insurer's obligation "to state clearly the terms of the policy"); *Hercules*, 784 A.2d at 492 (same). The Delaware Supreme Court offered a thoughtful explanation of the doctrine of *contra proferentem* in *Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146 (Del. 1997):

The starting point is the approach to interpreting insurance contracts. They must be interpreted in a common sense manner, giving effect to all provisions so that a reasonable policyholder can understand the scope and limitation of coverage. It is the obligation of the insurer to state clearly the terms of the policy, just as it is the obligation of the issuer of securities to make the terms of the operative document understandable to a reasonable investor whose rights are affected by the document. Thus, if the contract in such a setting is ambiguous, the principle of *contra proferentem* dictates that the contract must be construed against the drafter.

The policy behind this principle is that the insurer or the issuer, as the case may be, is the entity in control of the process of articulating the terms. The other party, whether it be the ordinary insured or the investor, usually has very little say about those terms except to take them or leave them or to select from limited options offered by the insurer or issuer. Therefore, it is incumbent upon the dominant party to make the terms clear. Convoluted or confusing terms are the problem of the insurer or issuer -- not the insured or investor.

*Oglesby*, 695 A.2d at 1149-50 (footnotes omitted).

In short, it was incumbent on Vigilant to make its "Credit cards, forgery, and counterfeiting" provision clear in cases of multiple losses and thefts. Having failed to do so, the financial consequences must fall entirely on Vigilant. This is the *contra* in *contra proferentem*.

## II. THE POLICY'S PLAIN TERMS REQUIRE PAYMENT FOR EACH LOSS AND THEFT

A reasonable reading of the Policy's "Credit cards, forgery, and counterfeiting" coverage requires Vigilant to pay up to $10,000 for each of the multiple checks forged on their checking account, and each of the multiple thefts of credit cards and/or credit card numbers. For example, the promise to pay up to $10,000 for "loss caused by forgery . . . of *any check*" cannot reasonably justify the payment of just $10,000 for *all* forgeries of *all* checks. This is a natural function of the meaning of "any," which (as even small children understand) connotes *one* and not *all*:

10

> **Any** . . . *adj* [ME, fr. OE *aenig*; akin to OHG *einag* any, OE *an* one
> — more at ONE] (bef. 12c) **1 :** one or some indiscriminately of
> whatever kind: **a. :** one or another taken at random {ask ~ man
> you meet} . . . .

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 53 (10th ed. 1993).

When a first grader is asked by a magician to *Pick a card, any card*, he or she thus

understands immediately that just a single card, and not the entire deck, should be selected.  By

the same token, a contractual promise to pay up to $10,000 for forgery of ***any check*** is not a

$10,000 ceiling for all checks, but only for one check at a time.

Similarly, the promise to pay up to $10,000 for "loss caused by theft of a credit card

number" may be reasonably read to refer to ***each*** such loss or theft.  To say otherwise is to

rewrite the policy, effectively changing "loss or theft" to read "all losses or thefts."  But this is

not an option: "Delaware observes the well-established general principle that . . . it is not the

proper role of the court to rewrite or supply omitted provisions to a written agreement."

*Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Systems Co.*, 708 A.2d 989, 992

(Del. 1998).

The Homseys' reading of the "Credit cards, forgery, and counterfeiting" clause -- under

which Vigilant must pay up to $10,000 for each covered loss and theft -- is thus reasonable.  And

as it happens, Vigilant has conceded the point.

## III. **VIGILANT HAS ADMITTED AMBIGUITY**

In its July 2007 reply brief in support of its failed motion to dismiss, Vigilant

affirmatively argued that the disputed policy language was reasonably susceptible to two

competing constructions.  According to Vigilant, the reference to "any check" could reasonably

mean "*every* check" (so that the Homseys would be entitled to payment of up to $10,000 for

every forged check); or it could just as easily mean "any *type* of check" (so that payment would

be limited to $10,000 for all forgeries regardless of whether a personal check, cashier's check or

traveler's check was involved).  Vigilant thus argued:

> Plaintiffs argue that the word "any" has one meaning and that it
> means "one."  As listed above, the word "any" has several
> definitions and it even can mean "every."  Therefore, it is
> reasonable to interpret the phrase, "[w]e cover a person's legal
> obligations, up to a total of $10,000 for . . . loss caused by forgery
> or alteration of any check or negotiable instrument . . . [o]ur
> obligation to defend ends when our payment for the loss equals
> $10,000[,]" to mean the total amount to be paid for "every" forged
> check is $10,000.  The phrase, "any check" in conjunction with the
> language "up to a total of $10,000" and "[o]ur obligation . . . ends
> when our payment . . . equals $10,000" reasonably can mean every
> check up to a cap of $10,000.  It also reasonably can mean any
> type of check or negotiable instrument (i.e., personal check,
> cashier's check, traveler's check, etc.) intending not to limit
> recovery of a particular type of check.

D.I. 10 at 5-6 (footnote omitted).

