## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COLEMAN DUPONT HOMSEY and )
ELLEN HOMSEY, )
                    )
             Plaintiffs, )      C.A. No. 07-338-JJF
                    )
       v. )
                    )
VIGILANT INSURANCE COMPANY, )
                    )
           Defendant. )

## VIGILANT INSURANCE COMPANY'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

EDWARDS ANGELL PALMER & DODGE LLP
Denise Seastone Kraft (#2778)
919 North Market Street, Suite 1500
Wilmington, DE 19801
(302) 777-7770
    *Attorneys for Defendant*
    *Vigilant Insurance Company*

December 19, 2007

# TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDINGS ........................................................... 1

II.   SUMMARY OF ARGUMENT ................................................................................. 2

III.  STATEMENT OF FACTS .................................................................................... 3

IV.   ARGUMENT .................................................................................................. 7

      A.    Standard of Law ................................................................................... 7

      B.    The Coverage Provision for Credit Cards, Forgery and Counterfeiting Carries an
          Aggregate Limit of $10,000. ................................................................. 7

      C.    Plaintiffs' Construction of the Coverage Provision for Credit Cards, Forgery and
          Counterfeiting is Unreasonable. ............................................................ 10

      D.    Defendant Has Not Admitted Ambiguity. ................................................ 11

      E.    A Finding of Ambiguity Does Not Support Plaintiffs' Interpretation .......... 12

      F.    The Thefts Constitute a Single Occurrence. ............................................ 15

      G.    If the Thefts Are Multiple Occurrences, They Are Subject to the Aggregate
          Limit.. ............................................................................................ 19

V.    CONCLUSION ............................................................................................ 19

WLM_511861_1/DKRAFT

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

Appalachian Ins. Co. v. Liberty Mutual Ins. Co., 676 F.2d 56 (3rd Cir. 1982) ...... 15, 16

AT&T Corp. v. Faraday Capital Limited, 918 A.2d 1104 (Del. 2007) .................... 7, 18

Bay Cities Paving & Grinding, Inc. v. Lawyers' Mutual Ins. Co., 855 P.2d 1263
    (Cal. 1993) .......................................................................................... 12

BHD, Inc. v. Nippon Ins. Co., 46 Cal.App. 4th 1137 (Cal.App. 2 Dist. 1996) ............ 18

Business Interiors, Inc. v. Aetna Cas. & Sur. Co., 751 F.2d 361 (10th Cir.1984) ........ 16, 18

Cincinnati MSMA Ltd. Partnership v. Cincinnati Bell Cellular Systems Co., 708 A.2d 989
    (Del. 1998) .......................................................................................... 14

E.I. du Pont de Nemours & Co. v. Admiral Ins. Co., No. 89C-AU-99, 1996 WL 190764 (Del.
    Super. April 9, 1996) ............................................................................. 17

Eagle Indus. v. DeVilbiss Health Care, Inc., 702 A.2d 1228 (Del. 1997) ................ 7

Flemming ex rel. Estate of Flemming, 311 F.3d 282 (2002) ................................ 17

Grinnell Co. v. Miller, 150 F.2d 345 (3rd Cir. 1945) ........................................ 8

Gutierrez v. State, 842 A.2d 650 (Del. Supr. 2004) ......................................... 8

Hills Stores Company v. Bozic, 769 A.2d 88 (Del. Ch. 2000) .............................. 7

In re Combustion Engineering, Inc., 366 F.Supp.2d 224 (D.Del. 2005) ............ 9, 14, 19

Intel Corp. v. Broadcom Corp., 173 F.Supp.2d 201 (D.Del. 2001) ....................... 7

Lexington Ins. Co. v. Travelers Indem. Co. of Illinois, 21 Fed.Appx. 585 (9th Cir. 2001) ..... 18

Northwestern National Ins. Co. v. Esmark, Inc., 672 A.2d 41 (Del. 1996) .............. 7

Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co., 616 A.2d 1192
    (Del. 1992) .......................................................................................... 7

Schreckengast v. State Farm Fire & Cas. Co., No. 97C-06-015, 1998 WL 731566
    (Del. Super. May 18, 1998) .................................................................... 17

Scirex Corp. v. Federal Ins. Co., 313 F.3d 841 (3rd Cir. 2002). ..................... 15, 16, 18

WLM_511861_1/DKRAFT

Twin City Fire Insurance Co. v. Delaware Racing Assoc., 840 A.2d 624 (Del. 2003) .................7

Universal Underwriters Ins. Co. v. Jones Ford, Lincoln-Mercury, Inc., 734 So.2d 173
(Miss. 1999)..............................................................................................................................18

## **Other Authorities**

THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (unabridged ed. 1983) ....8, 13, 14

Williston on Contracts (4th ed.) ....................................................................................................11

WLM_511861_1/DKRAFT

## I.    **NATURE AND STAGE OF THE PROCEEDINGS**

Plaintiffs Coleman DuPont Homsey and Ellen Homsey ("Plaintiffs" or "Homseys") initiated this action by filing their Complaint in the Delaware Superior Court. The Complaint, dated April 20, 2007, was served on the Delaware Insurance Commissioner, agent for service of Defendant Vigilant Insurance Company ("Defendant" or "Vigilant"), on May 9, 2007. A Notice of Removal was filed with the United States District Court for the District of Delaware on May 29, 2007 [D.I. 1] due to complete diversity jurisdiction between the parties. The Complaint alleges four Counts for damages as follows: Count I (Declaratory Judgment); Count II (Breach of Contract); Count III (Bad Faith Breach of Contract); Count IV (Consumer Fraud).

On December 5, 2007, Plaintiffs filed their Motion for Summary Judgment on the Number of Losses and Thefts (the "Motion") [D.I. 35]. Defendant now answers by opposing the Motion, and by cross-moving for summary judgment. Defendant asks this Court to hold that the coverage provision in question ("Credit cards, forgery and counterfeiting") carries an aggregate limit of $10,000.

1

WLM_511861_1/DKRAFT

## II.    **SUMMARY OF ARGUMENT**

1.    The coverage provision in question, "Credit cards, forgery, and counterfeiting," provides a clear and explicit aggregate limit of $10,000, through the use and position of the phrase, "up to a total of $10,000." None of Plaintiffs' multiple interpretations of the word "any" serves to increase that aggregate limit.

2.    Plaintiffs' interpretation of the policy language is patently unreasonable as it is based on the omission of important contract terms.

3.    There is no ambiguity in the Policy created by the use of the word "any."

4.    To the extent there is ambiguity in the policy created by the use of the word "any," the alternative, reasonable interpretations of the policy do not include Plaintiffs' interpretation.

5.    Under "cause theory," which is the law in both the Third Circuit and Delaware, all of Plaintiffs' losses constitute a single occurrence.

6.    To the extent that Plaintiffs' losses constitute multiple occurrences, they are subject to an aggregate limit.

WLM_511861_1/DKRAFT

### III.   STATEMENT OF FACTS

The pending Motion, and Defendant's cross-motion, seek declaratory judgments as to the meaning of a provision in a policy of insurance. As such, the only relevant submission of fact is the text of the policy language in question.

However, Plaintiffs have decided to submit a lengthy Statement of Facts that materially misrepresents both Defendant's handling of Plaintiffs' insurance claim, and the contents of the pleadings. Due to Plaintiffs' mistreatment of the record, Defendant feels obligated to correct several inaccuracies.

Plaintiffs state that after they submitted their claim to Defendant under their homeowners' insurance policy (Chubb Masterpiece Policy no. 12680929-01) (the "Policy"), Defendant "essentially ignored" the claim, remaining "virtually silent" for a year. To support their story, Plaintiffs provide side-by-side comparisons of certain paragraphs from the Complaint and Answer: numbers 33, 35-37, and 39-46. Each pair of paragraphs begins with an allegation from the Complaint stating that Defendant did not communicate with, or offer payment to, Plaintiffs in a given month, followed by Defendant's admission that the allegation is true. The cumulative effect of the paragraphs is, indeed, to suggest that Defendant remained silent and ignored Plaintiffs' claim for a year.

