IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COLEMAN DUPONT HOMSEY and )
ELLEN HOMSEY, )
 )
          Plaintiffs, )
 )    C.A. No. 07-338JJF
 )
v. )
 )
VIGILANT INSURANCE COMPANY, )
 )
          Defendant. )

## HOMSEY PLAINTIFFS' CONSOLIDATED REPLY AND ANSWERING BRIEF ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT ON THE NUMBER OF LOSSES AND THEFTS

John S. Spadaro, No. 3155
John Sheehan Spadaro, LLC
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

January 14, 2008

Attorney for plaintiffs Coleman
DuPont Homsey and Ellen Homsey

1696

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 7

I. THE "CREDIT CARDS" CLAUSE HAS A PLAIN AND
UNMISTAKABLE MEANING ................................................................................ 7

II. VIGILANT HAS REWRITTEN THE RECORD TO MASK
ITS EARLIER (RULE 11) ADMISSION ................................................................ 8

III. MULTIPLE MEANINGS MEANS AMBIGUITY ............................................... 9

IV. VIGILANT'S APPROACH TO CONTRACT CONSTRUCTION
IS TANGLED AND TORTURED ......................................................................... 11

V. FAR FROM BEING "IRRELEVANT," THE PRESENCE OR
ABSENCE OF A DEEMER CLAUSE IS DISPOSITIVE ................................... 15

    A. The Disputed Policy Language Is Not Subject to A Deemer Clause ..................... 15

    B. Vigilant's Unsupported Claim of a Deemer Clause is Transparent and Wrong ................. 16

    C. Vigilant Turns the Case Law on its Head ................................................................ 17

    i. Every Case on Which Vigilant Relies Includes a Deemer Clause ......................... 17

    ii. "Cause Theory" Derives From the Standard "Occurrence-Based" Deemer Clause ............ 20

    iii. Even if "Cause Theory" Applies, it Requires Proof of a Single,
"Uninterrupted" Cause ................................................................................................ 21

    iv. *Jones Ford* is Not Distinguishable ..................................................................... 22

CONCLUSION ........................................................................................................... 24

## TABLE OF AUTHORITIES

*Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56 (3d Cir. 1982) ...................... 17, 18, 21

*Business Interiors, Inc. v. Aetna Cas. & Sur. Co.*, 751 F.2d 361 (10th Cir. 1984) ................ 18, 19

*E.I. duPont de Nemours & Co. v. Admiral Ins. Co.*, C.A. No. 89C-AU-99,
1996 WL 190764 (Del. Super. Ct. April 9, 1996) ...................................................... 5, 18

*French v. Assurance Co. of Am.*, 448 F.3d 693 (4th Cir. 2006) .................................... 20

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993) ......................................... 20

*Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146 (Del. 1997) .................................. 1, 11

*Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*,
616 A.2d 1192 (Del. 1992) ................................................................... 3-4, 7, 10

*Scirex Corp. v. Federal Ins. Co.*, 313 F.3d 841 (3d Cir. 2002) ..................................... 17

*Shreckengast v. State Farm Fire & Cas. Co.*, C.A. No. 97 C-060015HDR,
1998 WL 731566 (Del. Super. Ct. May 18, 1998) ..................................................... 5, 18

*State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*,
343 F.3d 249 (4th Cir. 2003) .................................................................... 20

*Twin City Fire Ins. Co. v. Delaware Racing Assn.*, 840 A.2d 624 (Del. 2003) ............................ 10

*Universal Underwriters Ins. Co. v. Jones Ford, Lincoln-Mercury, Inc.*,
734 So.2d 173 (Miss. 1999) .................................................................. *passim*

*Woodward v. Farm Family Cas. Ins. Co.*, 796 A.2d 638 (Del. 2002) .................................... 10

## Other Authorities

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) ...................................... 13

# INTRODUCTION

In this bad-faith insurance coverage case the parties have cross-moved for summary judgment on the number of covered thefts and losses. By any objective measure, this is the single most important issue in the case.

But it would be wrong to think that the stakes are limited to the case at hand. This is because Vigilant seeks a radical new approach to the construction of consumer insurance contracts; an approach which, if adopted, could change the fate of countless future coverage disputes in this Court.

What we mean is this: the Delaware Supreme Court has said clearly and repeatedly that when insurance companies draft their preprinted policy forms, it is incumbent on ***them*** to make the terms clear -- clear enough, in fact, that they can be readily understood by ordinary consumers:

> The starting point is the approach to interpreting insurance contracts. They must be interpreted in a common sense manner, giving effect to all provisions so that a reasonable policyholder can understand the scope and limitation of coverage. It is the obligation of the insurer to state clearly the terms of the policy, just as it is the obligation of the issuer of securities to make the terms of the operative document understandable to a reasonable investor whose rights are affected by the document. ***
>
> ***Therefore, it is incumbent upon the dominant party to make the terms clear.*** Convoluted or confusing terms are the problem of the insurer or issuer -- not the insured or investor.

*Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1149-50 (Del. 1997) (emphasis added). But under the contract construction regime urged by Vigilant, consumers would henceforth labor under a "subtleties of meaning" standard. Thus Vigilant criticizes the Homseys for allegedly failing to "grasp th[e] subtlety of meaning" in the disputed policy language. D.I. 39 at 13. *And*

*see id.* at 11 (contending that the policy's use of "any" has "shades of meaning"), and 14 (arguing that "the sense in which 'any' means 'every' [within the disputed clause] is subtle . . . .")

Let us then state the matter directly: Delaware law does not permit the drafters of consumer insurance products to deal in "subtleties" or "shades of meaning." Nor, for that matter, does Vigilant's own insurance contract, which expressly promises to "use words in their *plain* [not subtle] English meaning." A9 (emphasis added).[1]

***

Subtlety, of course, should not be confused with contradiction, nor with confusion or omission; yet Vigilant offers great helpings of each. At page 10 of its brief, for example, Vigilant accuses us of "refashioning" the policy language -- only to adopt that supposed "refashioning" as its own just three pages later in the same brief.

Do we exaggerate? Simply consider the two passages verbatim:

| **Vigilant's brief at 10** | **Vigilant's brief at 13** |
|---|---|
| *The Policy does not, of course, promise to pay "up to $10,000 for 'loss caused by forgery . . . of any check'" as Plaintiffs have refashioned it.* | *Where the Policy once stated, "We cover a person's legal obligations (sic), up to a total of $10,000, for: . . . loss caused by forgery or alteration of any check or negotiable instrument," Plaintiffs have redrafted [it] . . . .* |

D.I. 39 at 10, 13. In other words, the policy doesn't promise up to $10,000 for loss caused by forgery of any check; it simply promises up to $10,000 for loss caused by forgery of any check. And shame on the Homseys for not grasping the difference.

***

---

[1] As before, references to the alphanumeric sequence beginning with "A_" are to the appendix that accompanied the Homseys' opening brief.

In the "clear as mud" category, Vigilant next offers this analysis:

> In a promise to pay up to a total of $10,000 for obligations, which obligations include loss caused by forgery of any checks or other negotiable instruments, the term "any" may mean that the coverage applies to every instance of forgery without exception, and it may also mean that the coverage applies to all classes of checks, i.e., cashier's checks, traveler's checks, etc.
>
> A reasonable reading of the "credit card, forgery and counterfeiting" coverage in its entirety suggests that both meanings are intended.

D.I. 39 at 11.

But the problems with this tortured passage are too many to count. For one thing, Vigilant's "$10,000 for obligations" formulation appears nowhere in the policy. Instead, the disputed clause promises coverage of up to $10,000 *for loss* -- in this case, loss caused by forgery of any check. The "obligation" reference appears in a separate and earlier grammatical clause, and only *in the singular* (not the plural). Of course, "$10,000 for obligation" makes no sense -- which is why Vigilant employs "obligations" throughout its brief, even when (mis)quoting its own policy language. *See* D.I. 39 at 5 (in purporting to reprint the subject clause verbatim, Vigilant changes "obligation" to "obligations").

Then there is the matter of multiple meanings. Again, Vigilant's latest brief suggests two meanings for the disputed clause, then states that *both are intended*. D.I. 39 at 11. But under settled Delaware law, "a contract is ambiguous . . . when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192,

1196 (Del. 1992). Multiple meanings means ambiguity as a matter of law; and ambiguity must necessarily be construed "most strongly against" the insurer. *Id.*[2]

But the ultimate failing in Vigilant's analysis is this: if you locked a hundred lay readers in a room with the disputed policy language and gave them a year to make sense of it, they would never hit upon either tortured meaning (precisely because they are tortured).