Several observations are in order.  First and most obviously, a promise to pay up to

$10,000 for *every* forged check -- which, as Vigilant concedes above, is a reasonable

interpretation -- requires multiple payments of up to $10,000 each.  This is because the primary

meaning of "every" is "each":

> ev.ery . . .*adj* [ME *everich*, *every*, fr. OE *ǽfre ǽlc*, fr. *ǽfre* ever +
> *ǽlc* each] (bef 12c) **1 a**: being each individual or part of a group
> without exception **b**: being each in a series or succession {~ few
> days} **2** *obs*: being all taken severally **3**: being each within a
> range of possibilities {was given ~ chance} **4**: COMPLETE,
> ENTIRE {we have ~ confidence in her} — **every now and then** *or*
> **every now and again** *or* **every so often**: at intervals :
> OCCASIONALLY

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 402 (10th ed. 1993).

This dictionary entry, taken from a leading collegiate dictionary, deserves close scrutiny.

Including subparts, it shows a total of five possible meanings for *every*.  The first two (numbers

1(a) and (b)) are of course the primary meanings, and both favor the Homseys: if "any check"

means "each individual check from a group of checks" or "each check in a series of checks," then the Homseys must necessarily prevail on this motion. Likewise, definition number 3 ("each within a range") supports the Homseys' construction. Definition number 4, meanwhile, has a purely temporal meaning that does not apply in the context of the "any check" reference.

But what of definition number 2 -- the one that Vigilant presumably meant to imply in the quoted passage from its prior brief? This alternative meaning ("being all taken severally") is denoted by the abbreviation "*obs,*" short for *obsolete*. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 37a (10th ed. 1993) (setting forth a legend for abbreviations used in the dictionary, including *obs*). In other words, Vigilant's preferred construction has fallen into obsolescence, and is no longer a part of common English usage. But can such a construction prevail in a consumer contract setting? Or in any setting that looks to the plain meaning of words? *Cf.* A9 (Vigilant's Policy promises to "use words in their plain English meaning.")

By admitting that "any check" can reasonably mean "every check," Vigilant thus concedes that the Homseys' construction is a reasonable one. After all, payment of up to $10,000 for *every* forged check is precisely what the Homseys seek. But how is the analysis affected by Vigilant's second alternative construction, in which "any check" supposedly means "any type of check"?

The answer is twofold. First, if the disputed clause is (as Vigilant concedes) susceptible to two competing but reasonable constructions -- one favoring the consumer insureds and the other favoring the insurance company -- then that language is ambiguous as a matter of law. *See Twin City Fire Ins. Co. v. Delaware Racing Assn.*, 840 A.2d 624, 628 (Del. 2003) (contract term is ambiguous when it can be assigned more than one reasonable meaning); *Woodward v. Farm Family Cas. Ins. Co.*, 796 A.2d 638, 642 (Del. 2002) (same). Second, ambiguous contract

language triggers the doctrine of *contra proferentem*. *Woodward*, 796 A.2d at 642 (quoting *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) for the proposition that ambiguities in an insurance contract "will be construed 'most strongly against the insurance company that drafted it.'")

This last line of analysis assumes, of course, that Vigilant's "any-type-of-check" construction can be taken seriously in the first instance. But in reality it cannot: a promise to pay up to $10,000 for forgery of "any check" does not remotely signal to the consumer that coverage is limited to all aggregated checks of various types. Rather, Vigilant's construction artificially rewrites "any check" to mean "any type of check" -- language that Vigilant might have included, but did not.

But any way one slices it, the Homseys should prevail; either by application of *contra proferentem* (taking Vigilant's admissions at face value), or because the Homseys' construction is the *only* reasonable one under standard English usage.

## IV. COURTS LOOK TO THE PRESENCE OR ABSENCE OF A DEEMER CLAUSE

In cases involving multiple (but related) criminal acts, courts look to whether the insurer has employed a "deemer clause" -- a clause that expressly deems related losses as a single unitary loss. In the absence of such a deemer clause (which Vigilant failed to include in its "Credit cards, forgery, and counterfeiting" coverage), courts treat each related theft as a discrete and individual loss.

### A. The Nature of "Deemer" Clauses

Found in a wide variety of insurance products, deemer clauses generally "provide that related claims will be treated as a single claim for certain purposes." Howard B. Epstein, Theodore A. Keyes, *Beware of Deemer Clauses Treating Related Claims as Single Claims*, NEW

14

YORK LAW JOURNAL, November 8, 2004.[3]  In liability policies, deemer clauses are sometimes

used to "deem[] when injury occurs" in cases involving progressive or continuous injury. *Abex*

*Corp. v. Maryland Cas. Co.*, 790 F.2d 119, 122 (D.C. Cir. 1986).  But wherever they appear,

deemer clauses exist to clarify what Vigilant's "Credit cards, forgery, and counterfeiting"

provision leaves unclear: whether the *many* should be deemed as *one*.

### B. The Presence (And Absence) of Deemer Clauses in the "Chubb Masterpiece Policy"

This is not to say that Vigilant's "Chubb Masterpiece Policy" contains no deemer clauses;

to the contrary, Vigilant's Policy uses the "deemer" mechanism more than once.  For example, in

a section of the Policy labeled "Introduction," Vigilant sets forth the following definition of the

term "occurrence":

> **Occurrence** means a loss or accident to which this insurance
> applies occurring within the policy period. ***Continuous or
> repeated exposure to substantially the same general conditions
> unless excluded is considered to be one occurrence.***

A9 (emphasis added in part).  The second sentence in this passage, treating multiple related

"exposures" as a single temporal event, is a deemer clause.