However, it is readily apparent that there are gaps in Plaintiffs' presentation of the record. Plaintiffs offer paired paragraphs running from number 33 to number 46, but they leave out the paragraphs numbered 34 and 38. Those paragraphs are reproduced here:

> Compl. ¶ 34: Vigilant did not communicate with the Homseys or their attorney regarding the tendered claim for "Credit card, forgery, and counterfeiting" coverage during February 2006.

WLM_511861_1/DKRAFT

> Ans. ¶ 34: **Defendant denies the averment in Paragraph 34.  Defendant communicated with the Homseys' attorney regarding the tendered claim in February 2006.**
>
> Compl. ¶ 38: Vigilant did not communicate with the Homseys or their attorney regarding the tendered claim for "Credit card, forgery, and counterfeiting" coverage during April 2006.
>
> Ans. ¶ 38: **Defendant denies the averment in Paragraph 34.  Defendant communicated with the Homseys' attorney regarding the tendered claim in April 2006.**

See Complaint, attached hereto as Exhibit "A," at ¶¶ 34, 38; Amended Answer [D.I. 15], attached hereto as Exhibit "B," at ¶¶ 34, 38.

Two months after receiving the tendered claim, and again two months later, Defendant communicated with the Homseys about their claim, through their attorney. Defendant's attention to the claim was thus active and ongoing, from an early date. However, Plaintiffs insist that Defendant "essentially ignored" their claim and remained "virtually silent" for a year, and omit from their portrayal of the record any material that suggests otherwise.  Perhaps Plaintiffs believe that the accuracy of their portrayal of Defendant's claims handling practices is rescued by their employment of the escape-hatch terms "essentially" and "virtually."  If so, the audacity and abuse of language exhibited here are fair predictors of Plaintiffs' approach to policy interpretation.

Plaintiffs' description of Defendant's issuance of $10,000 to them is likewise misleading.  Immediately after accusing Defendant of remaining "virtually silent" for a year, Plaintiffs describe the letter from Defendant that enclosed their $10,000 payment as "the sole pre-litigation writing from Vigilant to the Homseys on the subject of their claim."  The statement is obviously intended to bolster Plaintiffs' assertions regarding Defendant's year-long silence (or "virtual" silence).  However, the statement omits the

4

multiple previous communications from Defendant to Plaintiffs *through their attorney*. Plaintiffs reported their claim to Defendant through their attorney, and Defendant, in turn, sent correspondence to Plaintiffs by the same channel. Like the escape-hatch terms "virtually" and "essentially," Plaintiffs may be relying (one can only guess) on the literal meaning of the phrase "to the Homseys" in order to rescue their story from charges of prevarication. After all, Defendant's multiple correspondences with Plaintiffs were not delivered "to" Plaintiffs; instead, the letters were addressed to another party entirely: Plaintiffs' chosen representative. The term-twisting and shoehorning necessary to sustain Plaintiffs' tale about Defendant's "virtual silence" is, again, a fair example of Plaintiffs' general mistreatment of language.

As to the coverage provision in question, Defendant reproduces it here for the sake of convenience:

### Credit cards, forgery, and counterfeiting

We cover a person's legal obligations, up to a total of $10,000 for:

- loss or theft of a credit or bank card issued to you or your family member, provided that all the terms for using the card are complied with;

- loss caused by theft of a credit card number or bank card number issued to you or your family member when used electronically, including use on the Internet, provided that all the terms for using the card are complied with;

- loss caused by forgery or alteration of any check or negotiable instrument; or

- loss caused by accepting in good faith any counterfeit paper currency.

We will defend a claim or suit against you or a family member for loss or theft of a credit card or bank card. We

WLM_511861_1/DKRAFT

have the option to defend a claim or suit against you or a family member (or against a bank, with respect to this coverage) for forgery or counterfeiting.

We may investigate, negotiate and settle any such claim or suit at our discretion. Our obligation to defend ends when our payment for the loss equals $10,000.

In the event of a claim, the covered person shall comply with the duties described in Policy Terms, Property Conditions, Your duties after a loss and Policy Terms, Liability Conditions, Your Duties after a loss. In addition, the covered person shall notify the credit card service company or the issuing bank.

This coverage does not apply to losses covered under Identity fraud.

IV.    **ARGUMENT**

A.    **Standard of Law.**

Contract interpretation is a question of law. <u>Intel Corp. v. Broadcom Corp.</u>, 173

F.Supp.2d 201, 206 (D.Del. 2001). Delaware courts interpret contracts in accordance

with their plain terms. <u>Hills Stores Company v. Bozic</u>, 769 A.2d 88, 112 (Del. Ch. 2000).

Insurance contracts, like all contracts, "are construed as a whole, to give effect to

the intentions of the parties. Where the contract language is clear and unambiguous, the

parties' intent is ascertained by giving the language its ordinary and usual meaning."

<u>Northwestern National Ins. Co. v. Esmark, Inc.</u>, 672 A.2d 41, 43 (Del. 1996). The fact

that the parties disagree on the meaning of a term does not render that term ambiguous.

"Rather, a contract is ambiguous only when the provisions in controversy are reasonably

or fairly susceptible of different interpretations or may have two or more different

meanings." <u>Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.</u>, 616

A.2d 1192, 1196 (Del. 1992); <u>Twin City Fire Insurance Co. v. Delaware Racing Assoc.</u>,

840 A.2d 624, 628 (Del. 2003); <u>AT&T Corp. v. Faraday Capital Limited</u>, 918 A.2d 1104,

1108 (Del. 2007); <u>Eagle Indus. v. DeVilbiss Health Care, Inc.</u>, 702 A.2d 1228, 1232 (Del.

1997).

B.    **The Coverage Provision for Credit Cards, Forgery and Counterfeiting Carries an Aggregate Limit of $10,000.**

The coverage provision in question states plainly, "We cover a person's legal

obligations, up to a total of $10,000, for:" followed by a list of various categories of loss.

The phrase "up to a total" signifies an aggregate limit under any reasonable reading.

Clearly the phrase "up to" means "not beyond," and operates as limiting language. The

word "total" literally means "aggregate." The Random House Dictionary of the English

WLM_511861_1/DKRAFT

Language -- an authority quoted approvingly by the Delaware Supreme Court (see Gutierrez v. State, 842 A.2d 650, 653 (Del.Supr. 2004)) -- defines "total" as "the total amount; sum; aggregate." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1497 (unabridged ed. 1983).

The Third Circuit has also reached the obvious and natural conclusion that the phrase "up to a total" signifies an aggregate limit. Grinnell Co. v. Miller, 150 F.2d 345 (3rd Cir. 1945). In Grinnell, the plaintiff furnished plumbing supplies valued at $50,000 to a subcontractor, then sued the general contractor for payment for the supplies. The plaintiff presented evidence that the general contractor had agreed, in the court's words, "to pay [the plaintiff] for all materials ordered by [the subcontractor] and specified for the job, not to exceed the sum of $50,000." Grinnell at 347. Of course the court is discussing an aggregate limit of $50,000 for all supplies. No reasonable person would argue that the alleged contract, as described by the court, obligates the general contractor to pay up to $50,000 for each length of pipe.

After discussing the plaintiff's evidence, the Third Circuit offered the following summary:

> The foregoing constitutes the whole of the testimony submitted on behalf of plaintiff, which is claimed to prove an oral agreement on the part of [the general contractor] to pay for any or all the materials ordered by [the subcontractor] **up to a total of $50,000**.

Id. (emphasis added). The phrase is identical to the one used in the coverage provision ("up to a total of $10,000"). The Third Circuit employed the phrase to summarize its discussion of a contract whereby payment for plumbing materials was "not to exceed the sum of $50,000." Id. The phrase "up to a total," then, has a plain, natural, and unambiguous meaning, recognized by the Third Circuit and supported by an authoritative

dictionary: it signifies an aggregate limit.