***

Then there is the matter of omission. That is, this case is not merely about loss caused by the forging of checks, but also about thefts of credit cards and credit card numbers. Nowhere does Vigilant address this issue. And why? Because it underscores the fallacy of Vigilant's interpretation even further.

Specifically, the policy promises coverage of up to $10,000 for "loss caused by theft of a credit or bank card," and "loss caused by theft of a credit card number . . . ." A33. It does not refer to *thefts* of a credit card, or to *all thefts* of a credit card, or to theft of *all* credit cards. Rather, it speaks of theft in the singular, and "a credit card." Thus, if an insured's credit card is stolen on January 15, and the thief incurs unauthorized charges, the insured suffers a loss caused by theft of a credit card. If another theft occurs on March 31, that is another loss caused by theft of a credit card -- and especially so if, as happened here, the second theft involves an altogether different card. Since the policy promises coverage of up to $10,000 for loss caused by theft of a credit card, each of the two thefts is covered up to $10,000.

***

Next comes Vigilant's discussion of case law. Confronted by the Homseys' insistence that the case turns on the presence or absence of a deemer clause, Vigilant attempts no showing

---

[2] As shown below, Vigilant has now proffered three separate and distinct meanings for the disputed policy language.

4

that the disputed clause is subject to a deemer clause -- and then, as if to prove the Homseys' point, it proceeds to rely exclusively on cases in which a deemer clause was present (and therefore dispositive). Vigilant also relies on "cause theory" cases, every one of which involves an applicable deemer clause, and each of which arose under "occurrence-based" coverage. *See Shreckengast v. State Farm Fire & Cas. Co.*, C.A. No. 97 C-060015HDR, 1998 WL 731566, slip op. at *1 (Del. Super. Ct. May 18, 1998) (Ex. A) (court notes that under policy's definition of "occurrence," a "'continuous or repeated exposure to substantially the same general harmful conditions'" constitutes a single occurrence); *E.I. duPont de Nemours & Co. v. Admiral Ins. Co.*, C.A. No. 89C-AU-99, 1996 WL 190764, slip op. at *1 (Del. Super. Ct. April 9, 1996) (Ex. B) (in determining the number of occurrences, "[t]he ***primary policy language at issue is known as the 'deemer' clause***") (emphasis added). *DuPont*'s express recognition that the deemer clause is the "primary language" on the question of "number of occurrences" should conclusively answer any debate as to which party has framed the issues correctly.

But the "Credit cards, forgery, and counterfeiting" clause is not subject to any deemer clause, and it contains no reference to the term "occurrence." Vigilant thus seeks a free lunch: it wants to borrow a favorable result from these cases, without ever having employed the policy language on which those cases turn.

***

Just as *ad hominem* is almost always a distraction, responding to it can be a waste of time. But since we stand accused, we offer this brief defense.

In our opening brief we identified a specific letter as the sole (pre-litigation) written communication from Vigilant on the subject of the Homseys' claim. That was an honest misstatement. What we meant to say (and should have said) was that the letter constitutes Vigilant's sole pre-litigation writing on the subject of *coverage* -- that is, its only pre-lawsuit

statement of a coverage determination. This is an important point, because with Vigilant now threatening to challenge the existence of coverage itself -- an issue addressed in other pending motions -- the fact that Vigilant expressly acknowledged coverage prior to the lawsuit, without reserving any right to deny or revisit coverage, is legally significant.

The suggestion that we intended to deceive, meanwhile, is belied by the very section of the opening brief on which Vigilant seized. There we criticized Vigilant for "[h]aving remained *virtually* and *almost entirely* inactive on the claim for a full year" -- language we would not have used if we were suggesting total inaction and total silence. D.I. 36 at 8 (emphasis added).

As to whether our claim of delay is meritorious, we note again the undisputed facts: Vigilant received notice of the Homseys' claim in December 2005, and announced no coverage decision until December 2006. And this for a claim that, according to Vigilant, is worth just $10,000.

## ARGUMENT

### I. THE "CREDIT CARDS" CLAUSE HAS A PLAIN AND UNMISTAKABLE MEANING

Vigilant's convolutions should not obscure what the policy actually says. And what it says is simple and direct: first, the policy insures up to $10,000 for any forged check. Second, it insures up to $10,000 for theft of a credit card or credit card number. These are the promises we seek to enforce.

Neither formulation is difficult for consumers to understand. Indeed, the same grammatical and syntactical structure can be used to craft other readily understandable promises, like *I'll give you up to $10,000 for any used car you bring to me*, or *I'll give you $5 for any item in your pocket*. In each case, the amount offered has reference to a single object, and not an aggregated group of objects -- notwithstanding that the dollar amount is capped for each single object.

This, again, is what the policy actually says. But it is worth noting, too, what the policy does *not* say. First and foremost, it does not refer to "all loss," "all thefts," "all checks," or "all credit cards" -- language that would change the meaning dramatically. Nor does it refer to "any type of check." If these (very different) meanings were intended, Vigilant should have said so; and being the sole drafter, it could have said so. But neither Vigilant's unilateral intent, nor its risible views on "subtleties of meaning," can properly overcome the policy's actual terms. *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.")

## II. VIGILANT HAS REWRITTEN THE RECORD
## TO MASK ITS EARLIER (RULE 11) ADMISSION

As Vigilant lurches from one contradiction to the next, it becomes increasingly important to trace its steps. Thus we begin with Vigilant's earlier reply brief on its motion to dismiss. There Vigilant stated directly that

> the word "any" has several definitions and it even can mean
> "every." Therefore, it is reasonable to interpret the phrase, "[w]e
> cover a person's legal obligations (sic), up to a total of $10,000 for
> . . . loss caused by forgery or alteration of any check or negotiable
> instrument . . ." to mean *the total amount to be paid for "every"
> forged check is $10,000.*

D.I. 10 at 5 (emphasis added). Vigilant then proceeded to suggest that the same language "also reasonably can mean any type of check . . . ." *Id.*

Whoever crafted this argument was clearly not aware of its consequences under Delaware law; for to say (as Vigilant said above) that *though the Homseys' interpretation is reasonable, another interpretation is reasonable, too* is to concede this motion to the Homseys. So in its latest brief, Vigilant engaged in some revisionism. Here, then, is how Vigilant recasts its prior admission:

> Defendant did admit that the word "any," even in context, can have
> several shades of meaning. In a promise to pay up to a total of
> $10,000 for obligations, which obligations include loss caused by
> forgery of any checks or other negotiable instruments, the term
> "any" may mean that the coverage applies to every instance of
> forgery without exception, and it may also mean that the coverage
> applies to all classes of checks . . . .

D.I. 39 at 11.

To this we must respond (as the Court itself should respond), *not so fast*. Vigilant did *not* previously admit, nor even remotely contend, that the disputed language implies a cap of

8

$10,000 for "every instance of forgery without exception"; rather, it stated plainly that "***the total amount to be paid for 'every' forged check is $10,000***." D.I. 10 at 5 (emphasis added).[3]

How then, do we explain the still-evolving interpretations that Vigilant offers for its own contract language? Have the policy terms changed since Vigilant wrote its earlier brief?

Of course not. Rather, Vigilant originally figured that as a strategic matter, its best bet was to argue that while both sides can proffer reasonable constructions, their pro-insurer construction (the "any type of check" formulation) was the more reasonable of the two. Having learned from our opening brief that this approach is fatal to its litigation posture -- because under Delaware law, consumer insureds are entitled to the benefit of any reasonable construction that favors them -- Vigilant now seeks to rewrite the record (and the policy terms with it).

Vigilant's "$10,000 for obligations" formulation, meanwhile, appears nowhere in the disputed clause. It is a convoluted tangle that no ordinary consumer can reasonably be expected to glean from the policy itself. But importantly, it is ***not*** what Vigilant argued before. Rather, Vigilant flatly conceded that the disputed clause may be read to require that "***the total amount to be paid for 'every' forged check is $10,000***." D.I. 10 at 5 (emphasis added). This is an outright admission that the Homseys' interpretation is a reasonable one; and with that point agreed, the Homseys must necessarily prevail.