But the disputed coverage here ("the "Credit cards, forgery, and counterfeiting" coverage)

is part of Vigilant's "Delaware Personal Liability Coverage" section.  This bundle of coverages,

including the "Extra Coverages" it provides, appears in a dedicated section of the policy at pages

T-1 through T-13 (with the disputed coverage appearing at page T-6).  *See* A28-40.  For this part

of the policy -- the part at issue in this lawsuit -- Vigilant provides a separate and slightly altered

version of its "occurrence-based" deemer clause:

> "Occurrence" means an accident or offense to which this insurance
> applies and which begins within the policy period.  Continuous or

---

[3] Abstracted at www.srz.com/publications/publicationsdetail.aspx?publicationid=1080.

repeated exposure to substantially the same general conditions
unless excluded is considered to be one occurrence.

A28.

The difficulty with this language is that, while its deemer clause may apply to *some* of the coverages set forth in the Personal Liability Coverage section, it makes no sense when applied to the forging of checks or the theft of credit card numbers. In the context of forgeries and thefts, for example, what is the "exposure"? Is it the exposure of the forger's pen to the check's paper? Or the exposure of the thief's eyes to the credit card number? And what are the "same general conditions" in this scenario? Is the forger's very identity a "general condition"?

We thus see that any attempt to apply Vigilant's deemer clause to the facts here produces nonsensical results. An act of forgery is an "exposure to general conditions" in the same way that a football is a ham sandwich. This presumably explains why Vigilant has yet to argue in this case that the deemer clause set forth at page T-1 of the Policy has any meaningful application to this case.

In other words, there is simply no deemer clause that applies to the Homseys' claim. Vigilant chose to employ such deemer clauses in connection with other coverages; but it failed to do so in connection with its "Credit cards, forgery, and counterfeiting" coverage.

## C. Under Prevailing Case Law, the Absence of a Deemer Clause is Dispositive

The question presented here was definitively answered by the Mississippi Supreme Court in *Universal Underwriters Ins. Co. v. Jones Ford, Lincoln-Mercury, Inc.*, 734 So.2d 173 (Miss. 1999). In *Jones Ford* the insured car dealership was the victim of multiple acts of embezzlement by its bookkeeper over the course of four years. The claim was tendered to the dealership's

insurer under the policy's "employee dishonesty" coverage; but the insurer argued that a single

$10,000 policy limit should apply to all the acts of embezzlement collectively.

Surveying the relevant case law, the Mississippi high court found that the issue turned on

the presence or absence of an applicable deemer clause:

> Universal [the insurer] cites numerous cases in which courts have
> ruled that multiple and separate dishonest acts or occasions of
> embezzlement constitute a single loss to the insured, or that
> multiple occasions of embezzlement or theft were part of such a
> common scheme by an employee that it would constitute one loss
> or occurrence. Jones Ford [the insured] correctly points out,
> however, that the cases in which courts have considered the
> question of whether stated policy limits and deductibles for
> employee dishonesty coverage apply to a series of acts caused by
> an employee are *those cases in which the policy language clearly
> and unambiguously states that multiple acts may constitute one
> occurrence of loss.*

*Jones Ford*, 734 So.2d at 177 (collecting cases) (emphasis added). Examples cited in *Jones Ford*

include *American Commerce Ins. Brokers, Inc. v. Minnesota Mut. Fire & Cas. Co.*, 551 N.W.2d

224 (Minn. 1996), in which the policy "stated specifically that all loss or damage involving a

single act or series of related acts was considered one occurrence"; and *Business Interiors, Inc. v.

Aetna Cas. & Sur. Co.*, 751 F.2d 361 (10th Cir. 1984), in which the policy deemed all dishonest

acts by a single actor as one occurrence. *Jones Ford*, 734 So.2d at 177 (citing *American

Commerce*, 551 N.W.2d at 225 and *Business Interiors*, 751 F.2d at 362 n.1).

Other case law likewise confirms that in the absence of an applicable deemer clause,

multiple (but related) thefts constitute separate losses or occurrences. In *B.H.B., Inc. v. Nippon

Ins. Co. of Europe*, 46 Cal. App.4th 1137 (Cal. Ct. App. 1996) the insurer argued that a $10,000

deductible applied individually (not collectively) to each of several related jewelry thefts

perpetrated by a single thief.[4]  Addressing policy language that contained no deemer clause, the

California appellate court upheld the "multiple losses" approach:

> [A]ppellant argues that the $10,000 deductible should be applied to
> the aggregated amount of the loss, since all the thefts were of the
> same kind, committed in the same way by the same person, and all
> were submitted on a single claim.
>
> ***
>
> We do not find that contention to be tenable.  While the thefts were
> similar, each was a completed crime that would have supported a
> separate count in a criminal proceeding and a separate punishment.
>
> ***
>
> If a thief takes several items on a single occasion, there is one
> occurrence.  If a thief commits larceny on each of several
> successive days, there are many occurrences.

*B.H.D.*, 46 Cal. App.4th at 1141-42.