The use of the word "obligations" further supports this interpretation. The operative phrase states, again, "We cover a person's legal **obligations**, up to a total of $10,000." The word "obligations" is plural, and it aids the reader in understanding what is being totaled or aggregated. In other words, the policy provision covers certain obligations (e.g., obligations for loss caused by forgery, obligations for loss caused by credit card theft, etc.), until the total or sum of those obligations reaches (goes "up to") $10,000. If $10,000 is a total for obligations in the plural, then $10,000 cannot also be a limit for each individual obligation.

In fact, any reading that resulted in a $10,000 limit for each obligation or each loss would render the word "total" superfluous. It is well-settled that the Court "should avoid interpreting contractual language in such a way as to render any term of the contract meaningless or superfluous." In re Combustion Engineering, Inc., 366 F.Supp.2d 224, 231 (D.Del. 2005). If the policy provision offers $10,000 per loss or per obligation, then there is nothing being "totaled." Put another way, if the term "total" is not aggregating sums and comparing that aggregate to a limit of $10,000, then it is doing nothing. Because an interpretation that renders a term superfluous is to be avoided, the Court should give effect to the term "total" and allow the term to perform its work of aggregating the dollar amounts of losses or obligations.

For all of the above reasons – the natural and ordinary meaning of the phrase "up to a total," as recognized by the Third Circuit; the proximity of the term "total" to the term "obligations"; the rule that a contract interpretation that renders a term superfluous is to be avoided – the Court should deny Plaintiffs' Motion and grant Defendant's cross-

WLM_511861_1/DKRAFT

motion for summary judgment, by finding that the coverage in the Policy for "Credit cards, forgery and counterfeiting" provides an aggregate limit of $10,000.

**C.    Plaintiffs' Construction of the Coverage Provision for Credit Cards, Forgery and Counterfeiting is Unreasonable.**

Plaintiffs offer an interpretation of the Policy, focusing on the word "any," that purportedly expands the coverage for "Credit cards, forgery and counterfeiting" into a limitless parade of $10,000 payments. Plaintiffs' interpretation of the Policy is patently unreasonable, it relies on the omission of relevant contract terms, and the Court should reject it.

Plaintiffs argue that the Policy promises to pay "up to $10,000 for 'loss caused by forgery ... of *any* check.' " Plaintiffs then explain that this language cannot justify payment of $10,000 "for *all* forgeries of *all* checks." To illustrate why, Plaintiffs offer the example of a magician who tells a first grader to "Pick a card, any card." The first grader, explain Plaintiffs, understands that a single card, and not the entire deck, is to be taken. Likewise, conclude Plaintiffs, a promise to pay "up to $10,000 for 'loss caused by forgery ... of *any* check' " is a promise to pay up to $10,000 for one check at a time.

The Court should not fall for Plaintiffs' sleight-of-hand. While Defendant is loathe to ruin a good magic trick, it must inform the Court that Plaintiffs have hidden a card up their collective sleeve. Plaintiffs' entire argument rests on the excision of relevant policy language, until the remaining portions fit into Plaintiffs' desired shape. The Policy does not, of course, promise to pay "up to $10,000 for 'loss caused by forgery ... of *any* check,' " as Plaintiffs have refashioned it. Instead, when the missing portions of the Policy are restored, it promises to pay for "**obligations**, up to **a total of** $10,000, for:" followed by a list of possible losses. Rather than promise up to $10,000 for any

check, then, the Policy offers up to a **total** of $10,000 for Plaintiffs' potential **obligations**. Plaintiffs' interpretation, resting on the omission of important terms, is misleading, unreasonable, and should be rejected.

### D.    Defendant Has Not Admitted Ambiguity.

Plaintiffs argue that Defendant has admitted the coverage provision is ambiguous. Defendant has made no such admission. Defendant did admit that the word "any," even in context, can have several shades of meaning. In a promise to pay up to a total of $10,000 for obligations, which obligations include loss caused by forgery of any checks or other negotiable instruments, the term "any" may mean that the coverage applies to every instance of forgery without exception, and it may also mean that the coverage applies to all classes of checks: i.e., cashier's checks, traveler's checks, etc.

A reasonable reading of the "credit card, forgery and counterfeiting" coverage in its entirety suggests that both meanings are intended. This is broad coverage for forgery, as it is subject (in terms of the portion of the Policy under review) only to the aggregate limit of $10,000. There are no other internal exceptions or limitations to the forgery coverage. The language "or negotiable instrument" also signals an intention that the coverage apply in a broad array of possible cases. Given the intention of breadth, it makes sense to interpret "any" as meaning there is coverage for every instance of forgery without exception, and as also meaning that the coverage applies to any type of check.

That the term "any" may perform two functions at once does not create ambiguity. Indeed, a well-respected authority on contracts has reasoned, "A policy term will not be found to be ambiguous simply because ... it has more than one meaning, or a broad meaning." 16 WILLISTON ON CONTRACTS § 49:17 (4th ed.). The Supreme Court of

WLM_511861_1/DKRAFT

California explained the principle as follows, in a discussion of whether the word "related" is ambiguous:

> Although "related" is broad enough to encompass both logical as well as causal relationships, the Court of Appeal incorrectly found an inherent ambiguity. Multiple or broad meanings do not necessarily create ambiguity. For example, assume that an insurance policy excluded coverage for any claim arising from the operation of a "motor vehicle." Obviously, a "motor vehicle" could be either an automobile or a truck, but that does not mean it must be only one or the other, rather than both. Likewise here, the fact that "related" can encompass a wide variety of relationships does not necessarily render the word ambiguous. To the contrary, a word with a broad meaning or multiple meanings may be used for that very reason-its breadth-to achieve a broad purpose.

Bay Cities Paving & Grinding, Inc. v. Lawyers' Mutual Ins. Co., 855 P.2d 1263, 1271 (Cal. 1993).

Like the word "related" in Bay Cities, the word "any" achieves a broad purpose. It allows the Policy, in simple terms and plain language, to provide an expansive forgery coverage. This is not "ambiguity." It is, instead, the natural use of a broad term that, although it has two operative meanings, yields a single reasonable contract interpretation.

**E.    A Finding of Ambiguity Does Not Support Plaintiffs' Interpretation.**

Defendant denies that the term "any" in the context of the Policy is ambiguous. However, even if the Court finds that the word "any" is ambiguous, there is still no reasonable interpretation of the Policy that will lead to an obligation on Defendant's part to pay up to $10,000 for every forged check.

Plaintiffs point out that Defendant has admitted "any" may mean "every." Plaintiffs next rely on a dictionary that informs them the primary definition of "every" is "each." Thus, according to Plaintiffs, "any" means "every" means "each," and a promise

WLM_511861_1/DKRAFT

to pay (in Plaintiffs' words) "up to $10,000 for every forged check" requires "multiple payments of up to $10,000 each."

There are two problems with this reasoning. The first is that the term "any" only means "every" in a limited sense. Dictionaries that offer "every" as a definition of "any" generally provide an illustrative example, e.g. "any schoolboy would know that." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 68 (unabridged ed. 1983). The example suggests there is some obvious fact or bit of knowledge, such as "2 + 2 = 4." If any schoolboy would know that, then logically they all would know it – in other words, every schoolboy, as a group or pool of schoolboys, would know that. To say "any schoolboy" is to refer to schoolboys as a *class*.

This is the sense in which coverage for "any" forged check means coverage for "every" forged check: any forged check, out of a class of all possible forged checks, brought to Defendant's attention through a claim will be covered (subject to the aggregate limit). Just as there is not one schoolboy to be found among the class of all schoolboys who is ignorant of some basic tenet – i.e., "any schoolboy would know that," so there is not one forged check among the pool of possible forged checks to which Defendant will say, "I'm sorry, that type of forgery is not covered." Here, "any" means "every" because it means "*without exception*."