### III. MULTIPLE MEANINGS MEANS AMBIGUITY

As shown above, Vigilant earlier argued that its "Credit cards, forgery, and counterfeiting" clause was reasonably susceptible to two separate and competing meanings --

---

[3] Vigilant's new formulation also rewrites the clause so that the $10,000 cap applies to "obligations." The clause itself actually applies the $10,000 cap to "loss caused by forgery or alteration of any check . . . ." A33. Moreover, the term "obligations" does not appear in the clause, which actually employs the singular "obligation." Of course, a cap of "up to a total of $10,000 for ***obligation***" makes no sense -- precisely the reason why Vigilant has (improperly) rewritten the clause.

one favoring the Homseys and the other favoring Vigilant. D.I. 10 at 5-6. In its latest brief, Vigilant again advances multiple (albeit partly revised) meanings, stating candidly that "both meanings are intended." D.I. 39 at 11. Under Delaware law, this is the very definition of ambiguity. *See Twin City Fire Ins. Co. v. Delaware Racing Assn.*, 840 A.2d 624, 628 (Del. 2003) (contract term is ambiguous when it can be assigned more than one reasonable meaning); *Woodward v. Farm Family Cas. Ins. Co.*, 796 A.2d 638, 642 (Del. 2002) (same); *Rhone-Poulenc*, 616 A.2d at 1196 (same).

Vigilant cites a California case for the proposition that the term "motor vehicle" is not rendered ambiguous by virtue of the fact that both cars and trucks are motor vehicles. The obvious answer -- aside from the fact that this case is subject to Delaware law, which always treats multiple meanings as ambiguity -- is that the "motor vehicles" example does not involve multiple meanings at all. Rather, cars and trucks are examples of motor vehicles -- or, if one prefers, subsets of the larger set that is motor vehicles. The same cannot be said for the multiple alternative meanings that Vigilant posits for its "Credit cards" clause.

To illustrate the point, consider these multiple meanings just as Vigilant has framed them. *Meaning A* came from page 5 of its July 2007 reply brief, in which Vigilant conceded that the "Credit cards" clause may be reasonably read "to mean the total amount to be paid for 'every' forged check is $10,000." *Meaning B* came from the same brief, in which Vigilant argued that the clause "also reasonably can mean any type of check . . . ." *Meaning C* comes from Vigilant's latest brief, in which Vigilant argues that "the term 'any' may mean that the coverage applies to every instance of forgery without exception. . . ." D.I. 10 at 5; D.I. 39 at 11.

None of these three alternative meanings is a subcategory or subset of any other. Nor are they, by any stretch of the imagination, different ways of saying the same thing. Vigilant has thus advanced no fewer than three alternative meanings -- each of which it characterizes as

1696                                          10

reasonable as a Rule 11 matter, and one of which (*Meaning A*) favors the insured. On this record, there is really little for the Court to decide: Vigilant itself has established ambiguity, and embraced (at least in the alternative) the very construction that the Homseys advanced.

## IV. VIGILANT'S APPROACH TO CONTRACT CONSTRUCTION IS TANGLED AND TORTURED

Space does not permit an extended rebuttal of Vigilant's confused and confusing discussion of contract construction; but the following points bear emphasis:

• *The Homseys are wrong to argue that the word "any" is ambiguous.* Of course, we have made no such argument. Words are not intrinsically ambiguous; they are rendered ambiguous by context and sloppy usage. Further, it is Vigilant that has argued three alternative meanings for the disputed clause; and in that sense it is Vigilant that says that the clause is ambiguous (though for obvious reasons it refuses to say so explicitly).

• *"Any" means "every" only in a subtle shade of meaning.* The Court need not trouble itself with subtleties and shades of meaning, because Vigilant has already admitted that the disputed clause "mean[s] the total amount to be paid for 'every' forged check is $10,000." D.I. 10 at 5. Subtle or no, this is a meaning of "every" with which both sides can live -- and having admitted its reasonableness, it is a meaning that Vigilant *must* live with as a matter of law. But in any event, Delaware law requires insurers to state the terms of consumer insurance contracts clearly -- not in subtle shades of meaning, but in plain English. *Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1150 (Del. 1997) ("Convoluted or confusing terms are the problem of the insurer . . . not the insured . . . .")

• *The Homseys have read the word "total" out of the contract.* It is true enough that the $10,000 figure is a cap or total; but a total for what? On this point the policy language is clear: it promises coverage

up to a total of $10,000 for:

*** 

• loss or theft of a credit or bank card . . . ;

• loss caused by theft of a credit card number or bank card number . . .;

• loss caused by forgery or alteration of any check . . . .

A33.  The $10,000 total is thus a total for *loss* caused by specified causes -- in this case, forgery of any check or of a credit card or card number.  It is not a total for "losses," nor for "all loss," nor for "loss caused by forgery of all checks and credit cards."  Nor is it a total for "legal obligation" (a phrase that at least appears in the clause), or "legal obligations" (a phrase that appears only in Vigilant's brief).

In other words, one cannot create a true aggregate limit simply by tossing the word "total" into the policy.  Rather, the precise usage and context of the word makes all the difference.

Vigilant might have established a $10,000 aggregate limit for all forgeries and thefts of any kind.  Or it might have inserted a deemer clause, so that all related forgeries and thefts would be treated as a single loss.  But in fact it did neither.  Rather, it promised coverage up to $10,000 for forgery of any check, and for theft of a credit card or card number.  And we know at least what the former promise entails, because Vigilant's earlier brief confirmed that it can reasonably mean "the total amount to be paid for 'every' forged check is $10,000."  D.I. 10 at 5.

• *The Homseys' use of dictionary definitions is not a reliable tool for contract construction.*  Here Vigilant accuses us of "jumping" from one definition to the next to create some artificial congruence in the terms "any," "every" and "each."  To illustrate its point, Vigilant notes that while "stick" can mean "cleave" and "cleave" can mean "sever," "stick" can never mean "sever."

This, with all respect, is pure sophistry. That is, "stick" means "cleave" in the sense of *adhere*. The usage of "cleave" that means "to sever" is an entirely separate and unrelated meaning from the usage that suggests "adhering." That is why, while a husband should cleave to his wife, he should never sever her.

Vigilant's "stick and cleave" example merely shows that "cleave" is a homonym -- one of a group of words that share the same spelling and pronunciation but have different meanings. How this rebuts our (irrefutable) showing that "each" is the primary meaning of "every" is unclear.

But it was not the Homseys that introduced the term "every" into the analysis; rather, Vigilant itself argued that the term "any," *as it appears in the disputed policy clause*, means "every." D.I. 10 at 5. We merely pointed out that the primary meaning of "every" is "each." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 402 (10th ed. 1993). All three terms, meanwhile, have a consistent meaning in the context here. That is why any one of them could serve equally well in Vigilant's own formulation (taken, again, from its June 2007 reply brief):

1. The total amount to be paid for *any* forged check is $10,000.

2. The total amount to be paid for *every* forged check is $10,000.

3. The total amount to be paid for *each* forged check is $10,000.

• *The $10,000 total applies to . . . what exactly?* At page 9 of its brief, Vigilant argues that "[i]f $10,000 is a total for obligations in the plural, then $10,000 cannot also be a limit for each individual obligation." D.I. 39 at 9. But Vigilant is wrong on several levels.

First, the $10,000 figure is *not* "a total for obligations in the plural." The actual policy language requires Vigilant to "cover a covered person's legal obligation [in the *singular*], up to a total of $10,000 for . . . loss or theft of a credit or bank card . . . [or] loss caused by theft of a credit card number or bank card number . . . [or] loss caused by forgery . . . of any check . . . ."

A33.  Vigilant has thus scrambled the wording, altered the meaning, and changed the singular "obligation" to "obligations" to boot.

As an ineluctable matter of English grammar, the $10,000 total does not apply to "obligations" (a word that does not appear in the disputed clause), nor to "obligation" (the word that actually does appear).  Rather, it applies to "loss."  And what kind of loss?  For the purposes here, three kinds: loss caused by theft of a credit card, loss caused by theft of a card number, and loss caused by forgery of any check.

In short, the policy does not provide a "total of $10,000 for legal obligations," both because the $10,000 reference appears in a later grammatical clause, and because the word "obligations" is not part of the clause.  Nor does it provide for "a total of $10,000 for legal obligation [in the singular]," which would make no sense in any event.  But the final proof of Vigilant's convoluted and result-oriented approach can be found at page 14 of its brief, where Vigilant states the following:

> [E]ven if "any" did mean "each," the entire phrase would still be subject to the aggregate limit provided by the phrase "up to a total."  Rewritten to Plaintiffs' preference, the new phrase "loss caused by forgery or alteration of **each** check or negotiable instrument" would only provide that "each check" is one of the "obligations" (sic) subject to the $10,000 aggregate limit.