More recently, the Ninth Circuit relied on *B.H.D.* in concluding that four separate fires

set by a single arsonist according to a common plan each constituted a separate occurrence for

insurance purposes:

> We agree with the district court that four separate fires in four
> separate buildings at four separate locations constitute four
> separate occurrences for purposes of plaintiff's liability and the
> policy deductible.
>
> ***
>
> Each fire set by the arsonist would and did support separate counts
> in a criminal proceeding.

---

[4] One depressing (if predictable) trend in these cases is that where deductibles are involved,
insurers invariably argue that multiple related thefts should be treated as multiple losses; while in
cases involving the application of policy limits, insurers always argue for a "single loss"
approach.

*Lexington Ins. Co. v. Travelers Indem. Co. of Illinois*, No. 00-15407, 2001 WL1132677, slip op. at *4 (9th Cir. Aug. 16, 2001) (citing *B.H.D.*) (other citations omitted) (Ex. A).

The logic of these cases applies with equal force here. As shown above, no deemer clause applies to Vigilant's "Credit cards, forgery, and counterfeiting" coverage. The underlying acts of dishonesty took place over the course of nearly two years. They involved not a single methodology, nor any discernible overarching plan, but a hodgepodge of forgeries and thefts -- though not uniform thefts, since many thefts involved credit card numbers, while others involved bank card numbers. (Vigilant has yet to explain how a forged check, a stolen credit card number and a stolen bank card number can all constitute just a single loss.) They involved scores of discrete acts on multiple dates, any one of which, if prosecuted, could support separate and complete criminal charges.

In short, Vigilant's failure to employ a deemer clause -- one that actually (and sensibly) applies to the forging of checks, etc. -- is dispositive. Because nothing in the Policy allows Vigilant to deem multiple losses and thefts as just a single loss or theft, the Homseys should be granted summary judgment on the issue.

### D. *Faraday* Supports a Finding of Multiple Losses and Thefts

Would the Delaware Supreme Court align itself with *Jones Ford, B.H.D., Lexington* and the rest? Judging from its recent opinion in *AT&T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104 (Del. 2007), the answer is almost certainly yes.

In *Faraday* the insured sought coverage under its D&O policies for two separate shareholder suits. The policies promised coverage for "Losses Resulting From Any Claim," with "Claim" defined to include "any written or oral demand for damages" or "any civil, criminal, administrative or regulatory proceeding . . . ." *Faraday*, 918 A.2d at 1107. Based on this

language, the insurers argued that "when a demand is made in the form of a lawsuit, one lawsuit equals one 'claim.'" *Id.*

The Delaware Supreme Court disagreed. Under the policies' definition, it reasoned, demands for money damages -- whether separate from a lawsuit or made part of a formal pleading -- were enough by themselves to constitute a claim. Thus, each of the separate causes of action pled in the two underlying lawsuits could be counted as separate and discrete claims for purposes of coverage. *Id.*

By the same token, Vigilant's promise to pay up to $10,000 for "loss" or "theft" can be sensibly read to embrace each discrete and individual loss and theft among a larger universe of losses and thefts. Absent an applicable deemer clause, there is nothing to foreclose that (reasonable) construction. And as *Faraday* shows, the Delaware Supreme Court is not in the habit of rescuing insurance companies from their own policy language.

## CONCLUSION

A reasonable reading of Vigilant's "Credit cards, forgery, and counterfeiting" provision requires Vigilant to pay up to $10,000 for each individual loss or theft covered thereunder. By affirmatively arguing that the clause offers coverage up to $10,000 for *every* loss or theft, Vigilant has conceded the issue. Prevailing case law likewise confirms that Vigilant, which failed to employ a deemer clause for the coverage at issue, must cover each individual loss up to the $10,000 limit.

For all these reasons, plaintiffs Coleman DuPont Homsey and Ellen Homsey respectfully request the entry of summary judgment in their favor on the "number of thefts and losses" issue.

Respectfully submitted,

/s/ John S. Spadaro
John S. Spadaro, No. 3155
John Sheehan Spadaro, LLC
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

December 5, 2007

Attorney for plaintiffs Coleman
DuPont Homsey and Ellen Homsey

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| COLEMAN DUPONT HOMSEY and<br>ELLEN HOMSEY, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 07-338JJF |
| v. | ) | |
| | ) | |
| VIGILANT INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the

Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following:

Denise Seastone Kraft
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Wilmington, DE 19801

In addition, I certify that the document itself was served by U.S. Mail at the address

shown.

JOHN SHEEHAN SPADARO, LLC
/s/ John S. Spadaro
John S. Spadaro, No. 3155
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

Attorney for Coleman DuPont
Homsey and Ellen Homsey

December 5, 2007

1652

# EXHIBIT A

Westlaw.

21 Fed.Appx. 585

Page 1

21 Fed.Appx. 585, 2001 WL 1132677 (C.A.9 (Cal.))
**(Cite as: 21 Fed.Appx. 585)**

**H**
Lexington Ins. Co. v. Travelers Indem. Co. of
Illinois
C.A.9 (Cal.),2001.
This case was not selected for publication in the
Federal Reporter.Please use FIND to look at the
applicable circuit court rule before citing this
opinion. (FIND CTA9 Rule 36-3.)
United States Court of Appeals,Ninth Circuit.
LEXINGTON INSURANCE COMPANY;
Houston Casualty Company,
Plaintiffs-Counter-Defendants-Appellants,
v.
TRAVELERS INDEMNITY COMPANY OF
ILLINOIS, Defendant-Appellee,
Commonwealth Insurance Company, Reliance
National Insurance Company, Hartford Fire
Insurance Company, American International
Specialty Lines Insurance Company,
Defendants-Counter-Claimants-Appellees.
No. 00-15407.
D.C. No. CV-98-03477 CRB/JCS.