Plaintiffs do not grasp this subtlety of meaning. Instead, Plaintiffs spot the word "each" in a definition of "every," and use it to craft a new meaning for the Policy. Where the Policy once stated, "We cover a person's legal obligations, up to a total of $10,000, for: ... loss caused by forgery or alteration of any check or negotiable instrument," Plaintiffs have redrafted a policy that constitutes "a promise to pay up to $10,000 for

WLM_511861_1/DKRAFT

*every* forged check," which "requires multiple payments of up to $10,000 each."
However, as Plaintiffs note, the Court cannot rewrite the Policy. See Cincinnati MSMA
Ltd. Partnership v. Cincinnati Bell Cellular Systems Co., 708 A.2d 989, 992 (Del. 1998).

The sort of dictionary connect-the-dots employed by Plaintiffs to jump from
"any" to "every" to "each" is not a reliable tool for arriving at sensible meanings. As an
illustration, suppose a warranty for a jackknife provided a full manufacturer's refund if
the collapsible blade of the knife should "stick." A jaunt through the dictionary will
reveal that "stick" means "cleave" (RANDOM HOUSE DICTIONARY OF THE ENGLISH
LANGUAGE 1395 (unabridged ed. 1983)), and that "cleave," in turn, means "sever" (Id.
275). Employing Plaintiffs' tactic, a purchaser of the jackknife might demand a refund
on the basis that the knife "severs." This is, of course, absurd; but so is insisting that
"any" means "each," on the basis that the dictionary says it does. Again, the sense in
which "any" means "every" is subtle and tightly confined, and does not extend to "each."

The second problem is that even if "any" did mean "each," the entire phrase
would still be subject to the aggregate limit provided by the phrase "up to a total."
Rewritten to Plaintiffs' preference, the new phrase "loss caused by forgery or alteration
of **each** check or negotiable instrument" would only provide that "each check" is one of
the "obligations" subject to the $10,000 aggregate limit. To decide otherwise would
render "total" superfluous. If each check is subject to an individual $10,000 limit, then
the aggregating term "total" is doing nothing. The Court must avoid such a result. See
Combustion Engineering, supra.

F.    **The Thefts Constitute a Single Occurrence.**

Plaintiffs next argue that the incidents of forgery and credit card theft constitute multiple occurrences. They begin by stating that the relevant deemer clause in the Policy cannot sensibly apply to the thefts, and then discuss a series of cases that hold (so Plaintiffs aver) that in the absence of deemer language, multiple thefts will be considered multiple occurrences. While Defendant does not agree that the deemer language in the Policy does not apply to the thefts, the deemer clause is irrelevant, because Delaware courts, as well as the Third Circuit, do not rely solely on deemer clauses when determining whether multiple acts constitute a single occurrence.

The Third Circuit took up the question of whether multiple acts constitute a single occurrence in Appalachian Ins. Co. v. Liberty Mutual Ins. Co., 676 F.2d 56 (3rd Cir. 1982). In its ruling, the Third Circuit discussed the "cause theory":

> The general rule is that an occurrence is determined by the cause or causes of the resulting injury. "(T)he majority of jurisdictions employes (sic) the 'cause theory'. (Citations omitted.) Using this analysis, the court asks if '(t)here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.' " Bartholomew v. Insurance Co. of N. America, 502 F.Supp. 246, 251 (D.R.I.1980), aff'd. sub nom. Bartholomew v. Appalachian Ins. Co., 655 F.2d 27 (1st Cir. 1981), citing Olsen v. Moore, 56 Wis.2d 340, 202 N.W.2d 236 (1972); Transport Ins. Co. v. Lee Way Motor Freight, Inc., 487 F.Supp. 1325, 1330 (N.D.Tex.1980); contra, Elston-Richards Storage Co. v. Indemnity Ins. Co. of N. America, 194 F.Supp. 673, 682 (W.D.Mich.1960), aff'd., 291 F.2d 627 (6th Cir. 1961).

Appalachian, 676 F.2d at 61. The Third Circuit discussed cause theory again more recently in Scirex Corp. v. Federal Ins. Co., 313 F.3d 841 (3rd Cir. 2002). In Scirex, four nurses falsified records for several clinical trials, leading to substantial losses. The company conducting the trials sought separate recoveries under its insurance policy for

15

each ruined study, on the theory that they constituted separate "losses". However, the Third Circuit reasoned that such a result would conflict with the logic of cause theory, and provided a useful analogy:

> Scirex's interpretation, which would make possible a separate recovery for each loss even if those losses are part of the same occurrence, would lead us to grant a separate recovery for each forged check passed as part of an employee's forgery scheme, a result that has been squarely rejected. See, e.g., Business Interiors, Inc. v. Aetna Cas. & Sur. Co., 751 F.2d 361 (10th Cir.1984) (concluding that the employee's fraudulent acts constituted a *single loss* for policy purposes).

Scirex, 313 F.3d at 842 (emphasis in original).[1]

In Business Interiors, the court considered whether an employee's actions in forging or altering forty checks constituted one loss or forty for purposes of the employer's insurance policy. While the policy at issue had a deemer clause, the Court did not rely on it. Instead, citing Appalachian, the Court held that "The rule we choose to apply is the general one that 'an occurrence is determined by the cause or causes of the resulting injury.' " Business Interiors, 751 F.2d at 363. The court then determined that the cause of the loss was the employee's continuing dishonesty, and that the fraudulent acts constituted a single loss. Important to the court's decision was the notion that "the probable intent of the employee with regard to the last thirty-nine checks [was] essentially the intent to continue the dishonesty, not to commit an entirely new and different act of dishonesty." Id.

While the Third Circuit in Appalachian and Scirex was applying Pennsylvania law, Delaware court have held that cause theory is the law in Delaware as well. In

---

[1] Interestingly, the plaintiff in Scirex attempted to expand the amount of coverage available under its policy by arguing, unsuccessfully, that "any" means "each."

Schreckengast v. State Farm Fire & Cas. Co., No. 97C-06-015, 1998 WL 731566, at *3 (Del.Super. May 18, 1998), the court stated:

> In Delaware, an "occurrence" with regard to an insurance policy, is determined by the cause or causes of the resulting injury. The accepted test is whether there is one proximate, uninterrupted, and continuing cause which resulted in the damage. In applying this "cause" analysis, this Court has held that where a single event, process or condition results in injuries, it will be deemed a single "occurrence" even though the injuries may be widespread in both time and place....

(footnote omitted). See also, E.I. du Pont de Nemours & Co. v. Admiral Ins. Co., No. 89C-AU-99, 1996 WL 190764, at *3 (Del.Super. April 9, 1996) (relying on Appalachian).

Again, courts applying the theory do not predicate its application on the presence or absence of a deemer clause. Rather, they discuss cause theory as a general rule of policy construction. In fact, the Third Circuit has indicated that cause theory and policy language are *independent grounds* for counting occurrences. In Flemming ex rel. Estate of Flemming, 311 F.3d 282 (2002), the Third Circuit discussed whether losses related to a plane crash constituted a single occurrence. The court first discussed cause theory, then added, "Air Sunshine's insurance policy also contains a specific policy definition of 'occurrence.' " Flemming, 311 F.3d at 295. In finding a single occurrence, the court reasoned, "Under *both* the policy definition *and* our cause theory, the plane crash was one 'constant, uninterrupted cause' that subjected James Flemming to 'continuous or repeated exposure to substantially the same general conditions' and led to his death." Id. (emphasis added).