D.I. 39 at 14 (emphasis in original).

In other words, Vigilant says that if the policy expressly promised coverage up to a total of $10,000 for ***each forged check***, it would still pay no more than $10,000 for all aggregated checks.  The perversity of this position, and the willful blindness it displays toward standard English usage, is breathtaking.

To state the matter simply: the "total" applies to the $10,000, not to the checks.  That is why Vigilant must pay up to $10,000 for each check, but no more than $10,000 for any one

check. But "total" has no magic properties: it applies only in the context in which it is used. And having *not* been used with reference to "any check," it cannot be so deployed now.

## V. FAR FROM BEING "IRRELEVANT," THE PRESENCE OR ABSENCE OF A DEEMER CLAUSE IS DISPOSITIVE

### A. The Disputed Policy Language Is Not Subject to A Deemer Clause

As noted in our opening brief, Vigilant's "Credit cards, forgery, and counterfeiting" clause is a separate and independent grant of coverage -- to borrow from the policy itself, an "Extra Coverage" -- that, if desired, could actually stand alone as its own insurance product. Though other coverages within the policy apply to "occurrences" (as defined), the "Credit cards" clause is not occurrence-based and does not employ the term "occurrence." This makes sense: since the clause is triggered by criminal acts of deliberate misappropriation, deceit and the like, it cannot logically depend on the happening of an "accident" (the *sine qua non* of an occurrence).

This is presumably why Vigilant's policy contains two separate definitions of "occurrence." The first such definition, which applies to other coverages not at issue here, is substantially identical to the standard industry language one finds in scores of reported coverage cases. *See* A9.[4] The second definition, incorporated as part of the policy's "Delaware Personal Liability Coverage" section (of which the "Credit cards" clause is a part), expressly defines "occurrence" to include either an accident or an "offense." A28. But this latter, jerry-built definition is problematic.

The first problem was noted at length in our opening brief: the definition's deemer clause clause requires "[c]ontinuous or repeated exposure to substantially the same general conditions" -- language that makes no sense in the context of thefts and forgeries. *See* A28.

---

[4] For more on the standard definition of "occurrence," read on.

The second problem should be even more apparent: since the deemer clause is part of the definition of "occurrence" itself, it can only apply to coverages that look to the happening of an occurrence. But the "Credit cards, forgery, and counterfeiting" clause makes no use of the word "occurrence." Rather, it is a purely loss-based (not occurrence-based) coverage grant. And since the clause nowhere employs the term "occurrence," it fails to employ Vigilant's special definition of the term -- or, by extension, the deemer clause that is part of that special definition.

Through its own sloppy underwriting, then, Vigilant failed to include in the policy any deemer clause that could apply, logically or legally, to the "Credit cards" clause.

## B. Vigilant's Unsupported Claim of a Deemer Clause is Transparent and Wrong

Vigilant responds to the "deemer clause" analysis with the logic of a petulant child: *we have an applicable deemer clause*, says Vigilant, *we just don't want to use it.* More specifically, Vigilant says that "[w]hile Defendant does not agree that the deemer language in the Policy does not apply to the thefts, the deemer clause is irrelevant . . . ." A39 at 15.

It is a curious response. After all, the Homseys' opening brief argued emphatically that the presence or absence of a deemer clause is dispositive to this motion. Indeed, argument heading IV of that brief was actually titled "Courts Look to the Presence or Absence of a Deemer Clause"; while subheading C of the same argument asserted that "the Absence of a Deemer Clause is Dispositive." D.I. 36 at 14, 16. The Homseys also placed heavy reliance on the Mississippi Supreme Court's decision in *Universal Underwriters Ins. Co. v. Jones Ford, Lincoln-Mercury, Inc.*, 734 So.2d 173 (Miss. 1999) for the proposition that "multiple and separate dishonest acts" are treated as a single loss only in "those cases in which the policy language clearly and unambiguously states that multiple acts may constitute one occurrence of loss." *Jones Ford*, 734 So.2d at 177 (collecting cases). Why, then, would Vigilant punt on this issue?

Why not simply identify the supposedly applicable deemer clause, and thereby win the motion in a romp?

It requires little insight into the advocacy process to understand that if Vigilant could truly point to an applicable deemer clause, it would have rushed to do so. Having failed to identify any such clause, it has effectively conceded that no deemer applies.

### C. Vigilant Turns the Case Law on its Head

Vigilant would have the Court believe that "cause theory" is some amorphous cosmic force plucked from the ether by trial judges who are (apparently) determined to rule in favor of insurance companies regardless of the policy language.

Not so. Cause theory exists because it springs directly from the definition of "occurrence" -- a definition that, in its standard industry form, *always* includes a deemer clause. But again, the term "occurrence" does not appear in Vigilant's "Credit cards" provision, which is not subject to any deemer clause. And that makes all the difference.

### i. Every Case on Which Vigilant Relies Includes a Deemer Clause

Every single case cited by Vigilant, including its "cause theory" cases, include an applicable deemer clause. In *Scirex Corp. v. Federal Ins. Co.*, 313 F.3d 841 (3d Cir. 2002), the Third Circuit not only quoted the deemer clause in full, but quoted it with emphasis:

> *All losses* resulting from an actual or attempted fraudulent or dishonest act or series of related acts at the premises . . . whether committed by one or more persons will be deemed to be one occurrence or event.

*Scirex*, 313 F.3d at 851 (emphasis in original). Similarly, in *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56 (3d Cir. 1982) the Third Circuit noted that the operative policy language incorporated terms from an underlying Lloyd's policy, expressly providing that "[a]ll such exposure to substantially the same general conditions existing at or emanating from one premises

location shall be deemed one occurrence." *Appalachian*, 676 F.2d at 59 n.8. These deemer clauses compelled the results in those cases, just as the absence of a deemer clause compels the result here.

The same is true of Vigilant's Delaware cases. In *E.I. duPont de Nemours & Co. v. Admiral Ins. Co.*, C.A. No. 89C-AU-99, 1996 WL 190764, (Del. Super. Ct. April 9, 1996), the court expressly noted that in determining the number of occurrences, "*[t]he primary policy language at issue is known as the 'deemer' clause.*" *DuPont*, slip op. at *1 (Ex. B) (emphasis added). *See also Shreckengast v. State Farm Fire & Cas. Co.*, C.A. No. 97 C-060015HDR, 1998 WL 731566, slip op. at *1 (Del. Super. Ct. May 18, 1998) (Ex. A) (court notes that under policy's definition of "occurrence," a "'continuous or repeated exposure to substantially the same general harmful conditions'" constitutes a single occurrence.)

But Vigilant's discussion of *Business Interiors, Inc. v. Aetna Cas. & Sur. Co.*, 751 F.2d 361 (10th Cir. 1984) deserves special mention. A case of obvious importance here, *Business Interiors* involved multiple underlying acts of check forging and alteration. It was among the cases expressly cited by the Mississippi Supreme Court in *Jones Ford* as "those cases in which the policy language clearly and unambiguously states that multiple acts may constitute one occurrence of loss." *Jones Ford*, 734 So.2d at 177 (citing, *inter alia, Business Interiors*). As noted above, it was also cited prominently in the Homseys' opening brief.

How then does Vigilant deal with *Business Interiors*? Be claiming that while "the policy at issue [in *Business Interiors*] had a deemer clause, the [Tenth Circuit] did not rely on it." D.I. 39 at 16.

Let us therefore examine this proposition. Again, in *Business Interiors* the insured's employee "wrote forty checks, thirty-one of which were forgeries and nine of which were

material alterations of the original instruments." *Business Interiors*, 751 F.2d at 362. In its

opinion, the Tenth Circuit quoted the applicable deemer clause verbatim:

> As respects any one employee, dishonest or fraudulent acts of such
> employee during the policy period shall be deemed to be one
> occurrence . . . .

*Id.* at 362 (quoting policy). This deemer clause was thus drafted in precise contemplation of the

issues on appeal in *Business Interiors*. Yet according to Vigilant, the Tenth Circuit decided the

case without consulting the deemer clause -- despite its status as the controlling contract term,

and despite having quoted it verbatim in the very same opinion. Thereafter, says Vigilant, the

Mississippi Supreme Court (in *Jones Ford*) mistakenly read *Business Interiors* as a "deemer

clause" case. And how did Vigilant determine that, after taking the trouble to quote the

dispositive deemer clause verbatim, the Tenth Circuit then proceeded to ignore it? Apparently

through the exercise of clairvoyance -- since nowhere in its brief does Vigilant explain the

"quote-then-ignore" phenomenon.