Submitted Aug. 16, 2001.[FN*]

FN* The panel unanimously finds this case
suitable for submission on the record and
briefs and without oral argument. Fed.
R.App. P. 34(a)(2).
Decided Sept. 11, 2001.

Primary insurers filed action against excess insurers
in state court, seeking declaration that arson fires at
four different county courthouses set by same
individual constituted a single occurrence under
county's property insurance policy. Following
removal, parties filed cross-motions for summary
judgment. The United States District Court for the
Northern District of California, Charles R. Breyer,
J., granted defendants' motion. Primary insurers
appealed. The Court of Appeals held that the four
fires were four separate occurrences.

Affirmed.
West Headnotes
**[1] Federal Courts 170B ⟜776**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
           170Bk776 k. Trial De Novo. Most
Cited Cases
A district court's grant of summary judgment is
reviewed de novo. Fed.Rules Civ.Proc.Rule 56, 28
U.S.C.A.

**[2] Federal Courts 170B ⟜776**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
           170Bk776 k. Trial De Novo. Most
Cited Cases
Court of Appeals reviews a trial court's
interpretation of an insurance contract de novo.

**[3] Contracts 95 ⟜176(1)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k176 Questions for Jury
           95k176(1) k. In General. Most Cited
Cases
Under California law, contract interpretation is an
issue of law.

**[4] Federal Civil Procedure 170A ⟜2141**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(F) Taking Case or Question from
Jury
         170AXV(F)2 Questions for Jury
           170Ak2141 k. In General. Most Cited

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Fed.Appx. 585                                                      Page 2

21 Fed.Appx. 585, 2001 WL 1132677 (C.A.9 (Cal.))
**(Cite as: 21 Fed.Appx. 585)**

Cases
It is the duty of the trial court to determine an issue
of law.

**[5] Insurance 217 ☞1822**

217 Insurance
   217XIII Contracts and Policies
      217XIII(G) Rules of Construction
         217k1822 k. Plain, Ordinary or Popular
Sense of Language. Most Cited Cases
Under California law, it is not permissible to impute
an unusual meaning to language used in an
insurance contract.

**[6] Contracts 95 ☞143.5**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k143.5 k. Construction as a Whole.
Most Cited Cases
Under California law, a written contract must be
read as a whole and every part interpreted with
reference to the whole.

**[7] Contracts 95 ☞153**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k151 Language of Instrument
         95k153 k. Construction to Give
Validity and Effect to Contract. Most Cited Cases

**Contracts 95 ☞154**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k151 Language of Instrument
         95k154 k. Reasonableness of
Construction. Most Cited Cases
Under California law, when interpreting a written
contract, preference must be given to reasonable
interpretations as opposed to those that are
unreasonable, or that would make the contract
illusory.

**[8] Contracts 95 ☞143(2)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k143 Application to Contracts in
General
         95k143(2) k. Existence of Ambiguity.
Most Cited Cases
Under California law, the fact that the parties to a
contract dispute its meaning does not establish that
the contract is ambiguous.

**[9] Insurance 217 ☞2282**

217 Insurance
   217XVII Coverage--Liability Insurance
      217XVII(A) In General
         217k2279 Amounts Payable
         217k2282 k. Deductibles. Most Cited
Cases

**Insurance 217 ☞2285(1)**

217 Insurance
   217XVII Coverage--Liability Insurance
      217XVII(A) In General
         217k2279 Amounts Payable
         217k2285 Other Insurance
         217k2285(1) k. In General. Most
Cited Cases
Under California law, arson fires at four different
county courthouses set by same individual were
four separate occurrences for purposes of
determining liability of primary insurers and
deductible of county's property insurance policy;
each fire set by arsonist supported separate counts
in criminal proceeding.

**\*586** Appeal from the United States District Court
for the Northern District of California, Charles R.
Breyer, District Judge, Presiding.

Before     WOOD,[FN**]KOZINSKI,    and
O'SCANNLAIN, Circuit Judges.

     FN** Honorable Harlington Wood, Jr.,
     Senior Circuit Judge, United States Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Fed.Appx. 585

21 Fed.Appx. 585, 2001 WL 1132677 (C.A.9 (Cal.))
**(Cite as: 21 Fed.Appx. 585)**

of Appeals for the Seventh Circuit, sitting by designation.

MEMORANDUM [FN***]

FN*** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

**\*\*1** This case arises from a dispute between Lexington Insurance Company and Houston*587 Casualty Company ("the primary insurers" or "plaintiffs") and Commonwealth Insurance Company, Travelers Indemnity Company of Illinois, Reliance Insurance Company of Illinois, Hartford Fire Insurance Company, and American International Specialty Lines Insurance Company ("the excess insurers" or "defendants"), concerning coverage of a claim for the arson of four different Contra Costa County courthouses in California. The primary insurers contend that all four fires constitute a single occurrence under the property insurance policy, while the excess insurers assert that each fire represented a separate occurrence. The district court agreed with the excess insurers and granted their cross-motion for summary judgment. The primary insurers appeal the judgment. We have jurisdiction under 28 U.S.C. § 1291 (2000), and we affirm the decision of the district court.