Cause theory, as the cases note, is a general rule of insurance policy construction; it is the majority rule; and it is the law in Delaware, which in turn relies on decisions of

WLM_511861_1/DKRAFT

the Third Circuit. Moreover, a prominent authority, the Tenth Circuit (in <u>Business Interiors</u>), has held that under cause theory, an embezzler's continuing dishonesty constitutes a single cause, although there were forty violations, including both forgery and check alteration. That decision, in turn, has been cited and relied upon by the Third Circuit in <u>Scirex</u>. The application of the holding in <u>Business Interiors</u> to this case is readily apparent. Like the embezzler, Plaintiffs' daughter-in-law embarked on a scheme to steal money from Plaintiffs over a two-year period. All of the losses were caused by her continuing dishonesty, and under cause theory, all of the losses constitute a single occurrence.

None of Plaintiffs' cases are controlling, and most of them are not on point. <u>Universal Underwriters Ins. Co. v. Jones Ford, Lincoln-Mercury, Inc.</u>, 734 So.2d 173 (Miss. 1999), involves the definition of "loss," not "occurrence." <u>AT&T Corp. v. Faraday Capital Ltd.</u>, 918 A.2d 1104 (Del. 2007), involves the definition of "claim," not "occurrence." <u>BHD, Inc. v. Nippon Ins. Co.</u>, 46 Cal.App. 4th 1137 (Cal.App. 2 Dist. 1996) involves a policy providing separate deductibles for "losses separately occurring."

<u>Lexington Ins. Co. v. Travelers Indem. Co. of Illinois.</u>, 21 Fed.Appx. 585 (9th Cir. 2001), another case relied on by Plaintiffs, counted injuries stemming from four separate fires as four occurrences, but there the court reasoned (at 590) that had all the injuries been caused by a single fire, they would have constituted one occurrence. This is not out of step with the above discussion of cause theory, where multiple injuries caused by a sole cause – e.g., an embezzler's ongoing dishonesty – constitute a single occurrence.

WLM_511861_1/DKRAFT

G..    **If the Thefts Are Multiple Occurrences, They Are Subject to the Aggregate Limit.**

Even if the Court were to put aside well-established case law regarding cause theory, and decide that the individual acts of forgery and credit card fraud constitute multiple occurrences, that would not resolve the issue before the Court in Defendant's favor. If anything, the notion that each amount of money stolen or lost through forgery or credit card fraud is a separate occurrence, does harm to Plaintiffs' interpretation of the Policy. If the $10,000 limit applies (as Plaintiffs argue) individually to each loss – in other words, if it applies individually to each discrete amount of lost money – then there is truly no reason for the term "total" to sit where it does. If the $10,000 limit applies individually to one loss for $7,500, and it applies to a second loss for $5,600, and it applies separately to yet a third loss for $9,800, then the term "total" has no role in the operation of the Policy; it has no opportunity to "total" any dollar amounts. Again, the Court must reject Plaintiffs' interpretation in order to avoid rendering a term superfluous. See Combustion Engineering, supra.

WLM_511861_1/DKRAFT

## V.    **CONCLUSION**

For all of the reasons set forth in this Answering Brief, the Court should deny the relief requested in the Motion and grant the relief requested in Defendant's cross-motion, by holding that the coverage provision in question ("Credit cards, forgery and counterfeiting") carries an aggregate limit of $10,000.

EDWARDS ANGELL PALMER & DODGE LLP

*/s/ Denise Seastone Kraft*

Denise Seastone Kraft (#2778)
919 North Market Street
Wilmington, DE  19801
(302) 425-7106
 *Attorneys for Defendant*
 *Vigilant Insurance Company*

December 19, 2007

## CERTIFICATE OF SERVICE

I, Denise Seastone Kraft, hereby certify that on December 19, 2007, the attached **Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment** was served on the following persons in the manner indicated and was electronically filed with the Clerk of the Court using CM/ECF:

### BY TELECOPY & FIRST-CLASS MAIL

John Sheehan Spadaro, Esq.
John Sheehan Spadaro, LLC
724 Yorklyn Road
Suite 375
Hockessin, DE  19707
(302) 235-2536 (Telecopy)

*/s/ Denise Seastone Kraft*
Denise Seastone Kraft (#2778)
Edwards Angell Palmer & Dodge LLP
Wilmington, DE  19801
(302) 777-7770
dkraft@eapdlaw.com



## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| COLEMAN DUPONT HOMSEY and<br>ELLEN HOMSEY, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. |
| v. | ) | |
| | ) | NON-ARBITRATION CASE |
| VIGILANT INSURANCE COMPANY, | ) | TRIAL BY JURY DEMANDED |
| | ) | |
| Defendant. | ) | |

### COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiffs Coleman DuPont Homsey and Ellen Homsey, as and for their complaint for declaratory and other relief against defendant Vigilant Insurance Company, allege as follows:

### Nature of the Action

1. This is an action seeking recovery of compensatory and punitive damages, declaratory relief, attorneys' fees and other relief arising from defendant Vigilant Insurance Company's breach of contract, bad faith breach of contract, violation of 6 Del. C. §2513, and otherwise wrongful refusal to honor its contractual obligations under a certain policy of insurance denominated as a "Chubb Masterpiece Policy," and issued to the plaintiff Coleman DuPont Homsey.

2. This action seeks, among other relief, a declaration that the defendant Vigilant Insurance Company must pay Mr. and Mrs. Homsey's legal obligations for 1) thefts of certain credit cards and/or credit card numbers, up to a total of $10,000 for each such theft, and 2) losses caused by forgery of certain checks, up to a total of $10,000 for each such check.

## The Parties

3. Plaintiffs Coleman DuPont Homsey and Ellen Homsey are natural persons and husband and wife. They reside at 466 Snuff Mill Lane, Hockessin, Delaware 19707.

4. Mr. Homsey is the named insured under "Chubb Masterpiece Policy" no. 12680929-01.

5. Defendant Vigilant Insurance Company ("Vigilant") is, on information and belief, a New York corporation with offices at 15 Mountain View Road, Warren, New Jersey 07061. It is engaged in the business of insurance, and regularly sells insurance within the State of Delaware.

## The Insurance Contract

6. Vigilant issued to Mr. Homsey its "Chubb Masterpiece Policy" no. 12680929-01 (the "Policy"). On information and belief, the Policy has been in effect at all times relevant to this action.

7. The Policy expressly extends coverage to Mr. Homsey as "the person named in the [Policy's] Coverage Summary," along with "a spouse who lives with that person" (meaning, in this instance, plaintiff Ellen Homsey). Mrs. Homsey is thus an insured person under the Policy.

7. The Policy provides various insurance coverages, including without limitation those described within the Policy as Deluxe House Coverage, Standard Contents Coverage and Personal Liability Coverage.

8. Beginning at page T-1 of the Policy, the Policy sets forth the terms and conditions of its Personal Liability Coverage.

9. Beginning at page T-4 of the Policy, the Policy sets forth certain "Extra Coverages" as part of the Personal Liability Coverage section.

1321                                    2

10. Among the "Extra Coverages" set forth within the Policy's Personal Liability

Coverage section is one titled "Credit cards, forgery and counterfeiting," which appears at page

T-6 of the Policy. This grant of "Credit cards, forgery, and counterfeiting" coverage provides as

follows:

> **Credit cards, forgery, and counterfeiting**
> We cover a covered person's legal obligation, up to a total of
> $10,000 for:
>
> · loss or theft of a credit or bank card issued to you or a family
> member, provided that all the terms for using the card are complied
> with;
>
> · loss caused by theft of a credit card number or bank card number
> issued to you or a family member when used electronically,
> including use on the Internet, provided that all the terms for using
> the card are complied with;
>
> · loss caused by forgery or alteration of any check or negotiable
> instrument; or
>
> · loss caused by accepting in good faith any counterfeit paper
> currency.
>
> We will defend a claim or suit against you or a family member for
> loss or theft of a credit card or bank card. We have the option to
> defend a claim or suit against you or a family member (or against a
> bank, with respect to this coverage) for forgery or counterfeiting.
>
> We may investigate, negotiate and settle any such claim or suit at
> our discretion. Our obligation to defend ends when our payment
> for the loss equals $10,000.
>
> In the event of a claim, the covered person shall comply with the
> duties described in Policy Terms, Property Conditions, Your duties
> after a loss and Policy Terms, Liability Conditions, Your Duties
> after a loss. In addition, the covered person shall notify the credit
> card service company or the issuing bank.
>
> This coverage does not apply to losses covered under Identity
> fraud.