But this entire line of argument is fatuous. The Tenth Circuit quoted the *Business

Interiors* deemer clause in full because it was directly on point, and controlling. The Mississippi

Supreme Court cited *Business Interiors* as a "deemer clause" case because that is what it is -- just

like every other case on which Vigilant relies.

The case law is thus simpler than Vigilant makes it. Insurers win most of these cases

because they are generally adept at including deemer clauses. Occasionally a case arises in

which no applicable deemer clause was included; and those decisions go the other way. The

Mississippi Supreme Court had no trouble discerning this trend; and by relying solely on cases

that include an applicable deemer clause, Vigilant has confirmed the trend here.

### ii. "Cause Theory" Derives From the Standard "Occurrence-Based" Deemer Clause

By invoking "cause theory," Vigilant seeks the benefit of a bargain it never struck. That is, cause theory applies only where the issue is the number of *occurrences.* It is a natural byproduct of the insurance industry's standard definition of occurrence, which includes a built-in deemer clause.

To understand this, one needs to know something of the drafting of policy forms in the American insurance market. Specifically, the Insurance Services Office (or ISO) is "a national insurance policy drafting organization." *State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, 343 F.3d 249, 255 n.9 (4th Cir. 2003). As such, "ISO develops standard policy forms and files or lodges them with each State's insurance regulators;" so that "most CGL [or comprehensive general liability] insurance written in the United States is written on these forms." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993).

In *French v. Assurance Co. of Am.*, 448 F.3d 693 (4th Cir. 2006), the Fourth Circuit recounted a brief history of the ISO's periodic revision of the CGL form. *French*, 448 F.3d at 700-01. *French* notes that an earlier 1973 form was not revised until 1986. *Id.* at 700. For the purposes here, *French*'s most important observation is that the 1986 ISO form "define[s] the term 'occurrence' as 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.'" *Id.* at 698. This formulation, or substantially similar variations of the same, is now ubiquitous in American insurance products; and it clearly formed the basis of the deemer clauses that appear in Vigilant's policy. *See* A9, A28 (both providing that "[c]ontinuous or repeated exposure to substantially the same general conditions unless excluded is considered to be one occurrence.")

Because this nearly-universal definition of "occurrence" contains a built-in deemer clause as part of the definition itself, cause theory makes sense where the issue is the number of occurrences. That is why the Third Circuit has expressly framed the rule in terms of the ***number of occurrences***:

> The general rule is that ***an occurrence*** is determined by the cause or causes of the resulting injury. *** Using this analysis, the court asks if "(t)here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage."

*Appalachian*, 676 F.2d at 61 (citation omitted; emphasis added). In other words, the standardization of the "occurrence" definition means that wherever one finds the term "occurrence" in an insurance policy, one finds a built-in deemer clause. The "cause theory" analysis applies only to occurrence-based coverages, and it is the logical byproduct of the definition of "occurrence."

But again, Vigilant's "Credit cards" coverage is not occurrence-based, but loss-based. The definition of "occurrence" has nothing to do with this case, because the term "occurrence" appears nowhere in the "Credit cards, forgery, and counterfeiting" clause. Yet it is important to remember that wherever one finds a "cause theory" case, one will also find a built-in deemer clause.

### iii. Even if "Cause Theory" Applies, it Requires Proof of a Single, "Uninterrupted" Cause

As *Appalachian* notes, cause theory applies (in occurrence-based cases) where the court finds a single "'proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.'" *Appalachian*, 676 F.2d at 61 (citation omitted). Of course, the reference to "injuries and damage" speaks to the types of events that constitute "occurrences," rather than the types of underlying acts (forgery, etc.) involved here. But even if one attempts to apply cause theory here, one must still confront the question of "uninterrupted" injury.

Vigilant, by contrast, attempts no showing that the underlying thefts and forgeries -- a string of scattered episodic events -- constitute "uninterrupted injury." In fact, those acts cannot remotely be described as "uninterrupted." Rather, they are separated in time, place and means.

Documents included in the Homseys' appendix, for example, show that on April 14, 2004, the Homseys' former daughter-in-law forged a check to herself in the amount of $3,500. A102. On August 5, 2004, she forged a $2,000 check payable to one Lisa Carter. A110. On October 8, 2004 she charged $203.33 to the Homseys' Wilmington Trust Visa card at a local Staples outlet. A194. On December 26, 2004 she charged America Online's broadband service to the Homseys' AT&T credit card. A124.

In what sense are these acts "uninterrupted"? The first act was separated from the second by four months. The second act was a "paper act" only, disconnected from any physical place; while the entire point of the third act was that it occur at a Staples store. The fourth act involved the unauthorized use of the AT&T card number, and was thus distinct from both the check forgeries and the misappropriation of the Visa card. It was neither a paper transaction, nor a "store" transaction, but occurred purely online. How then are these distinct and disconnected acts -- the forging of a check on one date, the use of a credit card at a bricks-and-mortar store on a second date, and an online computer charge on a third date -- a single "uninterrupted" event? And while we are at it, how do they constitute the kind of physical injury or damage contemplated by the "occurrence" definition (and, by extension, the "cause theory" rule)?

The plain answer is that cause theory does not apply; but if it did apply, it would require a finding of "interrupted" (and therefore multiple) losses.

### iv. *Jones Ford* is Not Distinguishable

Among the most telling passages in Vigilant's brief is the claim that *Jones Ford* is "not on point" because it "involves the definition of 'loss,' not 'occurrence.'" D.I. 39 at 18 (citing

*Universal Underwriters Ins. Co. v. Jones Ford, Lincoln-Mercury, Inc.*, 734 So.2d 173 (Miss. 1999)). In point of fact, the terms "loss" and "losses" appear no fewer than ***seven times*** in Vigilant's "Credit cards, forgery, and counterfeiting" clause, while (as we have noted before) the term "occurrence" appears not even once.

Vigilant thus has it backwards. *Jones Ford* is directly on point precisely because it does involve loss-based coverage, and not occurrence-based coverage. Rather than confusing the "Credit cards" clause for an occurrence-based coverage (which it emphatically is not), the Court should apply the contract terms that actually exist -- terms that were entirely of Vigilant's choosing. It should also follow *Jones Ford's* useful analysis, and recognize that "the cases in which courts have considered the question of whether stated policy limits and deductibles" for acts of serial dishonesty "apply to a series of acts . . . are ***those cases in which the policy language clearly and unambiguously states that multiple acts may constitute one occurrence of loss.***" *Jones Ford*, 734 So.2d at 177 (collecting cases) (emphasis added).

## CONCLUSION

For the reasons set forth above, and for the reasons set forth in the Homseys' opening brief, the Homseys respectfully request the entry of summary judgment to this effect: that Vigilant's contractual promise of "Credit cards, forgery, and counterfeiting" coverage requires it to pay up to $10,000 for each theft of a credit card or card number, and each forged check.

Respectfully submitted,

/s/ John S. Spadaro
John S. Spadaro, No. 3155
John Sheehan Spadaro, LLC
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

January 14, 2008

Attorney for plaintiffs Coleman
DuPont Homsey and Ellen Homsey

1696

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COLEMAN DUPONT HOMSEY and )
ELLEN HOMSEY, )
                                        )
                    Plaintiffs,         )
                                        )        C.A. No. 07-338JJF
v.                                      )
                                        )
VIGILANT INSURANCE COMPANY,             )
                                        )
                    Defendant.          )

## NOTICE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the

Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following:

Denise Seastone Kraft
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Wilmington, DE 19801

In addition, I certify that the document itself was served by U.S. Mail at the address

shown.

JOHN SHEEHAN SPADARO, LLC
/s/ John S. Spadaro
John S. Spadaro, No. 3155
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

Attorney for Coleman DuPont
Homsey and Ellen Homsey

January 14, 2008

# EXHIBIT A

**\*731566**    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

Craig A. SHRECKENGAST and
Christine Shreckengast, Plaintiffs,
v.
STATE FARM FIRE & CASUALTY
COMPANY, Defendant.

No. 97C-06-015 HDR.
May 18, 1998.

Upon Defendant's Motion for Summary Judgment Granted.

Susan L. Parker, Esq. and Kathleen M. Miller, Esq. of Smith, Katzenstein & Furlow, Wilmington, for Plaintiffs.