## I. BACKGROUND

The property loss in this case resulted from arson fires at four different courthouses in Contra Costa County ("the County"). The first fire occurred on August 28, 1995 at the Walnut Creek Municipal Court in Walnut Creek. The other three fires occurred seventeen days later on September 14, 1995. The first of the September 14th fires occurred at the Traffic and Small Claims Court in Concord. The second fire occurred six minutes later at the nearby Mount Diablo Municipal Court in Concord. The final fire was ignited less than one hour later at the Contra Costa Superior Court

located in Martinez. The fires were individually started by Richard Dudley Stevens, who had apparently suffered several adverse rulings in all of the courthouses involved. Stevens was charged and convicted on separate counts of arson.

The County was insured for the damage sustained by the courthouses under policies issued by the primary and excess insurers to the County Supervisors Association Committee ("CSAC") and its members. CSAC is an association of California-based local government entities which, among other things, obtains property insurance for its members. Under the CSAC insurance program, the primary insurers are responsible for coverage up to $5 million for any one occurrence, while the excess insurers provide coverage of $10 million for losses which exceed the primary limit of $5 million per occurrence. Also under the program, the County was required to pay a $50,000 deductible per occurrence. As a result of the fires, the County suffered property damage in excess of $14 million. Only the Contra Costa Superior Court fire, causing damage of approximately $7.6 million, individually exceeded the primary policy limit.

The policies of the primary and excess insurers are virtually identical in terms of the scope of the coverage. Neither policy defines the term "occurrence." The policies do contain the following provisions:
Deductible Provision:
All claims for loss arising out of a single occurrence, shall be adjusted as one claim, and from the amount of each such claim, a single deductible shall apply to the total of the adjusted claims resulting from the single occurrence.

\* \* \* \* \* \*
**\*\*2** Loss:
Means the loss by any peril or combination of perils insured against arising out of a single occurrence. When the term applies to loss or losses from earthquake, flood, and/or windstorm, it shall be held to include those losses occurring *588 or commencing during the period of 72 consecutive hours.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Fed.Appx. 585                                                                    Page 4

21 Fed.Appx. 585, 2001 WL 1132677 (C.A.9 (Cal.))
**(Cite as: 21 Fed.Appx. 585)**

\* \* \* \* \* \*
Reinstatement:
Any reduction in the amount insured hereunder due to payment of any loss or losses shall be automatically reinstated for the balance of the term of this contract.

\* \* \* \* \* \*
Limit of Liability:
The limit of liability as stated below is per occurrence and in the aggregate as respects the peril of earthquake and also in the aggregate as respects the peril of flood. The provisions of the reinstatement clause as stated elsewhere herein are null and void as respects the perils of earthquake and flood.

All of the plaintiffs and defendants accepted coverage for the property damage caused by the fires and entered into a loss funding agreement. The agreement adjusted the losses and compensated the County for the damages sustained as a result of the fires. During the loss adjustment, a dispute arose between the primary and excess insurers regarding the number of occurrences applicable to the courthouse fires. The primary insurers contend that where a common scheme to destroy property exists, there is only a single occurrence of property damage, regardless of how many separate events or crimes actually cause the damage. The primary insurers claim that because Stevens was convicted of starting all four fires, there was a systematic and organized scheme that constitutes one occurrence and one deductible, resulting in the payment of only one $5 million policy limit.

The excess insurers disagree. They contend that, under the language of the policies and the parties' clear intent, each separate fire, in each separate building, at each separate time, is a separate occurrence.

The primary insurers filed their complaint for declaratory relief against the excess insurers in California state court. However, pursuant to 28 U.S.C. § 1441(b) (2000),[FN1] the excess insurers had the case removed to federal district court under

diversity jurisdiction. Once in district court, the parties filed cross-motions for summary judgment. The district court granted the excess insurers's motion and held that each individual fire constituted a separate occurrence. The primary insurers filed this timely appeal.

> FN1. Section 1441(b) provides:
> Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

Plaintiffs maintain that the four fires were caused by Stevens' common scheme or plan and therefore, under *EOTT Energy Corp. v. Storebrand International Insurance Co.,* 45 Cal.App.4th 565, 52 Cal.Rptr.2d 894 (Cal.Ct.App.1996), the four fires constitute a single occurrence. Defendants argue that under *EOTT* and *B.H.D., Inc. v. Nippon Insurance Co.,* 46 Cal.App.4th 1137, 54 Cal.Rptr.2d 272 (Cal.Ct.App.1996), each fire constitutes a separate occurrence.

### STANDARD OF REVIEW

[1][2] A district court's grant of summary judgment is reviewed *de novo. Balint v. Carson City,* 180 F.3d 1047, 1050 (9th Cir.1999) (en banc). We also review a trial *589 court's interpretation of an insurance contract *de novo. See Stanford Ranch, Inc. v. Md. Cas. Co.,* 89 F.3d 618, 624 (9th Cir.1996).