### The Underlying Forgeries and Thefts

11. In or about calendar year 2000 Mr. and Mrs. Homsey opened a "Capital Advantage Checking Account" with Wilmington Trust Company, a Delaware bank (the "Checking Account"). In addition, Mr. and Mrs. Homsey were issued a Wilmington Trust Visa credit card ("the "Wilmington Trust Visa card").

12. At times relevant to this complaint, Mr. and Mrs. Homsey have also been holders of an AT&T Universal credit card (the "AT&T card").

#### A. Losses Caused By Forgery of Checks

13. Mr. and Mrs. Homsey have suffered multiple losses as the result of the forging of checks from the Checking Account. Specifically, and on information and belief, their adult son's ex-wife forged multiple checks from the Checking Account, and presented them for payment during 2003 and 2004.

14. The forged checks include individual checks written for as little as $300, or as much as $35,000.

15. The total amount of forged checks exceeds $218,000.

16. Copies of certain of the forged checks are attached hereto as Exhibit A. An itemized listing of some or all of the forged checks is attached hereto as Exhibit B.

#### B. Losses Caused By Theft of the Wilmington Trust Visa Card

17. Mr. and Mrs. Homsey have suffered multiple losses due to multiple thefts of their Wilmington Trust Visa card and/or thefts of the corresponding credit card number. Specifically, and on information and belief, their son's ex-wife misappropriated the Homseys' Wilmington Trust Visa card (and/or the corresponding credit card number) on multiple occasions during 2003, 2004 and 2005.

18. The losses suffered by Mr. and Mrs. Homsey in connection with the multiple thefts of their Wilmington Trust Visa card (and/or the corresponding credit card number) exceed $26,000.

19. The multiple thefts of Mr. and Mrs. Homsey's Wilmington Trust Visa card (and/or of the corresponding credit card number) are reflected by the documents attached hereto as Exhibit C.

### C. Losses Caused By Theft of the AT&T Card

20. Mr. and Mrs. Homsey have suffered multiple losses due to multiple thefts of their AT&T card and/or thefts of the corresponding credit card number. Specifically, and on information and belief, their son's ex-wife misappropriated the Homseys' AT&T card (and/or the corresponding credit card number) on multiple occasions during 2004 and 2005.

21. The losses suffered by Mr. and Mrs. Homsey in connection with the multiple thefts of their AT&T card (and/or of the corresponding credit card number) exceed $13,000.

22. The multiple thefts of Mr. and Mrs. Homsey's AT&T card (and/or of the corresponding credit card number) are reflected by the documents attached hereto as Exhibit D.

### Coverage Under the Policy

23. The Policy, with its terms, conditions, definitions and exclusions, was drafted by Vigilant, and/or assembled by Vigilant using pre-existing form policy wordings of its own choosing.

24. The Policy's terms, conditions, definitions and exclusions were not the product of negotiations between Vigilant (on the one hand) and Mr. and Mrs. Homsey (on the other).

25. The Policy is a contract of adhesion.

26. Because the Policy is a contract of adhesion, Mr. and Mrs. Homsey are entitled (as consumer insureds) to any reasonable reading of its terms.

27. Mr. and Mrs. Homsey suffered multiple thefts of credit cards and/or credit card numbers during the Policy's effective period, and as alleged above.

28. A reasonable reading of the Policy's "Credit cards, forgery and counterfeiting" coverage section requires Vigilant to pay up to $10,000 for each of the multiple thefts of credit cards and/or credit card numbers suffered by Mr. and Mrs. Homsey.

29. Mr. and Mrs. Homsey were the victims of multiple instances of check forging on the Checking Account during the Policy's effective period, and as alleged above.

30. A reasonable reading of the Policy's "Credit cards, forgery and counterfeiting" coverage section requires Vigilant to pay up to $10,000 for each of the multiple checks forged on the Checking Account.

### Vigilant's (Wrongful) Claims Handling

31. By letter dated December 29, 2005 and sent by hand delivery and FedEx from Mr. and Mrs. Homsey's attorney to Weymouth & Smith Insurance, Inc., Vigilant's agent for receipt of notice of claims under the Policy, Mr. and Mrs. Homsey tendered to Vigilant their claim for coverage under the Policy's "Credit cards, forgery, and counterfeiting" coverage section. By that same letter, the Homseys provided to Vigilant's agent the documentary evidence attached hereto as Exhibits A and B.

32. Vigilant did not communicate with the Homseys or their attorney regarding the tendered claim for "Credit card, forgery, and counterfeiting" coverage during January 2006.

33. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during January 2006.

34. Vigilant did not communicate with the Homseys or their attorney regarding the tendered claim for "Credit card, forgery, and counterfeiting" coverage during February 2006.

35. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during February 2006.

36. Vigilant did not communicate with the Homseys or their attorney regarding the tendered claim for "Credit card, forgery, and counterfeiting" coverage during March 2006.

37. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during March 2006.

38. Vigilant did not communicate with the Homseys or their attorney regarding the tendered claim for "Credit card, forgery, and counterfeiting" coverage during April 2006.

39. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during April 2006.

40. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during May 2006.

41. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during June 2006.

42. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during July 2006.

43. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during August 2006.

44. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during September 2006.

45. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during October 2006.

46. Vigilant made no offer of payment to Mr. and Mrs. Homsey in connection with their claim for "Credit card, forgery, and counterfeiting" coverage during November 2006.

47. By letter dated December 4, 2006 (nearly one full year after Mr. and Mrs. Homsey tendered to Vigilant their claim for coverage under the Policy's "Credit cards, forgery, and counterfeiting" coverage section) Vigilant tendered to Mr. Homsey the amount of $10,000, contending that this amount represents some "maximum payment" for "Credit cards, forgery, and counterfeiting" coverage. Vigilant has thus failed and refused to pay to Mr. and Mrs. Homsey the full value of their claim, and has instead adopted a construction of the "Credit cards, forgery, and counterfeiting" coverage section that is designed to minimize Vigilant's financial liability on the claim.

48. Vigilant's construction of the "Credit cards, forgery, and counterfeiting" coverage section is particularly unreasonable as applied to Mr. and Mrs. Homsey's claim for loss caused by forgery. That is, the Policy expressly promises coverage up to $10,000 for loss caused by "forgery or alteration of any check . . . ." The reference to "any check" means *any one check* or *any single check*. As a matter of standard English usage, it does not permit Vigilant to limit coverage to $10,000 for an aggregated group of multiple checks.

49. Vigilant's handling of Mr. and Mrs. Homsey's claim for "Credit cards, forgery, and counterfeiting" coverage has thus been wrongful in two fundamental respects: first, by virtue of the appalling delays in which Vigilant has engaged; and second, by virtue of its refusal to adopt a reasonable construction of its own Policy language.

50. Based on the facts and circumstances as alleged above, Mr. and Mrs. Homsey are entitled to coverage under the Policy's "Credit cards, forgery, and counterfeiting" coverage section, and in connection with the thefts and forgeries alleged herein.

51. Vigilant's December 4, 2006 tender of $10,000 to Mr. Homsey reflects the fact that Vigilant does not deny, or will not deny, that Mr. and Mrs. Homsey are entitled to "Credit cards, forgery, and counterfeiting" coverage under the Policy. Rather, the parties' threshold dispute relates to the dollar amount of Vigilant's coverage obligation.