Robert K. Pearce, Esq. and Edward F. Kafader, Esq. of Trzuskowski, Kipp, Kelleher & Pearce, Wilmington, for Defendant.

ORDER

RIDGELY, President J.

**\*\*1**    This 18th day of May, 1998, upon consideration of the defendant's motion for summary judgment, counsels' briefs and the record in this case, it appears that:

(1) Plaintiffs Craig and Christine Shreckengast ("the Shreckengasts") seek a defense and indemnification (FN1) for two actions against them from their insurer, State Farm. At issue is a dispute over the interpretation of two policies, the Apartment Policy and the Homeowner's Policy. State Farm summarily denied coverage and has now moved for summary judgment regarding its lack of obligation to compensate for damages resulting from an accident.

(2) Central to the case at bar are two general liability policies which the Shreckengasts maintained with State Farm. The Apartment policy provided coverage for an apartment building which the Shreckengasts owned and solely used as rental property. At no time did the Shreckengasts reside there. The Apartment policy was effective from February 4, 1992 until February 4, 1994; however, the policy was prematurely terminated when the Shreckengasts sold the apartment building to Mr. & Mrs. Ellingsworth ("the Ellingsworths") on January 25, 1994.    The Homeowner's policy provided coverage for their residence from June 1, 1994 until June 1, 1995.

The incident that triggered this action occurred on or about June 27, 1994.    (FN2) A tree that was located, at least in part, on the property of the apartment building, fell during a wind storm and caused substantial damage to the adjacent property. This accident allegedly caused personal injuries and property damage to the business of Mr. and Mrs. Kesterson ("the Kestersons").

(3) As a result of the accident, two tort actions commenced against the Shreckengasts.    First, Harford Mutual Insurance Co. ("Harford"), as subrogee of the Ellingsworths ("the Harford action"), claimed that the Shreckengasts breached their duty of care since they should have been aware of the dangerous condition of the tree.    Second, the Kestersons personally sought to recover for personal injuries, medical expenses, lost income, and punitive damages ("the Kesterson action").    Consequently, the Shreckengasts sought a defense and indemnification from State Farm in both actions pursuant to the Apartment policy and the Homeowner's policy.    However, State Farm denied coverage claiming that the damage occurred outside the effective dates of the Apartment policy, and that the Homeowner's policy specifically excluded coverage of injuries arising from business pursuits.

(4) In its motion for summary judgment, State Farm argues that it properly denied coverage to the Shreckengasts because the policies were unenforceable.    First, State Farm argues that the "occurrence" which could have triggered the Apartment policy's application arose after the policy was terminated.    According to the policy, coverage provided for an "occurrence which takes place during the policy period."    (FN3) An "occurrence" is an "accident, including continuous or repeated exposure to substantially the same general harmful conditions which result in bodily injury or property damage."    (FN4) State Farm argues that since the property damage or "destruction of tangible property" occurred after the Apartment policy expired, State Farm is not required to pay for the damages.

**\*\*2**    Next, State Farm contends that the Homeowner's Policy is inapplicable.    While effective at the time of the accident, the Homeowner's policy did not provide coverage for the apartment building

© 2007 Thomson/West. No claim to original U.S. Govt. works.

because the Shreckengasts never resided in it. State Farm further argues that even if the policy provided liability insurance for the apartment building, this damage would be excluded because the policy did not provide coverage for accidents arising out of a business pursuit and did not trigger any exceptions to that exclusion.

(5) The Shreckengasts answer that they are entitled to coverage as provided by both policies. (FN5) With regard to the Apartment Policy, the Shreckengasts argue that the policy was in effect at the time of the "occurrence" since the "occurrence" was a continuous, uninterrupted pattern of the deterioration of the tree which, ultimately, resulted in the injury when it fell. Therefore, since the "occurrence" or deterioration took place during the policy period, the insurer must defend their claim. The Shreckengasts also argue that while the Homeowner's Policy possesses a business exclusion to the coverage, the nature of the accident permits reliance upon the exception to that exclusion. Accordingly, the exception states that the business exclusion does not apply to activities which are ordinarily incident to non-business pursuits. Hence, the alleged deterioration of the tree does not relate to the renting of the properties and, therefore, invokes the exception which permits coverage.

(6) Summary judgment is appropriate if, after viewing the record in the light most favorable to the non-moving party, the court finds no genuine issue of material fact. (FN6) However, if from the evidence produced, there is a reasonable indication that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law, summary judgment will not be granted. (FN7) When the facts permit a reasonable person to draw but one inference, the question becomes one for decision on summary judgment. (FN8) If an examination of the record reveals no genuine issue as to material facts, it is incumbent upon the court to grant summary judgment. (FN9) If the basic facts are not in dispute and point to only one justifiable conclusion, summary judgment is appropriate. (FN10)

(7) The arguments pertaining to each policy will be addressed in turn. Regarding the Apartment Policy, the issue turns on whether the triggering "occurrence" is the deterioration of the tree's roots or the falling of the tree. In Delaware, an "occurrence," with regard to an insurance policy, is determined by the cause or causes of the resulting injury. The accepted test is whether there is one proximate, uninterrupted, and

continuing cause which resulted in the damage. (FN11) In applying this "cause" analysis, this Court has held that where a single event, process or condition results in injuries, it will be deemed a single "occurrence" even though the injuries may be widespread in both time and place and may affect a multitude of individuals. (FN12)

**3 In *DuPont,* the Court determined an "occurrence" within the context of industrial pollution. In that case, the pollutants were produced at one location and dumped at another where the property damage took place. The Court held that "in determining the number of occurrences, the proper focus in a products liability case is on production and dispersal, not on the location of injury or the specific means by which injury occurred." (FN13) Applying *DuPont's* rationale, the Shreckengasts argue that this Court should focus on the "cause" (i.e. rotting of the roots) to determine the "occurrence," not on the specific injury (i.e. the falling of the tree).

However, a product liability suit is sufficiently distinguishable from the case at bar. Even in *DuPont,* the Court differentiated causation in a product liability suit from that of other suits. For example, in a multiple car accident the "occurrence" is a distinct, discrete act. Similarly, in this instance, this Court finds that the distinct, discrete act is the falling of the tree that resulted in the compensatory damage.

(8) Since the "occurrence" is the falling of the tree, this Court must next address whether an insured may still recover after the policy has expired. Generally, an insured may not recover after the policy has expired. (FN14) Accordingly, the "occurrence" is not the time of the negligent act, but the time when the complaining party actually suffered damage. (FN15) "Therefore the important time factor, in determining insurance coverage where the basis of the claim is negligence, is the time when the damage has been suffered." (FN16) However, circumstances do arise when a complainant may recover after the expiration of the policy. This occurs when there is a delay between an injury and the damage. For example, if a claimant was exposed to asbestos, the triggering event would be the actual exposure to the injurious conditions, not the subsequent manifestation of the exposure. (FN17) Therefore, that claimant could employ the former policy covering the time period of the injurious conditions.

In the case *sub judice,* no such delay existed between the time when the tree fell and the resulting property and personal damage. Therefore, the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 731566, Shreckengast v. State Farm Fire & Cas. Co., (Del.Super. 1998)                                    **Page 3**

Shreckengasts cannot recover pursuant to the Apartment Policy because the triggering "occurrence" took place after the policy terminated.

(9) This Court will next address the issue of whether the Shreckengasts may recover pursuant to the Homeowner's Policy. I find that they cannot recover because the Homeowner's Policy did not encompass the apartment building. (FN18) When terms of a policy are clear, the Court should enforce the policy as written. (FN19) This policy distinctly provides coverage only for structures in which the Shreckengasts resided, on a permanent or temporary basis. As stipulated, the plaintiffs never resided or occupied any portion of the apartment building. Therefore, the issue of whether maintaining a tree relates to a business activity is moot.

\*\*4. (10) Based upon the undisputed facts, I find as a matter of law that State Farm is not obligated to provide coverage for the accident under either policy.

NOW, THEREFORE, IT IS ORDERED that State Farm's Motion for Summary Judgment is *GRANTED.*

(FN1.) Defense clause provides the insured with litigation insurance in the event a claim is filed against the insured. Indemnification clause provides the insured with insurance coverage for the actual claim. *Hoechst v. National Union,* Del.Super., C.A. No. 89C-SE-35, 1994 WL 721618, Gebelein, J. (Apr. 8, 1994).

(FN2.) When the word "trigger" is used in insurance, it is a term of art which means the event that activates coverage under the policy. *Hoechst Celanese Corp. v. Certain Underwriters at Lloyd's London,* Del.Supr., 673 A.2d 164, 166 n. 2 (1996).