### ANALYSIS

\*\*3 [3][4] This is a diversity case and both parties agree that California law controls. The parties do not dispute the relevant facts. The single issue

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Fed.Appx. 585                                                                                   Page 5

21 Fed.Appx. 585, 2001 WL 1132677 (C.A.9 (Cal.))
**(Cite as: 21 Fed.Appx. 585)**

before us is one of contract interpretation, which is an issue of law. *See EOTT,* 52 Cal.Rptr.2d at 898. "[I]t is the duty of the trial court to determine the issue of law." *Id.* (citation omitted).

[5][6][7][8] "The principles which govern the interpretation of insurance contracts are both familiar and well settled." *EOTT,* 52 Cal.Rptr.2d at 899. Under California law, the intent of the parties determines the meaning of the contract. Cal. Civil Code §§ 1636, 1638 (West 1985). The parties' intent is inferred, if possible, from the written provisions of the contract. *Id.* § 1639. The meaning of the provisions must be interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense, or unless a special meaning is given to them by usage." *Id.* § 1644. It is not permissible to impute an unusual meaning to language used in [an insurance contract]." *Certain Underwriters at Lloyds v. Engs Motor Truck Co.,* 135 Cal.App.3d 831, 185 Cal.Rptr. 613, 614 (Cal.Ct.App.1982). "A written contract must be read as a whole and every part interpreted with reference to the whole." *Shakey's Inc. v. Covalt,* 704 F.2d 426, 434 (9th Cir.1983). "Preference must be given to reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory." *Id.*"The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous." *Int'l Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc.,* 752 F.2d 1401, 1406 (9th Cir.1985).

In *EOTT,* as here, the court was asked to determine if there was a single occurrence or multiple occurrences as to insurance coverage. EOTT suffered a $1.5 million loss as the result of over 650 thefts of diesel fuel from a petroleum processing plant over eleven months. 52 Cal.Rptr.2d at 896-97 . EOTT argued that the thefts were part of a conspiracy and therefore constituted a single occurrence subject to a single deductible. *Id.* Storebrand contended that each theft was a separate occurrence, and because no one theft had exceeded that $100,000 deductible, Storebrand, as the insurer, was not liable. *Id.* at 896. The trial court held that the term "occurrence" was unambiguous and that each theft was a separate occurrence. *Id.* at 897.

However, the appellate court reversed. Based on the language used in the deductible clause and finding that the term "occurrence" in the umbrella liability portion of EOTT's policy was defined to include "a continuous or repeated exposure to conditions," the appellate court determined that "the term 'occurrence' reasonably contemplates that multiple claims could, in at least some circumstances, be treated as a single occurrence or loss." *Id.* at 900.

The interpretation of what constitutes a single occurrence or multiple occurrences was also addressed in *B.H.D.,* where a person posing as a customer stole numerous pieces of jewelry from the insured jewelry store in three months. 54 Cal.Rptr.2d at 273-74. The store owners presented a claim for more than $117,000, based on the multiple thefts. *Id.* at 274. The deductible provision in *B.H.D.* provided that "each claim for loss or damages (separately occurring) ... shall be adjusted separately and from the amount of each adjusted claim or the applicable limit of *590 liability, whichever is less, the sum of $10,000 shall be deducted." *Id.* at 272. The trial court found that the store owners never suffered a loss of more than $10,000 on any one occasion and never met the $10,000 deductible. Therefore, there was no liability on the part of the insurer. *Id.* at 272-73. The appellate court affirmed, holding that the language of the deductible provision meant that the deductible applied to each theft that occurred on a separate occasion. *Id.* at 274-75. The court in *B.H.D.* distinguished the holding in *EOTT* not only due to the specific language in B.H.D.'s policy, but also noted that "[t]here was no evidence in this case of a conspiracy or a systematic and organized scheme, as there was in *EOTT."Id.* at 275. The court also observed that while the thefts were similar, each one was a completed crime that would support a separate count and a separate punishment in a criminal proceeding. *Id.* at 274. As the court stated, "If a thief commits larceny on each of several successive days, there are many occurrences. ... Any other construction would drain the term of meaning or lead to absurdity." *Id.* at 274-75.

**4 [9] We agree with the district court that four separate fires in four separate buildings at four

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Fed.Appx. 585                                                                 Page 6

21 Fed.Appx. 585, 2001 WL 1132677 (C.A.9 (Cal.))
**(Cite as: 21 Fed.Appx. 585)**

separate locations constitute four separate occurrences for purposes of plaintiffs' liability and the policy deductible. *See H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 150 F.3d 526, 535 (5th Cir.1998) (holding that two sexual assaults on two different children by same employee in same store one week apart constituted two occurrences for insurance purposes); *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.,* 447 F.2d 204, 207 (5th Cir.1971) (noting that single occurrence provision applies where single fire caused liability for all damages; a second fire would be a second occurrence).

Facts similar to those of the instant case were presented as the basis for the holding in *Goose Creek Consolidated I.S.D. v. Continental Casualty Co.,* 658 S.W.2d 338, 339 (Tex.Ct.App.1983), where two fires occurred within approximately one hour and forty-five minutes at two schools several blocks apart. The insurer in *Goose Creek* argued that it should have been allowed to show that the damages arose from a single cause: an arsonist. *Id.* at 340. The court held that whether the two fires were caused by one individual or different individuals was "of no consequence.... [Who caused the fires] could have no bearing on the fact that two fires distinguishable in space and time occurred and that one did not cause the other.... [W]here there are two fires at two different places with two separate causal factors, there are two loss occurrences." *Id.* at 340-41.