## COUNT I

### Declaratory Judgment

52. Plaintiffs Coleman DuPont Homsey and Ellen Homsey repeat and incorporate by reference the allegations set forth in paragraphs 1 through 51 above.

53. The Policy's terms require Vigilant to pay Mr. and Mrs. Homsey's legal obligations for the thefts of credit cards and/or credit card numbers they have suffered, up to a total of $10,000 for each such theft.

54. The Policy's terms require Vigilant to pay Mr. and Mrs. Homsey's legal obligations for the forging of checks from their Checking Account, up to a total of $10,000 for each such check.

55. Vigilant has failed to pay (and refuses to pay) Mr. and Mrs. Homsey's legal obligations for the subject thefts and forgeries.

56. An actual controversy of a justiciable nature exists between Mr. and Mrs. Homsey (on the one hand) and Vigilant (on the other) concerning the parties' rights and obligations under the Policy. The controversy is of sufficient immediacy to justify the entry of a declaratory judgment.

9

57. An award of declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

## COUNT II

### Breach of Contract

58. Plaintiffs Coleman DuPont Homsey and Ellen Homsey repeat and incorporate by reference the allegations set forth in paragraphs 1 through 57 above.

59. Vigilant has breached the terms of the Policy by failing and refusing to pay Mr. and Mrs. Homsey's legal obligations for the thefts and forgeries alleged herein.

60. Vigilant has breached the terms of the Policy by engaging in the conduct described in paragraphs 31 through 49 above.

61. As a direct result of Vigilant's breach of contract, plaintiffs Coleman DuPont Homsey and Ellen Homsey have been deprived of the benefits of the insurance coverage for which premiums were paid under the Policy. As a further result of Vigilant's breach of contract, plaintiffs Coleman DuPont Homsey and Ellen Homsey have suffered economic loss.

## COUNT III

### Bad Faith Breach of Contract

62. Plaintiffs Coleman DuPont Homsey and Ellen Homsey repeat and incorporate by reference the allegations set forth in paragraphs 1 through 61 above.

63. By valuing Mr. and Mrs. Homsey's claim for "Credit cards, forgery and counterfeiting" coverage at just $10,000, Vigilant has necessarily construed the reference to "any check" (within the "Credit cards, forgery, and counterfeiting" coverage section) to mean "all aggregated checks." This is a willfully perverse and unreasonable construction, and contrary to the plain meaning of "any" as commonly understood by ordinary speakers of standard English

(including small children). For Vigilant to adopt such a construction as a means of avoiding its coverage obligations is willful, dishonest, and without reasonable justification.

64. Vigilant's delay in investigating and paying Mr. and Mrs. Homsey's claim for "Credit cards, forgery and counterfeiting" coverage has been egregious, extreme and without reasonable justification.

65. As a direct result of Vigilant's bad faith breach of contract, plaintiffs Coleman DuPont Homsey and Ellen Homsey have suffered and will suffer injury as heretofore alleged.

## COUNT IV

### Consumer Fraud

66. Plaintiffs Coleman DuPont Homsey and Ellen Homsey repeat and incorporate by reference the allegations set forth in paragraphs 1 through 65 above.

67. The Policy contains Vigilant's promise of good faith and fair dealing in the handling of claims thereunder.

68. By selling and issuing the Policy, Vigilant promised to handle claims thereunder in good faith, and to deal fairly with Mr. and Mrs. Homsey.

69. By selling and issuing the Policy, Vigilant promised to provide "Credit card, forgery and counterfeiting" coverage consistent with the Policy's terms.

70. By engaging in the conduct alleged in paragraphs 31 through 49 above, Vigilant has created a condition of falsity in the promises it made in the course of the Policy's sale.

71. Vigilant's conduct, as alleged above, is in violation of 6 Del. C. §2513.

72. As a direct result of Vigilant's violation of 6 Del. C. §2513, plaintiffs Coleman DuPont Homsey and Ellen Homsey have suffered and will suffer injury as heretofore alleged.

1321                                    11

WHEREFORE, plaintiffs Coleman DuPont Homsey and Ellen Homsey respectfully request that this Court enter judgment in their favor and against Vigilant Insurance Company as follows:

a. Awarding to Mr. and Mrs. Homsey compensatory damages for Vigilant's breach of contract;

b. Awarding to Mr. and Mrs. Homsey punitive damages for Vigilant's bad faith breach of contract;

c. Awarding to Mr. and Mrs. Homsey punitive damages for Vigilant's breach of the contractual duty of fair dealing;

d. Awarding to Mr. and Mrs. Homsey compensatory and punitive damages for Vigilant's violation of 6 Del. C. §2513;

e. Declaring the parties' rights, duties, status or other legal relations under the Policy;

f. Awarding to Mr. and Mrs. Homsey all costs of this action, including without limitation attorneys' fees under 18 Del. C. §4102; and

g. Awarding such other and further relief as this Court deems just and proper.

Respectfully submitted,

JOHN SHEEHAN SPADARO, LLC

John S. Spadaro, No. 3155
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

April 20, 2007

Attorney for plaintiffs Coleman DuPont Homsey and Ellen Homsey

# B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COLEMAN DUPONT HOMSEY and ELLEN HOMSEY,<br><br>Plaintiffs,<br><br>v.<br><br>VIGILANT INSURANCE COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)   C.A. No. 07-338 (JJF)<br>)<br>)<br>)   NON-ARBITRATION CASE<br>)   TRIAL BY JURY DEMANDED<br>) |

### VIGILANT INSURANCE COMPANY'S AMENDED ANSWER TO THE COMPLAINT

Defendant, Vigilant Insurance Company ("Vigilant" or "Defendant"), by and through its undersigned counsel, hereby answers the Complaint filed by Plaintiffs Coleman DuPont Homsey and Ellen Homsey ("Homsey" or "Plaintiffs") as to all Counts in the Complaint by filing this Amended Answer:

### Nature of the Action

1.    The allegations set forth in paragraph 1 of the Plaintiff's Complaint contain legal conclusions and a summary of the Plaintiff's claims and requests for relief to which the Defendants need not reply. In the event that these allegations are construed to require a response, the allegations are denied and Defendant call upon Plaintiffs to prove the same.

2.    The allegations set forth in paragraph 1 of the Plaintiff's Complaint contain legal conclusions and a summary of the Plaintiff's claims and requests for relief to which the Defendants need not reply. In the event that these allegations are construed to require a response, the allegations are denied and Defendant call upon Plaintiffs to prove the same.

**The Parties**

3.      Defendant is without knowledge or information sufficient to admit or deny the

averments of Paragraph 3 of the Complaint.

4.      Defendant admits that Masterpiece policy number 12680929-01 issued by

Vigilant Insurance Company, as amended from time to time (the "Policy"), named Coleman

Dupont Homsey as a named insured.

5.      Defendant admits that Vigilant is a corporation organized under the laws of the

State of New York, with offices located at 15 Mountain View Road, Warren, New Jersey 07061.

Defendant further admits that Vigilant Insurance Company regularly sells insurance in Delaware.

**The Insurance Contract**

6.      Defendant admits originally issuing the Policy to Coleman Dupont Homsey so as

to be effective February 5, 2004. Defendant is without knowledge or information sufficient to

admit or deny the remaining averments of Paragraph 6 of the Complaint as to whether the

Plaintiffs complied with the provisions of the Policy so as to keep it in effect at all times relevant

to this action.

7.      This Paragraph references the Policy which is a document that speaks for itself

and any factual or legal characterizations of such are denied. By way of further response,

Defendant is without knowledge or information sufficient to admit or deny whether Ellen

Homsey is a spouse and strict proof thereof is demanded.

7. (SIC)  This Paragraph references the Policy which is a document that speaks for itself

and any factual or legal characterizations of such are denied.

8.      This Paragraph references the Policy which is a document that speaks for itself

and any factual or legal characterizations of such are denied.

2

9.      This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.

10.     This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.

### The Underlying Forgeries and Thefts

11.     Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 11 of the Complaint.