(FN3.) *See,* Apartment Policy, p. 20.

(FN4.) *Id.* at 32.

(FN5.) They also assert that they have a per se right to defense for the "Harford" and "Kesterson" actions since the insurer's duty to defend is broader than its duty to indemnify. *See, Continental Insurance Co. v. Burr,* Del.Supr., 706 A.2d 499, 501 (1998).

(FN6.) *Guy v. Judicial Nominating Comm'n,* Del.Super., 659 A.2d 777, 780 (1995); *Figgs v. Bellevue Holding Co.,* Del.Super., 652 A.2d 1084, 1087 (1994).

(FN7.) *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962), *rev'd in part and aff'd. in part,* 208 A.2d 495 (1965).

(FN8.) *Frelick v. Homeopathic Hosp. Ass'n,* Del.Super., 150 A.2d 17 (1959); *Wotten v. Kiger,* Del.Supr., 226 A.2d 238 (1967).

(FN9.) *E.K. Geyser Co. v. Blue Rock Shopping Ctr., Inc.,* Del.Super., 229 A.2d 499 (1967).

(FN10.) *489.137 Square Feet of Land v. State ex rel. Price,* Del.Supr., 259 A.2d 378 (1969).

(FN11.) *Du Pont v. Admiral Ins.,* Del.Super., C.A. No. 89C-AU-99, 1996 WL 190764 at \*3, Steele, J. (Apr. 9, 1996).

(FN12.) *Id.*

(FN13.) *Id.*

(FN14.) *Yarrington v. Maryland Casualty Co.,* N.J.Super., 138 N.J.Super. 398, 351 A.2d 353, 355 (1971).

(FN15.) *Id.*

(FN16.) *Id.*

(FN17.) *Mitchell v. Maryland Casualty Co.,* 324 Md. 44, 595 A.2d 469 (Md.1991).

(FN18.) The declaration page did not include the apartment building. Of import, the policy contains the following provisions:

p. 2: "insured location" means:

a) the residence premises;

b) the part of any other premises, other structures and grounds used by you as a residence.

p. 3: We cover:

a) the dwelling used principally as a private residence on the residence premises shown in the Declarations.

p. 4: Property not covered:

g) property regularly rented or held for rental to others by an insured.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 731566, Shreckengast v. State Farm Fire & Cas. Co., (Del.Super. 1998)                    **Page 4**

h) property rented or held for rental to others away from the residence premises.

(FN19.) *Hallowell v. State Farm Mut. Auto Ins. Co.,* Del.Supr., 443 A.2d 925, 926 (1992); *State Farm Fire and Cas. Co. v. Hackendorn,* Del.Super., 605 A.2d 3, 7 (1991); *Hudson v. State Farm Mut. Ins. Co.,* Del.Supr., 569 A.2d 1168 (1990).

© 2007 Thomson/West. No claim to original U.S. Govt. works.

# EXHIBIT B

1996 WL 190764, E.I. du Pont de Nemours & Co. v. Admiral Ins. Co., (Del.Super. 1996)    Page 1

**\*190764**    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.

E.I. DU PONT DE NEMOURS & COMPANY, a Corporation of the State of Delaware, Plaintiff,
v.
ADMIRAL INSURANCE COMPANY, et al., Defendants.

C.A. No. 89C-AU-99.
Submitted: April 20, 1995.

Decided: April 9, 1996.

Certain Defendants' Motion for Partial Summary Judgment on the Number of Occurrences.

Charles S. Crompton, Jr. and Richard L. Horwitz of Potter Anderson and Corroon, Wilmington, and Richard Allen Paul and Erin Kelly of E. I. du Pont de Nemours & Company; (Peter J. Kalis, Michael J. Lynch and Carolyn M. Branthoover of Kirkpatrick & Lockhart, Pittsburgh, Pennsylvania, of counsel), for Plaintiff E. I. du Pont de Nemours & Company.

Laurence V. Cronin of Smith, Katzenstein & Furlow, Wilmington, Defense Coordinator.

Donald L. Gouge, Jr. of Heiman, Aber & Goldlust, Wilmington (James E. Rocap, III, Stephen L. Braga and Cynthia Thomas Calvert of Miller, Cassidy, Larroca & Lewin, Washington, D.C.; Roy L. Reardon, Robert F. Cusumano of Simpson, Thacher & Bartlett, New York City, of counsel), for Certain Defendants.

OPINION

STEELE, Vice-Chancellor.

**\*\*1** Defendants Admiral Insurance Company, et. al. (FN1) ("Certain Defendants") filed a motion for partial summary judgment on the number of occurrences as defined in various insurance policies issued to E.I. duPont de Nemours and Company (" DuPont"). DuPont has filed a cross-motion for partial summary judgment on the same issue. The issue before the Court is a narrow one. The parties suggest

the Court can determine whether the property damage at the Niagara Falls Plant (the "Niagara plant") and the damage at the Necco Park Landfill ("Necco") resulted from a single occurrence or from multiple occurrences. Each party suggests the Court can then grant summary judgment and remove the issue from the triers of fact. That determination must be based upon the insurance policy language, "all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."

The significance of the number of occurrences determination relates, of course, to the extent of the insurers' liability. Each policy contains a "per occurrence" limit of liability, which provides the insurer's obligation to the insured is limited to a specified dollar amount for each separate occurrence. DuPont suggests, given the monetarily extensive damages at the various sites, grouping different sites under a single occurrence could significantly reduce DuPont's potential recovery. The Court does not focus on the parties' respective economic dilemmas posed by post contracting consequences but upon interpretation of the contracts as written. As this Opinion will attempt to explain, I find summary judgment inappropriate on the issues presented.

FACTS

The parties claim they do not contest the facts material to this issue. Environmental damage occurred at the Niagara plant and at Necco due to the migration of various industrial wastes stored at those sites. The sites are located less than two miles from each other. The Niagara plant produced the industrial wastes at both sites. They were then distributed to distinct areas for disposal.

The primary policy language at issue is known as the "deemer" clause. For the years 1967 through 1971, that clause read, "all personal injury or property damage arising out of continuous or repeated exposure to substantially the same general conditions existing at or emanating from one location or source ... shall be considered as arising out of one occurrence." The applicable policies from 1971 to 1986 read, "[an] 'occurrence' ... shall mean ... a continuous or repeated exposure to conditions .... All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence." The significance of the "deemer" clause is that a coverage cap is listed in each policy limiting the amount of

© 2007 Thomson/West. No claim to original U.S. Govt. works.

coverage the insured could receive per occurrence. Hence, since the damages at Niagara and Necco exceed the coverage limit, the insurers' liability differs significantly based upon whether that damage is due to a single occurrence or multiple occurrences.

## LEGAL STANDARD

**2  A motion for summary judgment requires the Court to examine the record to determine whether any genuine issues of material fact exist. *Burkhart v. Davies*, Del. Supr., 602 A.2d 56, 59 (1991), *cert. denied*, 504 U.S. 912 (1992). The Court will consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits when making its determination. Super. Ct. Civ. R. 56(c). After viewing the record in the light most favorable to the nonmoving party, if the Court finds no genuine issue of material fact, summary judgment is appropriate. *Hammond v. Colt Indus. Operating Corp.*, Del. Supr., 565 A.2d 558, 560 (1989). When faced with cross motions for summary judgment, no party's motion will be granted unless no issue of material fact exists or if a dispute exists regarding the inferences which may be drawn from the facts. *Empire of Am. Relocation Servs., Inc., v. Commercial Credit Co.*, Del. Supr., 551 A.2d 433, 435 (1988).

## DISCUSSION

It is not disputed the contaminants that escaped containment at Necco and created the property damage at that site were produced at Niagara. In fact, from 1932-1977, the Necco Park landfill served as an immense receptacle for waste products from the Niagara plant. *See* Plaintiff's Memorandum at 8 (agreeing with defendant's description of Necco). No party disputes the fact Necco and Niagara were situated in two distinct geographical locales. Hence, the Court must decide to what the "premises location" refers: the individual site or the original source of the chemical waste. That is, are the "general conditions" out of which the property damage arose the interaction of the chemical waste at the specific site, or the creation and disposal of the waste from the plant.