Each fire set by the arsonist would and did support separate counts in a criminal proceeding. *See B.H.D.,* 54 Cal.Rptr.2d at 274. The deductible provision in this case, while identical to that in *EOTT,* contained an additional qualification not found in *EOTT.* The deductible provision stated that a single deductible applied to claims resulting from a single occurrence, with the reinstatement clause creating an exception only for earthquake and flood: According to the "72-hour provision," in the event of damages from either earthquake or flood, plaintiffs were allowed to aggregate losses within a 72-hour period as one occurrence.

Although plaintiffs argue that the arson fires should be considered a third exception, we cannot make

this inference from the language of the contract. *See Pardee Constr. Co. v. Ins. Co. of the West,* 77 Cal.App.4th 1340, 92 Cal.Rptr.2d 443, 456 (Cal.Ct.App.2000) ("the insurers' failure to use available language expressly excluding [a specific type of] coverage implies a manifested*591 intent not to do so"); Cal. Civil Code §§ 1639, 1644 (West 1985). Plaintiffs' argument that they should be allowed to aggregate the arson fires as is possible with earthquake and flood would render the 72-hour provision superfluous; all the damage from the same earthquake or flood would constitute a single occurrence and the 72-hour provision would be unnecessary. The policy may not be interpreted in a manner that contradicts other provisions of the policy. *See B.H.D.,* 54 Cal.Rptr.2d at 275.

## CONCLUSION

**\*\*5** For the above-stated reasons, we AFFIRM the district court's order granting summary judgment to defendants.

C.A.9 (Cal.),2001.
Lexington Ins. Co. v. Travelers Indem. Co. of Illinois
21 Fed.Appx. 585, 2001 WL 1132677 (C.A.9 (Cal.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Attached Printing Summary Report for SPADARO,JOHN 5989548**

| | |
|---|---|
| Date/Time of Request: | Tuesday, December 04, 2007 13:09:00 Central |
| Client Identifier: | HOMSEY/VIGILANT 060111 |
| Database: | KEYCITE-HIST |
| Citation Text: | 21 Fed.Appx. 585 |
| Service: | KeyCite |
| Lines: | 44 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with
Thomson, West and their affiliates.

Westlaw.

Date of Printing: DEC 04,2007

KEYCITE

**H**Lexington Ins. Co. v. Travelers Indem. Co. of Illinois, 21 Fed.Appx. 585 (9th Cir.(Cal.), Sep 11, 2001) (Not selected for publication in the Federal Reporter) NO. 00-15407

History
Direct History

**H**    1  Lexington Ins Co. v. Commonwealth Ins. Co., 2000 WL 74117 (N.D.Cal. Jan 24, 2000) (NO. C
            98-3477 CRB)
                            *Order Affirmed by*
=>     2  **Lexington Ins. Co. v. Travelers Indem. Co. of Illinois**, 21 Fed.Appx. 585 (9th Cir.(Cal.) Sep 11,
            2001) (Not selected for publication in the Federal Reporter, NO. 00-15407)

Related References (U.S.A.)
**H**    3  Lexington Ins. Co. v. Commonwealth Ins. Co., 1999 WL 33292943 (N.D.Cal. Sep 17, 1999) (NO.
            C98-3477CRB(JCS))

Court Documents
Appellate Court Documents (U.S.A.)

C.A.9 Appellate Briefs
       4  LEXINGTON INSURANCE COMPANY, Houston Casualty Company,
            Plaintiffs-Counter-Defendants-Appellants, v. COMMONWEALTH INSURANCE COMPANY,
            Travelers Indemnity Company of Illinois, Reliance Insurance Company of Illinois, Hartford Fire
            Insurance Company, American International Specialty Lines Insurance Company,
            Defendants-Counter-Claimants-Appellees., 2000 WL 33991476 (Appellate Brief) (C.A.9 Sep. 11,
            2000) **Brief and Argument of Defendants-Counter-Claimants-Appellees** (NO. 00-15407)
            ORIGINAL IMAGE OF THIS DOCUMENT WITH APPENDIX (PDF)
       5  LEXINGTON INSURANCE COMPANY, et al., Plaintiff/Appellant, v. COMMONWEALTH
            INSURANCE COMPANY, et al., Defendant/Appellees., 2000 WL 33985677 (Appellate Brief)
            (C.A.9 Sep. 20, 2000) **Reply Brief of Appellants Lexington Insurance Company and Houston
            Casualty Company** (NO. 00-15407)
            ORIGINAL IMAGE OF THIS DOCUMENT (PDF)

Dockets (U.S.A.)

C.A.9
       6  LEXINGTON INSURANCE, ET AL v. COMMONWEALTH INS, ET AL, NO. 00-15407
            (Docket) (C.A.9 Mar. 07, 2000)

N.D.Cal.
       7  LEXINGTON INSURANCE, ET AL v. COMMONWEALTH INS CO, ET AL, NO. 3:98cv03477
            (Docket) (N.D.Cal. Sep. 11, 1998)

© Copyright 2007 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64
058 914 668, or their Licensors. All rights reserved.