12.     Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 12 of the Complaint.

**A.      Losses Caused by Forgery of Checks**

13.     Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 13 of the Complaint.

14.     Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 14 of the Complaint.

15.     Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 15 of the Complaint.

16.     Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 16 of the Complaint with respect to attached Exhibit A and Exhibit B.

**B.      Losses Caused by Forgery of Checks**

17.     Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 17 of the Complaint.

18.     Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 18 of the Complaint.

3

19.    Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 19 of the Complaint with respect to attached Exhibit C.

C.    **Losses Caused by Theft of the AT&T Card**

20.    Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 20 of the Complaint.

21.    Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 21 of the Complaint.

22.    Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 22 of the Complaint with respect to attached Exhibit D.

**Coverage Under the Policy**

23.    Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 23 of the Complaint. Defendant further states that Plaintiffs were not obligated to accept the Policy as written or worded.

24.    Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 24 of the Complaint. Defendant further states that Plaintiffs were not obligated to accept the Policy as written or worded.

25.    Defendant denies the averment in Paragraph 25 as a conclusion of law.

26.    Defendant denies the averments in Paragraph 26 as conclusions of law.

27.    Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 27 of the Complaint.

28.    This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.

4

29.     Defendant is without knowledge or information sufficient to admit or deny the averments of Paragraph 29 of the Complaint.

30.     This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.

### Vigilant's Claims Handling

31.     Defendant only admit that Weymouth & Smith received a letter from Plaintiffs' counsel dated December 29, 2005. Defendant is without knowledge or information sufficient to admit or deny the remaining averments of Paragraph 31 of the Complaint.

32.     Defendant denies the averment in Paragraph 32. Defendant communicated with the Homsey's insurance agent, as agent for the Homsey's, regarding the tendered claim in January 2006.

33.     Defendant admits the averment in Paragraph 33.

34.     Defendant denies the averment in Paragraph 34. Defendant communicated with the Homsey's attorney regarding the tendered claim in February 2006.

35.     Defendant admits the averment in Paragraph 35.

36.     Defendant admits the averment in Paragraph 36.

37.     Defendant admits the averment in Paragraph 37.

38.     Defendant denies the averment in Paragraph 38. Defendant communicated with the Homsey's attorney regarding the tendered claim in April 2006.

39.     Defendant admits the averment in Paragraph 39.

40.     Defendant admits the averment in Paragraph 40.

41.     Defendant admits the averment in Paragraph 41.

42.     Defendant admits the averment in Paragraph 42.

43.    Defendant admits the averment in Paragraph 43.

44.    Defendant admits the averment in Paragraph 44.

45.    Defendant admits the averment in Paragraph 45.

46.    Defendant admits the averment in Paragraph 46.

47.    Defendant admits that Vigilant tendered $10,000 to Homsey on December 4, 2006 in full satisfaction of the Policy claim. Defendant denies the remaining averment that Vigilant has failed to pay Homsey full value of the claim at issue and further denies any improper construction of the Policy terms. By way of further response, this Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.

48.    This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied. By way of further response, Defendant denies the averment in Paragraph 48 that Vigilant's actions in interpreting the Policy were improper or "particularly unreasonable."

49.    This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied. By way of further response, Defendant denies the averment in Paragraph 49 that Vigilant's actions in interpreting the Policy were improper or "wrongful."

50.    This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.

51.    This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.

## COUNT I

### Declaratory Judgment

52.     Defendant hereby incorporates by reference paragraphs 1 through 51 of this Amended Answer as though fully set forth herein at length.

53.     This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.

54.     This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.

55.     This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.  By way of further response, in accordance with the Policy, Vigilant has fully paid Homsey on this claim.

56.     Defendant denies the averment in Paragraph 56 that a controversy of a justiciable nature exists between the parties or that it is of sufficient immediacy to justify the entry of a declaratory judgment regarding the Policy.  Vigilant has fully paid Homsey on this claim in accordance with the Policy.

57.     Defendant denies the averment in Paragraph 57.  Vigilant has fully paid Homsey on this claim in accordance with the Policy.

## COUNT II

### Breach of Contract

58.     Defendant hereby incorporates by reference paragraphs 1 through 57 of this Amended Answer as though fully set forth herein at length.

59.     Defendant denies the averment in Paragraph 59 that Vigilant breached the terms of the Policy.  Vigilant has fully complied with the terms of the Policy.

7

60.     Defendant denies the averment in Paragraph 60 that Vigilant breached the terms of the Policy. Vigilant has fully complied with the terms of the Policy.

61.     Defendant denies the averment in Paragraph 61 that Vigilant breached the terms of the Policy. Vigilant has fully complied with the terms of the Policy.

## COUNT III

### Bad Faith Breach of Contract

62.     Defendant hereby incorporates by reference paragraphs 1 through 61 of this Amended Answer as though fully set forth herein at length.

63.     Defendant denies the averment in Paragraph 63. Vigilant has fully complied with the terms of the Policy.

64.     Defendant denies the averment in Paragraph 64. Vigilant has fully complied with the terms of the Policy.

65.     The allegations set forth in paragraph 65 of the Complaint contain legal conclusions and a summary of the Plaintiffs claims and requests for relief to which the Defendant need not reply. In the event that these allegations are construed to require a response, the allegations are denied and Defendant calls upon Plaintiffs to prove the same.

## COUNT IV

### Consumer Fraud

66.     Defendant hereby incorporates by reference paragraphs 1 through 65 of this Amended Answer as though fully set forth herein at length.

67.     This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.

8

68.     This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied. Vigilant has fully complied with the terms of the Policy.

69.     This Paragraph references the Policy which is a document that speaks for itself and any factual or legal characterizations of such are denied.

70.     Any allegation of wrongful conduct by Defendant is denied.

71.     The allegations set forth in paragraph 71 of the Complaint contain legal conclusions to which the Defendant need not reply. In the event that these allegations are construed to require a response, the allegations are denied and Defendant calls upon Plaintiffs to prove the same.

72.     The allegations set forth in paragraph 72 of the Complaint contain legal conclusions to which the Defendant need not reply. In the event that these allegations are construed to require a response, the allegations are denied and Defendant calls upon Plaintiffs to prove the same.

WHEREFORE, Defendant respectfully requests that judgment be entered in its favor and against Plaintiffs with an award of attorneys' fees and costs in defense of this matter.

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs fail to state a claim against Defendant upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the applicable statute of limitations.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs breached the agreement between the parties.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred pursuant to the equitable doctrine of accord and satisfaction.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to satisfy conditions precedent.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they have been paid in full for any claimed losses.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they have failed to join necessary parties to fully adjudicate this matter.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they failed to provide timely notice regarding their alleged losses as required under the Policy.

WHEREFORE, Defendant respectfully requests that judgment be entered in its favor and against Plaintiffs with an award of attorneys' fees and costs in defense of this matter.

Dated: August 10, 2007

EDWARDS ANGELL PALMER & DODGE LLP

By: _Denise S. Kraft_

Denise Seastone Kraft (No. 2778)
919 North Market Street
Suite 1500
Wilmington, DE 19801
(302) 425-7106
(888) 325-9741 Fax
dkraft@eapdlaw.com

Of Counsel:

Mark Seiger, Esq.
Edwards Angell Palmer & Dodge LLP
90 State House Square
Hartford, CT  06103-3702
(860) 541-7745
(888) 325-9099 Fax

11

## CERTIFICATE OF SERVICE

I, Denise Seastone Kraft, do hereby certify that on this 10th day of August, 2007, a copy of the foregoing **Vigilant Insurance Company's Amended Answer To The Complaint** was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

John Sheehan Spadaro, Esq.
John Sheehan Spadaro, LLC
724 Yorklyn Road
Suite 375
Hockessin, DE 19707
Phone: (302) 235-7745
Fax:    (302) 235-2536

Denise Seastone Kraft (No. 2778)