DuPont would have this Court conclude because Necco and Niagara are separate locations and it exposed different contaminants to the groundwater at each separate site, the contamination arose from two separate occurrences. Alternatively, Certain Defendants argue the irrelevance of the geographic location and point instead to the Niagara plant as the source of the contaminants, the distribution of which

ultimately resulted in the property damage. I find the position of neither party compelling.

As defendants note in their Reply Memorandum, DuPont's position distinguishing Necco Park from the Niagara plant site contrasts with DuPont's stated position regarding the Pompton Lakes area and even the various regions around the Niagara Plant. *See* Certain Defendants' Reply Memorandum at 8-13. Defendants set out in some detail numerous examples of how, at both the Pompton and Niagara plants, different types of contaminants were placed in different locations around those plants for disposal, consequently contaminating distinct areas. *Id.; see also* DuPont Opposition Memorandum at 6 (damage to the environment surrounding the Niagara Plant consists of contamination of the groundwater, certain soils, and Gill Creek). Yet, DuPont does not claim separate occurrences at Niagara or Pompton for each region of distinct contaminants, location, and damage.

**3  Generally, an occurrence is determined by the cause or causes of the resulting injury. *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982). The commonly accepted test is whether there is one proximate, uninterrupted, and continuing cause which resulted in all of the damage. *Id.; Bartholomew v. Insurance Co. of N. Am.*, 502 F. Supp. 246 (D.R.I. 1980), *aff'd sub nom. Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27 (1981); *Air Prods. & Chems. v. Hartford Acc. & Indem. Co.*, 707 F. Supp. 762, 773 (E.D. Pa. 1989). In applying this "cause" analysis, courts have held "where a single event, process or condition results in injuries, it will be deemed a single occurrence even though the injuries may be widespread in both time and place and may affect a multitude of individuals." *Transport Ins. Co. v. Lee Way Motor Freight, Inc.*, 487 F. Supp. 1325, 1330 (N.D. Tex. 1980);*see generally* C. T. Drechsler, *What Constitutes "each," "a single," "one," "any one," "any," or "an" Accident or Occurrence, Within Liability Policy Limiting Insurer's Liability to Specified Amount*, 55 A.L.R.2d 1300 (1957).

Whether the damage resulted from the disposal of cyanide residue solids east of Building 301 or of copper sludge at the southern boundary of the plant, or the burial of any such Niagara plant contaminants at Necco, the creation of those contaminants caused the damage at Niagara and the need for their subsequent disposal. *See* Certain Defendants' Exhibit 3 at III-53 - III-55. Just as at Pompton, the damage-producing contaminants emanated from the plant at Niagara. Consequently, a single plant's waste creates

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1996 WL 190764, E.I. du Pont de Nemours & Co. v. Admiral Ins. Co., (Del.Super. 1996)          Page 3

a single occurrence. Arguably, however, on the facts of this case where that waste was stored and the specifics of that waste's damage-causing migration vary. The initial cause of the environmental damage at both the Niagara plant and at Necco was the production of industrial waste by the Niagara plant followed by the disposal of that waste at those on- and off-plant locations.

DuPont criticizes defendants' arguments in which product liability cases are cited. In *Uniroyal, Inc. v. Home Ins. Co.,* 707 F. Supp. 1368 (E.D.N.Y. 1988), the court dealt with a manufacturer of Agent Orange claiming coverage for its product liability. *Id* at 1369. The court faced policy language much like the present language in determining the number of occurrences. *Id* at 1371-72. That court focused on the manufacture and deliveries by Uniroyal of the product as constituting a single occurrence rather than the various instances of actual spraying and the consequent injuries as a number of separate occurrences. *Id* at 1383. "Finding a single occurrence is especially apt in cases ... of mass deliveries of hazardous products ultimately imposing damage on large numbers of people." *Uniroyal,* 707 F.Supp. at 1384. The conclusion is clear in the case of mass disposal of hazardous products ultimately imposing damage at a large number of locations. In determining the number of occurrences, the proper focus in a products liability case is on production and dispersal -- not on the location of injury or the specific means by which injury occurred.

**\*\*4** While DuPont is critical of Certain Defendants' lack of reference to any environmental cases concerning the number of occurrences, DuPont cites *McCoy v. Draine,* Del. Super., C.A. No. 87C-AU-18A, Graves, J. (Feb. 1, 1991) (Opinion), and *Ennis v. Reed,* Del. Super., 467 C.A. 1977, Taylor, J. (April 4, 1978) (Letter Opinion) as the pertinent case law. Those cases concern auto accidents and are inapposite and unpersuasive. The issue facing those judges regarding the number of occurrences was essentially whether the liable driver was able to regain control of his vehicle between multiple accidents. *McCoy, supra; Ennis, supra.* The car accident context is substantially different from the type of injurious process created by manufacture and dispersal of products. *See Uniroyal,* 707 F. Supp. at 1386. With car accidents, the damage-causing agent is not produced at one place and distributed to a number of locations where damage then occurs. The occurrence (impact) is a distinct, discreet event. Any analogy to the industrial waste situation would be strained at best.

DuPont also makes a number of arguments which urge this Court to find against Certain Defendants due simply to their status as insurers. DuPont claims the courts in the product liability cases finding one occurrence with a number of injuries made those findings to prevent insurers from escaping coverage obligations. (FN2) Further, DuPont argues the propriety of the *contra proferentum* doctrine for ruling against the insurers.

First, in as much as *Uniroyal* and other such cases were decided based on a policy to apply insurance coverage as broadly as possible, I find it difficult to conclude they constituted attempts to allow insurers to escape their contractual obligations for some unstated perverse policy reason. The holdings as they relate to the number of occurrences based on the manufacturing source are the persuasive aspects of those cases. No court can find coverage where a policy clearly and unambiguously precludes it.

Second, the *contra proferentum* doctrine is inapplicable. Different policies contained slightly different language regarding determination of the number of occurrences, however, I do not find the language at issue ambiguous. In fact, the debate between the parties is not over the meaning of a certain term or terms, but over which location the "single premises location" language applied, i.e. what was the *cause* of the damage. Disagreement over the proper construction of a contract does not render it ambiguous. *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* Del. Supr., 616 A.2d 1192, 1196 (1992).

There is no ambiguity to construe against a drafter even if, as a matter of fact, the insurers could be considered "the drafter" under the well established meaning of the term for the purpose of a "*contra proferentum*" analysis. *E.I. duPont de Nemours and Co. v. Shell Oil Co.,* Del. Supr., 498 A.2d 1108, 1114 (1985).

**\*\*5.** The real issues here are ones of material fact and they prevent granting Certain Defendants' Motion for Partial Summary Judgment on the Number of Occurrences or granting DuPont's cross Motion for Partial Summary Judgment on the Number of Occurrences.

The Niagara Plant and the Necco Park landfill are two separate premises locations. The existing record does not clearly delineate whether damage resulted from separate, uninterrupted conditions at the landfill

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1996 WL 190764, E.I. du Pont de Nemours & Co. v. Admiral Ins. Co., (Del.Super. 1996)          **Page 4**

clearly distinguishable from the events at the plant which created the environmental wastes in the first instance. The trier of fact must determine whether there was "exposure to substantially the same general conditions existing at or emanating from one premises." A trial judge's best intentions and attempts to resolve factual issues at summary judgment in order to avoid an inefficient and time consuming trial are taken at substantial risk. *See generally Hoechst Celanese Corp., et. al., v. Certain Underwriters, et. al.,* Del. Supr., No. 329, 1994 (March 27, 1996) (Opinion). While the parties here do not dispute the material factual bases for a summary conclusion, the differing inferences they would have the Court draw preclude summary judgment. In short, the trier of fact will be called upon to determine what specific act when and where caused damages triggering the policies effected.

The parties' coordinating counsel will submit an order approved as to form including the affected parties in accordance with this opinion.

IT IS SO ORDERED.

(FN1.)  The Parties will submit and the Court will sign an agreed form of Order prepared by Coordinating Counsel which will identify the parties to these motions.

(FN2.)  DuPont cites the following cases supporting this position: *Stonewall Ins. Co. v. National Gypsum Co.,* S.D.N.Y., No. 86 Civ. 9671, Martin, J. (May 27, 1992) (Memorandum Opinion and Order); *Champion Int'l Corp. v. Continental Casualty Co.,* 546 F.2d 502 (2d Cir. 1976); *Uniroyal,* 707 F.Supp. at 1386; *Owens-Illinois, Inc. v. Aetna Casualty & Sur. Co.,* 597 F. Supp. 1515 (D.D.C. 1984).

© 2007 Thomson/West. No claim to original U.S. Govt. works.